# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALLCO RENEWABLE ENERGY LIMITED, ALLCO FINANCE LIMITED AND THOMAS MELONE,<br><br>                Plaintiffs,<br><br>v.<br><br>DEB HAALAND, in her official capacity of Secretary of the Interior, GARY FRAZER, in his official capacity of Assistant Director for Endangered Species, U.S. Fish and Wildlife Service, PAUL DOREMUS, in his official capacity of Assistant Administrator for Fisheries, NOAA Fisheries Directorate, MARTHA WILLIAMS in her official capacity of Principal Deputy Director, U.S. Fish and Wildlife Service, COLONEL JOHN A. ATILANO II in his official capacity of Commander and District Engineer, Colonel, U.S. Army Corps of Engineers, U.S. FISH AND WILDLIFE SERVICE, NOAA FISHERIES DIRECTORATE, U.S. ARMY CORPS OF ENGINEERS, BUREAU OF OCEAN ENERGY MANAGEMENT, and the U.S. DEPARTMENT OF THE INTERIOR,<br><br>                Defendants. | Case No. 1:21-cv-11171<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Allco Renewable Energy Limited, Allco Finance Limited and Thomas Melone by and through their undersigned attorney, hereby demand declaratory and injunctive relief, stating as follows in support:

1.      This case challenges the approval of the proposed Vineyard Wind Project by the Defendants.   It asks the Court to set aside those approvals as violating the National Environmental

1

Policy Act ("NEPA"), 42 U.S.C. §§4321-4370h, the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §1337(p)), section 404 of the Clean Water Act ("CWA"), 33 U.S.C. §1344, and section 101 of the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. §1371, and the Defendants' rules and regulations, and to ensure that federal review of the proposed project complies with the law.

## INTRODUCTION

2.      The Defendants' recent approval of the Vineyard Wind project confirmed what the fishing industry has been saying for years—that off-shore wind will eventually kill their industry and the livelihoods of generations of New England fisherman and women. The final Record of Decision for the Vineyard Wind 1 Offshore Wind Energy Project dated May 10, 2021, (the "ROD") concludes that the commercial fishing industry will *forever* need to abandon the entire footprint of the Vineyard Wind project as a viable fishing area. *See id*. p. 39 ("While Vineyard Wind is not authorized to prevent free access to the entire wind development area, due to the placement of the turbines it is likely that the entire 75,614 acre area will be abandoned by commercial fisheries due to difficulties with navigation.")

3.      As if that result is not shocking enough, while Florida and other States are currently or planning to review construction standards for buildings that are affected by coastal weather, the ROD simply ignores two facts:

> i.  Fact 1—No offshore wind turbine that exists today can survive a Category 3 or greater Atlantic hurricane.  Neither the ROD nor the final environmental impact statement issued on March 12, 2021 (the "FEIS") examine any safety or engineering issues with respect to the untested and unbuilt experimental Haliade-X wind turbines.  With all the government regulation that exists with respect to the

safety of virtually every product and structure in the United States, here there is none.  No engineering reports, no tests, nothing was done by the Defendants to review the structural integrity and safety of the 84 Haliade-X wind turbines, each of which is the height of the former John Hancock Tower on Clarendon Street.

    ii. Fact 2—a report done last year for the Nuclear Regulatory Commission predicted that, if it arrived today, Superstorm Sandy would arrive as a Category 4 or 5 and directly impact the area of the offshore wind turbines.  With more than 2,000 turbines forecasted for the coast, a Category 4 or 5 storm could result in an oil spill greater than that of the Exxon Valdez, which was 10 million gallons of oil.

4.    An adverse weather event of a category 3 or greater hurricane could lead to a catastrophic release of the oil and contaminants from the wind turbine generators ("WTGs"), thus causing the take of, and possibly extinction of, multiple endangered species, and destroying the fishing grounds off the coast of Rhode Island and Massachusetts for generations.  The evidence is overwhelming that climate change will result in more frequent and more intense tropical cyclones in the Atlantic Ocean.

5.    In order to provide legal cover for not taking a hard look at the safety of the wind turbines, the Solicitor of the Department of the Interior issued a legal opinion (reversing a prior opinion of the prior Solicitor) concluding that the Secretary of the Interior had the discretion to "balance" the mandated criteria in subsection 8(p)(4) of OCSLA, i.e., the Secretary had the authority to ignore some criteria, such as safety.

6.    While there are many failures of the Defendants to adhere to federal law as detailed herein, the entire house of cards on which the Defendants' approval is built has an Achilles heel— the Biological Opinion issued by the National Marine Fisheries Service dated September 11, 2020

(the "Biological Opinion").   The FEIS and all the approvals issued and to be issued by the Defendants are based upon that Biological Opinion.   The problem with the Biological Opinion is that all its conclusions are based upon an unlawful standard created by unlawful changes to regulations in 2019—changes that the Defendants appear poised to concede in other litigation were in fact unlawful.   *See, California v. Haaland*, Case No. 4:19-cv-06013-JST (N.D. Cal.), *Center for Biological Diversity v. Haaland*, 4:19-cv-05206-JST (N.D. Cal.), *Animal Legal Defense Fund v. U.S. Department of Interior*, No. 4:19-cv-06812-JST (N.D. Cal.).   The use of an unlawful standard in the Biological Opinion requires, in and of itself, that the Defendants' approvals be vacated.

## JURISDICTION AND VENUE

7.     This action arises under NEPA, 42 U.S.C. §§4321-4370h, 36 C.F.R. Part 25, the MMPA, the OCSLA and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

8.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 because the action raises a federal question. The Court has authority to issue the requested declaratory and injunctive relief pursuant to 28 U.S.C. §§2201, 2202, and 5 U.S.C. §§705, 706.

9.     This action reflects an actual, present, and justiciable controversy between Plaintiffs and the Defendants within the meaning of the Declaratory Judgment Act, 28 U.S.C. §2201.  Plaintiffs' interests will be adversely affected and irreparably injured if the Defendants continue to violate NEPA and other federal law as alleged herein, and if they affirmatively implement the decisions challenged herein. These injuries are concrete and particularized, and fairly traceable to the Defendants' challenged decisions, providing the requisite personal stake in the outcome of this controversy necessary for this Court's jurisdiction.

10.     The requested relief would redress the actual, concrete injuries to the Plaintiffs' caused by the Defendants' failure to comply with duties mandated by NEPA and its implementing regulations and federal law.

11.     The challenged agency actions are final and subject to judicial review pursuant to 5 U.S.C. §§702, 704 and 706.

12.     Plaintiffs have exhausted administrative remedies.

13.     Venue in this Court is proper pursuant to 28 U.S.C. §1391(e) because an officer of the United States is named as a Defendant in his or her official capacity and resides in this judicial district, and a substantial part of the events or omissions giving rise to this suit occurred in this district, and the proposed Vineyard Wind project would be partially located in this district.

## THE PARTIES

14.     Plaintiffs Allco Renewable Energy Limited and Allco Finance Limited (collectively, "Allco"), are the owner, operator, and developer of various solar electric generating facilities that are Qualifying Facilities ("QFs") located in Connecticut, Vermont, and Massachusetts, as well as other States.  *See,* section 3(17) of the Federal Power Act §3(17), 16 U.S.C. § 796(17).  Allco is a "qualifying small power producer" within the meaning of section 3(17) of the Federal Power Act, 16 U.S.C. §796(17)(D).

15.     The Defendants' failure to comply with duties mandated by NEPA and its implementing regulations and federal law will have a substantial adverse impact on the development of QF solar electric generation in the Northeastern United States, including Plaintiffs'.  Part of Allco's corporate mission is to combat climate change by developing sustainable and economically viable renewable energy generation in the United States, while maximizing the creation of United States jobs and minimizing the impact to the environment,

including without limitation the adverse effects that continued use of fossil-fuel generation will have on endangered species.

16.     As part of its corporate mission to combat climate change, Allco also seeks to enforce rights of a special type of renewable energy generators called Qualifying Facilities or "QFs" generally.  It engages in that part of its mission by participating in various proceedings to enforce laws that benefit United States developers of renewable energy QFs on a broad scale. *See, e.g., Winding Creek Solar LLC v. Peterman*, 932 F.3d 861 (9th Cir. 2019) (declaring California's implementation of section 210 of the Public Utility Regulatory Policies Act, Pub. L. No. 95-617, 92 Stat. 3117 ("PURPA") under its Re-MAT program invalid); *Allco Renewable Energy Ltd. v. Mass. Elec. Co.*, 208 F. Supp. 3d 390 (D. Mass. 2016) *aff'd* 875 F.3d 64 (1st Cir. 2017) (declaring Massachusetts' implementation of PURPA invalid); *Windham Solar LLC*, 156 FERC ¶ 61,042 (2016), *Windham Solar LLC,* 157 FERC ¶61,134 (2016) (declaring Connecticut's implementation of PURPA invalid).

17.     As part of its corporate mission to combat climate change, Allco also intervenes in various regulatory proceedings in order to oppose the construction of new fossil fuel based generation and infrastructure.

18.     Thomas Melone lives part-time in Edgartown, Massachusetts, on Nantucket Sound. Plaintiff Melone is concerned with the substantial adverse effects on the environment from the Defendants' failure to comply with duties mandated by NEPA and its implementing regulations and federal law particularly as it relates to the conservation of imperiled species, and with the effective implementation of the Endangered Species Act ("ESA"), 16 U.S.C. §§1531 *et seq*., the MMPA and the OCSLA.   In particular Plaintiff Melone is concerned about the adverse effect of the Vineyard Wind project will have on the Piping Plover, whose habitat includes portions of

Plaintiff Melone's property in Edgartown, and whose habitat on Melone's property would be adversely affected by discharges into the Atlantic Ocean and/or Nantucket Sound and/or Vineyard Sound, including oil and other contaminant spills from the wind turbines from a Category 3 or above Atlantic storm.  Plaintiff Melone is also concerned about the adverse effect of the Vineyard Wind project on habitat from the climate warming caused by the wind turbines themselves. Plaintiff Melone is also concerned about the adverse effect of the Vineyard Wind project will have on the North Atlantic Right Whale whose critical habitat includes Nantucket Sound. Plaintiff Melone derives, or, but for the threatened status of the Piping Plover and the endangered status of the Right Whale, would derive, recreational, scientific, conservation and aesthetic benefits from the existence of native Piping Plovers and Right Whales and their properly functioning habitat through wildlife observation, study, photography, and education within Nantucket Sound and its watersheds.   The Defendants' failure to comply with duties mandated by NEPA and its implementing regulations and federal law will result in an inadequate mitigation of harm to listed species and their designated habitats—including but not limited to, the examples listed above— that benefit Plaintiff Melone. This harms Plaintiff Melone's past, present and future enjoyment of these species and their habitats.   Requiring the Defendants to comply with duties mandated by NEPA and its implementing regulations and federal law would ensure that those listed species and Plaintiff Melone's cognizable interests in these species would not be substantially adversely affected.

19.     Plaintiff Melone has recreated on the Nantucket Sound, Vineyard Sound and the areas of the Atlantic Ocean in which the Vineyard Wind project would be located.  Plaintiff Melone has specific intentions to continue to do so on an ongoing basis.   Those activities would be adversely affected by the Vineyard Wind project.  Plaintiff Melone derives recreational, spiritual,

professional, commercial, scientific, educational, and aesthetic benefits from his use of the Nantucket Sound, Vineyard Sound and the area of the Atlantic Ocean in which the Vineyard Wind project would be located. The United States Army Corps of Engineers ("USACE") has concluded that commercial fisheries will need to abandon the Project's wind energy area due to difficulties of navigation. It is foreseeable that those navigation difficulties will equally apply to the areas proposed to be occupied by the 2,021 turbines that the FEIS concludes are cumulative impacts of the proposed action. Logically, the difficulties of navigation will also apply to non-commercial uses, such as Plaintiff Melone's. Plaintiff Melone's access to the area of the Vineyard Wind project for future enjoyment will be prevented and/or unreasonably interfered with because of navigational risks caused by the Vineyard Wind project and the balance of the 2,021 turbines that the FEIS concludes are cumulative impacts of the proposed action. Requiring the Defendants to comply with duties mandated by NEPA and its implementing regulations and federal law would ensure that Plaintiff Melone's cognizable interests in the present and future use of the Nantucket Sound, Vineyard Sound and the area of the Atlantic Ocean in which the Vineyard Wind project would be located would not be substantially adversely affected or unreasonably affected.

20.     Melone's property is also within the affected zone of the proposed discharge from the Project that is authorized by the USACE. Melone's property is adjacent to wetlands, marshlands and eel grass habitats. Melone's property includes marshlands, wetlands and nesting grounds for various species, including the Piping Plover. Plaintiff Melone derives recreational, spiritual, professional, commercial, scientific, educational, and aesthetic benefits from his use of his property on Nantucket Sound, and the wetlands, marshlands, eel grass habitats and nesting grounds. The Federal Defendants' failure to comply with duties mandated by NEPA and its implementing regulations and federal law will result in harm to wetlands, marshlands, eel grass

habitats and nesting grounds and their habitats that benefit Plaintiff Melone. This harms Plaintiff Melone's past, present and future enjoyment of these lands, species and their habitats.   Requiring the Defendants to comply with duties mandated by NEPA and its implementing regulations and federal law would ensure that those lands, species and habitats and Plaintiff Melone's cognizable interests in the same would not be substantially adversely affected.

21.     Deb Haaland is the Secretary of the Interior (the "Secretary") and is sued in her official capacity.

22.     Gary Frazer is the Assistant Director for Endangered Species, U.S. Fish and Wildlife Service, and is sued in his official capacity.

23.     Paul Doremus is the Assistant Administrator for Fisheries, NOAA Fisheries Directorate and is sued in his official capacity.

24.     Martha Williams is the Principal Deputy Director, U.S. Fish and Wildlife Service, and is sued in her official capacity.

25.     Colonel John A. Atilano II is the Commander and District Engineer, U.S. Army Corps of Engineers, New England District, and is sued in his official capacity.

26.      The U.S. Fish and Wildlife Service ("FWS") is a bureau within the Department of the Interior.  The FWS is the primary government agency dedicated to the conservation, protection, and enhancement of fish, wildlife and plants, and their habitats.

27.     NOAA Fisheries Directorate, also known as the National Marine Fisheries Service ("NMFS"), is an office of the National Oceanic and Atmospheric Administration within the Department of Commerce.  NMFS is responsible for the stewardship of the Nation's ocean resources and their habitat.  NMFS issues Incidental Harassment Authorizations ("IHA") under section 101(a)(5)(D) of the MMPA, 16 U.S.C. §1371(a)(5)(D)).

28.     The USACE is an engineer formation of the United States Army.  The USACE issues permits pursuant to section 404 of the CWA (33 U.S.C. §1344) and section 10 of the River and Harbors Act of 1899 ("RHA") (33 U.S.C. §403).

29.     The Bureau of Ocean Energy Management ("BOEM") is a bureau within the Department of the Interior.  BOEM issues approvals under section 8(p) of the OCSLA, 43 U.S.C. §1337(p).[1]

## STANDING

### A. Economic Injury and Procedural Standing

30.     Allco is a business that develops QF solar projects that rely on the right (i) of QFs under PURPA to enter into long-term commitments to sell the output of their facilities at fixed rates determined at the time of commitment, and (ii) to sell the output of their solar energy facilities under State programs designed to facilitate the development of solar energy electric generation facilities.  Plaintiff Melone is the owner of Allco.  The Federal Defendants' action will reduce Allco's opportunities and ability to develop QF solar projects because the Project is one of many projects in process of approval through which offshore wind energy producers intend to decimate U.S. onshore renewable energy producers in the Northeastern United States, including Allco.   If the Project and those foreseeable are not approved, the New England States need for renewable energy will be fulfilled by solar and other onshore renewables, including Allco's.

31.     Plaintiffs have standing to challenge the Federal Defendants' action and standing to ensure that the Federal Defendants' follow all procedural requirements in their decision-making.

32.     Plaintiffs' economic and procedural standing would be redressed by an order that requires the Federal Defendants to follow procedural requirements that make it less likely that the

---

[1] The Defendants are collectively referred to as the "Federal Defendants."

Federal Defendants' action will be finalized and ultimately upheld in legal challenges, and less likely that the Project and the balance of the 2,021 turbines that the FEIS concludes are cumulative impacts of the proposed action would be built.

**B. Informational Standing**

33.     As part of its business developing QF solar projects, Allco needs to engage in advocacy before Congress, federal agencies and State legislatures and agencies to ensure that the requirements of PURPA are implemented as required by Congress and that such entities recognize the benefits of solar energy and the detriments of off-shore wind energy and other forms of electrical generation and implement policy and programs accordingly.  Plaintiff Melone also engages in the same regulatory advocacy.

34.     Proper consultation as required by the ESA and the preparation of an environmental impact statement ("EIS") that complies with NEPA and a supplemental EIS and a proper legal and factual analysis by the Federal Defendants under the OCSLA, the CWA and the MMPA would produce key information that Plaintiffs would use to engage in their regulatory advocacy.

35.     Proper consultation as required by the ESA and the preparation of an EIS that complies with NEPA and a supplemental EIS and a proper legal and factual analysis under the OCSLA, the CWA and the MMPA would produce information from a neutral federal agency that has greater credibility and weight than any such information developed and produced by private entities.

36.     The Federal Defendants' failure to properly consult as required by the ESA and the failures to prepare an EIS that complies with NEPA and a supplemental EIS, and a proper legal and factual analysis under the OCSLA, the CWA and the MMPA denies Plaintiffs the key, credible, and weighty information that it would use in engaging in their regulatory advocacy.

37.     An order for the Federal Defendants to consult using the standards mandated by the ESA and requiring the preparation of an EIS that complies with NEPA and a supplemental EIS and a prepare proper legal and factual analysis under the OCSLA, the CWA and the MMPA, would redress the denial of the information by requiring the Federal Defendants to consult and prepare a supplemental EIS and to provide a proper legal and factual analysis under the OCSLA, the CWA and the MMPA, which will cause the information to be produced and available to Plaintiffs for their use in regulatory advocacy.

**C.  Species Impacts Standing.**

38.     The Plaintiffs' cognizable interests in the affected species would be harmed by the Federal Defendants' action, which would exacerbate climate change, harm habitat and reduce the population of the affected species.

39.     Electricity production currently represents a significant portion of the United States' total carbon-dioxide emissions.

40.     These emissions are a meaningful contribution to global greenhouse gas concentrations, and a significant contributor to climate change.

41.     The Federal Defendants' action would result in a significant decrease in solar energy investment that would otherwise occur, risks of catastrophic oil spills, and an increase in warming in the area of the Project, exacerbating climate change, reducing the population and habitat of the affected species, and resulting in a "take" of listed species.  An order requiring the Federal Defendants to consult using mandated standards, and requiring the preparation of an EIS that complies with NEPA and a supplemental EIS and a prepare proper legal and factual analysis by the Federal Defendants under the OCSLA, the CWA and the MMPA would make it less likely that Federal Defendants' action will be finalized and the Project approved and thereby redress the

Plaintiffs' injury.

**D.  OCSLA Standing.**

42.     The individual plaintiff's cognizable interests in the present and future use of the Nantucket Sound, Vineyard Sound (which are affected by the Project) and the area of the Atlantic Ocean in which the Vineyard Wind project would be located would be harmed by and unreasonable interfered with by the Federal Defendants' action.  The individual plaintiff's harms would be redressed by an order that requires Federal Defendants to follow the requirements of the OCSLA that prevent interference with other reasonable uses of the OCS.

**E.  MMPA Standing.**

43.     Plaintiffs have standing under 16 U.S.C. §1374(d)(6). Plaintiffs' harms would be redressed by an order that requires Federal Defendants to follow the requirements of the MMPA.

## LEGAL AND FACTUAL BACKGROUND

**I.      National Environmental Policy Act.**

44.     NEPA is our "basic national charter for the protection of the environment." 40 C.F.R. §1500.1(a). It was enacted—recognizing that "each person should enjoy a healthful environment"—to ensure that the federal government uses all practicable means to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings," and to "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences," among other policies. 42 U.S.C. § 4331(b), (c).

45.     NEPA regulations explain, in 40 C.F.R. §1500.1(c), that:

> Ultimately, of course, it is not better documents but better decisions that count. NEPA's purpose is not to generate paperwork – even excellent paperwork – but to foster excellent action. The NEPA process is intended to help public officials make decisions that are based on

understanding of environmental consequences, and take actions that
protect,    restore,    and    enhance    the    environment.

46.    NEPA achieves its purpose through "action forcing procedures. . . requir[ing] that

agencies take a hard look at environmental consequences." *Robertson v. Methow Valley Citizens*

*Council*, 490 U.S. 332, 350 (1989) (citations omitted).

47.    "Agencies shall integrate the NEPA process with other planning at the earliest

possible time to insure that planning and decisions reflect environmental values, to avoid delays

later in the process, and to head off potential conflicts." 40 C.F.R. §1501.2.

48.    Federal agencies must comply with NEPA before there are "any irreversible and

irretrievable commitments of resources which would be involved in the proposed action should it

be implemented." 42 U.S.C. §4332(C)(v); *see also* 40 C.F.R. §§1501.2, 1502.5(a).

49.    NEPA requires the Federal Defendants to consider "any adverse environmental

effects which cannot be avoided." 42 U.S.C. §4332(C)(ii).  In so doing, the Federal Defendants

must "identify and develop methods and procedures . . . which will insure that presently

unquantified environmental amenities and values may be given appropriate consideration in

decision-making along with economic and technical considerations." *Id.* §4332(B).

50.    To accomplish these purposes, NEPA requires that all federal agencies prepare a

"detailed statement" regarding all "major federal actions significantly affecting the quality of the

human environment." 42 U.S.C. § 4332(C).  This statement, known as an EIS, must, among other

things, rigorously explore and objectively evaluate all reasonable alternatives, analyze all direct,

indirect, and cumulative environmental impacts, and include a discussion of the means to mitigate

adverse environmental impacts. 40 C.F.R. §§1502.14, 1502.16.  The scope of the analysis must

include "[c]umulative actions," or actions that "when viewed with other proposed actions have

cumulatively significant impacts and should therefore be discussed in the same impact statement,"

14

and "[s]imilar actions," or actions that "when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together." 40 C.F.R. §§1508.25(a)(2), (3).

51.     Direct effects include those that "are caused by the action and occur at the same time and place." 40 C.F.R. §1508.8(a).  Indirect effects include effects that "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. §1508.8(b).  Cumulative effects are "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. §1508.7. "Effects" are synonymous with "impacts." 40 C.F.R. §1508.8.

52.     These effects include "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative" effects. 40 C.F.R. §1508.8.

53.     The cumulative impact requirement ensures that agencies consider effects that result from individually minor but collectively significant actions taking place over a period of time. 40 C.F.R. §1508.7).

54.     The Federal Defendants' analysis must do more than merely identify impacts; it must also "evaluate the severity" of effects. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989); 40 C.F.R. §1502.16(a)-(b) (recognizing that agency must explain the "significance" of effects).

55.     "NEPA is 'essentially procedural,' designed to ensure 'fully informed and well-considered decision[s]' by federal agencies." *Del. Riverkeeper Network v. FERC*, 753 F.3d at 1309-10 (quoting *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978)). The

statute serves that purpose by requiring federal agencies to take a "hard look" at "their proposed actions' environmental consequences in advance of deciding whether and how to proceed." *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 37 (D.C. Cir. 2015).  NEPA "does not dictate particular decisional outcomes, but 'merely prohibits uninformed—rather than unwise—agency action.'" *Id*. (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989)). Under NEPA regulations, agencies must consider all reasonable alternatives, *including those not specifically under their authority to implement*. *See*  https://ceq.doe.gov/nepa/regs/40/1-10.HTM. *See also NRDC v. Morton*, 458 F.2d 827 (D.C. Cir 1972).

II.     **The Endangered Species Act**.

56.     Congress passed the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq*., in 1973 to affirm our nation's commitment to the conservation of threatened and endangered species and their habitat – the forests, rangeland, prairies, rivers, and seas these species need to survive. Congress purposefully gave "conservation" a sweeping definition – the use of all methods and procedures necessary to recover threatened and endangered species so that they no longer need the Act's protections. 16 U.S.C. §1532(3). The ESA works, in part, by placing the survival and recovery of imperiled animals, fish, and plants at the forefront of every federal action and decision.

57.     The ESA requires that each federal agency initiate and complete consultation with the Department of the Interior, the U.S. Fish and Wildlife Service or the National Marine Fisheries Service ("the Services") before taking any action that may jeopardize the continued existence of endangered or threatened species, or result in the destruction or adverse modification of critical habitat.

III.     **The Marine Mammal Protection Act**.

58.     The MMPA was enacted on October 21, 1972.  All marine mammals are protected

under the MMPA. The MMPA prohibits, with certain exceptions, the "take" of marine mammals in U.S. waters and by U.S. citizens on the high seas, and the importation of marine mammals and marine mammal products into the U.S.   The primary purpose of MMPA is protection of marine animals and the MMPA was not intended to balance interests between other industries and the protected marine mammals. *Committee for Humane Legislation, Inc. v. Richardson*, 414 F. Supp. 297 (D.D.C.), *aff'd*, 540 F.2d 1141 (D.C. Cir. 1976).

**IV.     The Proposed Vineyard Wind Project.**

59.     The proposed Vineyard Wind Project ("Project") is an approximately 800-megawatt offshore wind energy facility located more than 14 miles (23.6 kilometers) southeast of Martha's Vineyard.  The purpose of the Project to provide electricity from renewable energy in New England.

60.     Additional details regarding the Project and selected alternatives are presented in the Record of Decision published on May 14, 2021, which is attached hereto as **Exhibit 1**.

61.     The FEIS was issued on March 12, 2021.

62.     The Federal Defendants' Notice of Availability of the Record of Decision was published in the Federal Register, Volume 86, Number 92 (Friday, May 14, 2021), Pages 26541-26542.

63.     The permit under 16 U.S.C. §1374 was issued on May 21, 2021.

**V.     The Withdrawal And The Recission of Withdrawal Of The Vineyard Wind Construction And Operations Plan, And Failure To Prepare A Supplemental EIS.**

64.     On December 1, 2020, Vineyard Wind withdrew its construction and operations plan ("COP") from review by the Federal Defendants.   The stated reason was to allow the evaluation of the selection of wind turbines to a new much larger wind turbine, a GE Haliade-X 12 MW-13 MW turbine, from a much smaller turbine that had been proposed in the COP.  On

December 16, 2020, the BOEM published a decision in the Federal Register, Federal Register,

Vol. 85, No. 242, December 16, 2020 at 81486, terminating the review process of the COP stating:

> In December 2017, Vineyard Wind submitted to BOEM a COP for the Vineyard Wind 1 Project. On December 7, 2018, BOEM published a Draft EIS for the proposed Project. On June 12, 2020, BOEM published a Supplement to the Draft EIS in response to comments from the public and stakeholders requesting an expanded cumulative analysis and an analysis of fishing data previously unavailable to BOEM. A Final EIS was scheduled to be published in the Federal Register on December 11, 2020.  However, by way of a letter dated December 1, 2020, Vineyard Wind withdrew the COP ''from further review and decision-making by BOEM pursuant to 30 CFR 585.628'' to conduct additional technical and logistical reviews associated with the inclusion of the General Electric Haliade-X wind turbine generator into the final project design. Vineyard Wind's December 1, 2020, letter for withdrawal of its COP was made ''effectively immediately.'' Since the COP has been withdrawn from review and decision-making, there is no longer a proposal for a major federal action awaiting technical and environmental review, nor is there a decision pending before BOEM. See 42 U.S.C. 4332; 40 CFR 1500.1; 1508.1(q), (x). Thus, in light of Vineyard Wind's letter dated December 1, 2020, this notice advises the public that the preparation and completion of an EIS is no longer necessary, and the process is hereby terminated.

65.     On January 22, 2021, Vineyard Wind notified BOEM via letter that it had completed its review and had concluded that inclusion of the Haliade-X turbines did not warrant any modifications to the COP. Accordingly, Vineyard Wind informed BOEM that it was rescinding its withdrawal of its COP and asked BOEM to resume its review of the COP.

66.     "Agencies: (1) Shall prepare supplements to either draft or final environmental impact statements if: (i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. §1502.9(c)(1).

67.     After allegedly conducting an independent review of the information provided by Vineyard Wind, BOEM concluded that: (1) the Haliade-X turbines fall within the design envelope analyzed in the June 2020 SEIS; (2) Vineyard Wind's already-submitted COP contains all the

necessary information to complete the FEIS; and (3) an additional SEIS was not needed under 40 C.F.R. §1502.9.

**VI.    The Outer Continental Shelf Lands Act.**

68.    Subsection 8(p)(4) of the OCSLA authorizes the Secretary of the Interior, "in consultation with the Secretary of the Department in which the Coast Guard is operating and other relevant departments and agencies of the Federal Government" to "grant a lease, easement, or right-of-way on the outer Continental Shelf for activities …if those activities … produce or support production, transportation, or transmission of energy from sources other than oil and gas."

69.    Subsection 8(p)(4) of the OCSLA sets forth certain requirements that the Secretary "shall ensure" are met.

70. Subsection 8(p)(4) states:

> Requirements
> The Secretary shall ensure that any activity under this subsection is carried out in a manner that provides for—
> (A) safety;
> (B) protection of the environment;
> (C) prevention of waste;
> (D) conservation of the natural resources of the outer Continental Shelf;
> (E) coordination with relevant Federal agencies;
> (F) protection of national security interests of the United States;
> (G) protection of correlative rights in the outer Continental Shelf;
> (H) a fair return to the United States for any lease, easement, or right-of-way under this subsection;
> (I) prevention of interference with reasonable uses (as determined by the Secretary) of the exclusive economic zone, the high seas, and the territorial seas;
> (J) consideration of—
> (i) the location of, and any schedule relating to, a lease, easement, or right-of-way for an area of the outer Continental Shelf; and
> (ii) any other use of the sea or seabed, including use for a fishery, a sealane, a potential site of a deepwater port, or navigation;
> (K) public notice and comment on any proposal submitted for a lease, easement, or right-of-way under this subsection; and
> (L) oversight, inspection, research, monitoring, and enforcement relating to a lease, easement, or right-of-way under this subsection.

71.     The decision reached by the Secretary as to compliance with OCSLA is based upon a recent legal opinion issued by the Solicitor of the Department of the Interior, which opinion reversed a prior legal opinion of the prior Solicitor of the Department of the Interior.

72.     Specifically, the dueling opinions interpret the duties of the Secretary under subsection 8(p)(4) of the OCLSA.  The legal opinion which was used as the framework for the standard used by the ROD, "*Secretary's Duties under Subsection 8(p)(4) of the Outer Continental Shelf Lands Act When Authorizing Activities on the Outer Continental Shelf*" (M- 37067) (April 9, 2021) provides that "subsection 8(p)(4) of OCSLA and similar statutes require only that the Secretary strike a rational balance between Congress's enumerated goals, i.e., a variety of uses. In making this determination, the Secretary retains wide discretion to weigh those goals as an application of her technical expertise and policy judgment..." M-37067, p. 2.

73.     Thus, as interpreted by the Secretary, she is authorized to simply discard any of the enumerated "requirements" in subsection 8(p)(4) that she does not like.  Two such requirements that were completely discarded are those in clauses (G) and (I).

74.     Clause (G) provides that one of the "requirements" is "protection of correlative rights in the outer Continental Shelf."

75.     Clause (I) provides that one of the "requirements" is "prevention of interference with reasonable uses (as determined by the Secretary) of the exclusive economic zone, the high seas, and the territorial seas."

76.     In the ROD, the USACE concluded that the Vineyard Wind project would eliminate the current use of the wind energy area by commercial fisherman and women and that the commercial fishing industry will forever need to abandon the entire footprint of the Vineyard Wind project as a viable fishing area.  *See*, ROD p. 39 ("While Vineyard Wind is not authorized to

prevent free access to the entire wind development area, due to the placement of the turbines it is likely that the entire 75,614 acre area will be abandoned by commercial fisheries due to difficulties with navigation.")  It is foreseeable that those navigation difficulties will equally apply to the areas proposed to be occupied by the 2,021 turbines that the FEIS concludes are cumulative impacts of the proposed action.  Logically, the difficulties of navigation will also apply to non-commercial uses, such as Plaintiff Melone's.  Plaintiff Melone's access to the area of the Vineyard Wind project for future enjoyment will be prevented and/or unreasonably interfered with because of navigational risks caused by the Vineyard Wind project and the balance of the 2,021 turbines that the FEIS concludes are cumulative impacts of the proposed action.

77.     Other "requirements" that were completely or partially discarded are those in clauses (A) safety, (B) protection of the environment, and (C) prevention of waste.

78.     There are up to 84 wind turbines proposed for the Project.  Thousands of wind turbines are planned off the coast and fall under the foreseeable cumulative consequences of the proposed action.

79.     No offshore wind turbine that exists today can survive a Category 3 or greater Atlantic hurricane.  Neither the ROD nor the FEIS examine any safety or engineering issues with respect to the untested and unbuilt experimental Haliade-X wind turbines.

80.     In the draft EIS ("DEIS"), BOEM stated at 2-18:

*Severe weather and natural events:* As described above, Vineyard Wind designed the proposed Project components to withstand severe weather events. The WTGs would be designed to endure sustained wind speeds of up to 112 mph (182.2 kph) and gusts of 157 mph (252.7 kph). WTGs would also automatically shut down when wind speeds exceed 69 mph (111 kph).

81.     In Plaintiffs' comments on the DEIS, they brought to BOEM's attention that meant the WTGs would not survive a Category 3 or greater Atlantic storm.  Since the submission of

Plaintiffs' comments, BOEM deleted its reference to the WTGs' survivability and has omitted

such information in subsequent versions of the EIS for the Project and other proposed projects.

82.     An adverse weather event of a category 3 or greater hurricane, which is likely to

occur during the next thirty years, would likely lead to a release (and possibly catastrophic release)

of the WTGs' oil and contaminants, thus causing the take of, and possibly extinction of, multiple

endangered species, and destroying the fishing grounds off the coast of Rhode Island and

Massachusetts for generations.  The evidence is overwhelming that climate change will result in

more frequent and more intense tropical cyclones in the Atlantic Ocean.

83.     The ROD's decision-making framework and the new legal opinion ignore the plain

language of the statute.  That is evident from Clause (J) in which Congress stated that the

requirements in Clause (J) only need to be considered, and were not mandatory.  Congress did not

say that for the other requirements.

84. Clause (J) states:

> The Secretary shall ensure that any activity under this subsection is carried out in a
> manner that provides for ....
>
> consideration of—
> (i) the location of, and any schedule relating to, a lease, easement, or right-of-way for
> an area of the outer Continental Shelf; and
> (ii) any other use of the sea or seabed, including use for a fishery, a sealane, a potential
> site of a deepwater port, or navigation;

85.     The Secretary's postcard decision states that she authorized approval based upon a

balancing of factors but did not provide any reasoning supporting the balancing that was

undertaken.  The only portion of the Secretary's that discussed the "balancing" undertaken by the

Secretary of the Interior is wholly conclusory, lacking any analysis:

> BOEM weighed all concerns in making decisions regarding this project and
> has determined that all practicable means within its authority have been

adopted to avoid or minimize environmental and socioeconomic harm associated with the selected alternatives and the approval of the COP.

*See* ROD at p. 26-27.

Today's decision balances the orderly development of OCS renewable energy with the prevention of interference with other uses of the OCS and the protection of the human, marine, and coastal environments. A decision that balances these goals and does not hold one as controlling over all others is consistent with the duties required under subsection 8(p)(4) of OCSLA, which requires the Secretary to strike a rational balance between Congress's enumerated goals.

*See* ROD at p. 29.

**VII.   Legal Framework for the USACE's Approvals.**

86.   Section 404(a) of the CWA authorizes the Secretary of the Army, acting through the Army Corps of Engineers, to issue permits for the discharge of dredged or fill material into navigable waters "after notice and opportunity for public hearings." 33 U.S.C. §1344(a).   In making permitting decisions, the Corps must follow a set of guidelines developed by the Environmental Protection Agency ("EPA") in conjunction with the Secretary of the Army (the "404(b)(1) Guidelines" or "Guidelines"). *See id*. § 1344(b); *Bersani v. EPA*, 850 F.2d 36, 39 (2d Cir. 1988).   These Guidelines prohibit the Corps from granting a Section 404 permit "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. §230.10(a). The Corps' own regulations further require the Corps to conduct a public interest review for each proposed discharge, and prohibit the Corps from granting a permit that (1) would "not comply with [EPA's] 404(b)(1) [G]uidelines" and/or (2) that would be "contrary to the public interest." 33 C.F.R. §320.4(a)(1).

87.   Under EPA's 404(b)(1) Guidelines, an alternative to the proposed discharge is practicable if it is "available and capable of being done after taking into consideration cost, existing

technology, and logistics in light of overall project purposes." 40 C.F.R. §230.10(a)(2). Alternatives need not be in locations that are presently owned by a permit applicant so long as they are otherwise practicable and could "reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity." *Id.*; *accord Bersani*, 850 F.2d at 39.

88.     "[P]racticable alternatives include, but are not limited to: (i) Activities which do not involve a discharge of dredged or fill material into the waters of the United States or ocean waters," *see* 40 C.F.R. §230.10(a)(1)(i), such as onshore renewable energy generation.

**V.     Administrative Procedure Act and Administrative Exhaustion.**

89.     Plaintiffs submitted timely comments on the DEIS on January 21, 2019, and supplemental comments on May 24, 2019.

90.     Plaintiffs submitted timely comments on the draft supplemental EIS on June 27, 2020.

91.     Plaintiffs have satisfied any administrative exhaustion requirement.

92.      The APA provides a right to judicial review for any "person suffering legal wrong because of agency action." 5 U.S.C. §702.  Actions that are reviewable under the APA include final agency actions "for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

93.     Under the APA, a reviewing court shall "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A). A court must also compel agency action unlawfully withheld or unreasonably delayed. 5 U.S.C. § 706(1).

## COUNT I
## FAILURE TO COMPLY WITH THE OUTER CONTINENTAL SHELF LANDS ACT

94.     Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs as though fully set forth herein.

95.    Subsection 8(p)(4) of the OCLSA sets forth certain requirements that the Secretary "shall ensure" are met.

96.    In approving the COP, the Secretary failed to comply with the requirements in subsection 8(p)(4) that she ensure the construction, operation and decommissioning of the Vineyard Wind Project be carried out in a manner that provides for—

> (A) safety;
> (B) protection of the environment;
> (C) prevention of waste;
> (D) conservation of the natural resources of the outer Continental Shelf;
> …
> (F) protection of national security interests of the United States;
> (G) protection of correlative rights in the outer Continental Shelf;
> …
> (I) prevention of interference with reasonable uses (as determined by the Secretary) of the exclusive economic zone, the high seas, and the territorial seas;
> (J) consideration of—
>  …
> (ii) any other use of the sea or seabed, including use for a fishery, a sealane, a potential site of a deepwater port, or navigation;

97.    30 C.F.R. §585.621(c) requires that a COP must demonstrate that the proposed activities will not "unreasonably interfere with other uses of the OCS, including those involved with National security or defense."

98.    The USACE has concluded that other uses such as commercial fishing will be for all practical purposes excluded from the wind energy area due to difficulties with navigation.

99.    The USACE's conclusion firmly establishes that the Vineyard Wind Project would (i) interfere with reasonable uses of the OCS, which is prohibited by subsection (p)(4) and (ii) "unreasonably interfere with other uses of the OCS," which is prohibited by 30 C.F.R. §585.621(c).

100.    The Secretary's failure to adhere to the requirements of subsection 8(p)(4) of the OCSLA and 30 C.F.R. § 585.621(c) requires that the ROD and the Secretary's approval be vacated.

## COUNT II
## FAILURE TO CONSIDER OTHER USES AND ENGAGE IN BALANCING
## (VIOLATION OF THE OCSLA)

101.    Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs as though fully set forth herein.

102.    Subsection 8(p)(4) of the OCLSA sets forth certain requirements that the Secretary "shall ensure" are met.  One of those requires that the Secretary consider "any other use of the sea or seabed, including use for a fishery, a sealane, a potential site of a deepwater port, or navigation."

103.    While the Secretary claims she considered other uses, her decision to approve the COP, which the USACE has concluded will cause commercial fisheries to abandon the wind energy area, is arbitrary and capricious and not based upon substantial evidence.

104.    Under either standard advocated by the Solicitor's dueling legal opinions, the Secretary's failure to adequately explain how she balanced whatever factors she is allowed and required to balance is arbitrary and capricious, and requires her approval to be vacated.

## COUNT III
## FAILURE TO PREPARE A SUPPLEMENTAL EIS AND FAILURE TO PROVIDE FOR
## PUBLIC COMMENT ON SUCH SUPPLEMENTAL EIS
## (VIOLATION OF NEPA)

105.    Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs as though fully set forth herein.

106.    "Agencies: (1) Shall prepare supplements to either draft or final environmental impact statements if: (i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. §1502.9(c)(1).  A court reviews the agency's decision not to prepare a supplemental EIS in two parts, asking (1) whether the agency took the hard look that the new circumstances required and,

if so, (2) whether the agency's decision, based on what it learned, was arbitrary or capricious. *NRDC v. FAA*, 564 F.3d 549 (2d Cir. 2009)

107.    "Agencies … Shall prepare, circulate, and file a supplement to a statement in the same fashion (exclusive of scoping) as a draft and final statement unless alternative procedures are approved by the Council." 40 C.F.R. §1502.9(c)(4).

108.    At the 11th hour, Vineyard Wind decided to abandon the wind turbines on which all environmental review was based and switched to a much larger wind turbine, the Haliade-X turbine.

109.    After allegedly conducting an independent review of the information provided by Vineyard Wind, BOEM concluded that: (1) the Haliade-X turbines fall within the design envelope analyzed in the June 2020 SEIS; (2) Vineyard Wind's already-submitted COP contains all the necessary information to complete the FEIS; and (3) an additional SEIS was not needed under 40 C.F.R. § 1502.9.

110.    Those BOEM conclusions are plainly and clearly erroneous.  The wind turbines proposed in the COP are shown in Figure 6 of the June 3, 2020, *Vineyard Wind Project Visual Impact Assessment*, COP Vol. II, App. III-Ha.  That wind turbine has height of 194.5 meters.  The 12MW Haliade-X turbine has a height of 260 meters, which is 65.5 meters or 212 feet higher than the wind turbine previously analyzed.  The "design envelope" previously analyzed stopped at a height of the prior turbine.  As a result, the conclusion that the use of the Haliade-X wind turbine fits within the prior "design envelope" is plainly wrong.

111.    The entire visual assessment is based upon incorrect facts and is therefore invalid.

112.    Similarly, all the reports regarding mortality of migratory birds, some of which may be endangered, are likewise invalid.  The swept area of the Haliade-X is 38,000 square meters and

the rotor diameter is 220 meters.  The rotor diameter of the turbine previously analyzed was 167 meters.  Each wind turbine now reaches more than 20 stories higher and more than 170 feet wider than the previously analyzed wind turbine.

113.    The change to the Haliade-X wind turbine required the preparation of a supplemental EIS.

114.    Similarly, the USACE's conclusion that commercial fishing interests will abandon the wind energy area constitutes significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts that requires a supplemental EIS.

115.    The failure to prepare a supplemental EIS is arbitrary and capricious and a violation of NEPA. 40 C.F.R. §1502.9(c)(1).

116.    The failure to provide the Plaintiffs with the opportunity for public comment on the required supplemental EIS violates NEPA.  40 C.F.R. §1502.9(c)(4).

<u>COUNT IV</u>
**FAILURE TO TAKE A HARD LOOK AT THE SEVERITY OF DIRECT, INDIRECT,
AND CUMULATIVE IMPACTS OF GREENHOUSE GAS POLLUTION.
(VIOLATION OF NEPA)**

117.    Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs as though fully set forth herein.

118.    Climate change has been intensively studied and acknowledged at the global, national, and regional scales. Climate change is fueled by the human-caused release of greenhouse gas emissions, in particular carbon dioxide and methane.

119.    Pursuant to NEPA and NEPA's implementing regulations, BOEM and the cooperating agencies must take a hard look at the direct, indirect, and cumulative environmental

consequences of their proposed actions. 42 U.S.C. §§4332(2)(C)(i)-(v); 40 C.F.R. §§1502.14(a), 1502.16, 1508.7, 1508.8, and 1508.14.

120.    BOEM and the cooperating agencies fail to take the required hard look at the direct, indirect, and cumulative GHG emissions and the impacts of those emissions on climate change. BOEM and the cooperating agencies fail to sufficiently quantify and account for direct GHG emissions, and fail to analyze the effect of those emissions on other resource values.

121.    BOEM and the cooperating agencies also fail to analyze the cumulative environmental effects of the proposed Project and reasonably foreseeable projects.

122.    To comply with NEPA, BOEM and the cooperating agencies are required to take a hard look at the direct, indirect, and cumulative GHG emissions and the severity of the impacts of those emissions on climate change for the proposed Project.  BOEM and the cooperating agencies have never taken a comprehensive hard look at the climate impacts of the proposed Project, which NEPA requires it to do.

123.    It is reasonably foreseeable that the proposed Project could result in the inability to reduce global warming in the next 9 years as U.N. scientists have said must be done, further endangering the Earth's climate, as it nears the tipping point.

124.    Where information relevant to foreseeable adverse impacts is unavailable, agencies must nonetheless evaluate "such impacts based upon theoretical approaches or research methods generally accepted in the scientific community." 40 C.F.R. §1502.22(b)(4).

125.    Specifically, the FEIS and BOEM and the cooperating agencies fail to analyze the GHG and other impacts.

126.    The FEIS fails to analyze the cumulative and life cycle GHG impacts of offshore wind projects.  The FEIS assumes without enquiry that the ability of utilities to purchase electricity

from an offshore wind facility is desirable. The FEIS assumes, without analysis, that the offshore wind generation from the Project is renewable, sustainable, does not emit atmospheric pollutants, and does not itself add to global warming over the next decade. Such an assumption does not pass the muster of informed decision making.

127.    The FEIS assumes, without analysis, that the offshore wind generation from the Project does not displace other forms of renewable energy generation that would come online but for the Project. Such an assumption does not pass the muster of informed decision making.

128.    The FEIS assumes, without analysis, that the offshore wind generation from the Project would displace a future electric generating plant that would use natural gas as fuel. Such an assumption does not pass the muster of informed decision making.

129.    The FEIS and BOEM and the cooperating agencies also fail to consider the potential for other adverse climate effects of the Project.

130.    BOEM and the cooperating agencies' failures are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of NEPA, 42 U.S.C.§ 4332(C)(ii), its implementing regulations at 40 C.F.R. §§ 1508.7, 1508.8, 1508.25, 1508.27, and the APA at 5 U.S.C. § 706(2)(A), and their approvals must be vacated.

## COUNT V
## FAILURE TO TAKE A HARD LOOK AT THE SEVERITY OF DIRECT, INDIRECT, AND CUMULATIVE IMPACTS OF WARMING DIRECTLY CAUSED BY THE PROJECT
## (VIOLATION OF NEPA)

131.    Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs as though fully set forth herein.

132.    BOEM and the cooperating agencies have failed to take a hard look at the direct, indirect, and cumulative impacts to the climate from warming caused by the Project from its

alteration of wind flow, and fail to discuss the severity of these impacts.

133.    The FEIS fails to sufficiently quantify and account for the warming that is generated by the Project.  *See*, Harvard Wind Study explaining that wind turbines generators over the next critical ten years are worse for the climate than natural gas.[2]  "The direct climate impacts of wind power are instant, while the benefits accumulate slowly," says Keith. "If your perspective is the next 10 years, wind power actually has -- in some respects -- more climate impact than coal or gas."[3] *See*, Cell Press. "*Large-scale US wind power would cause warming that would take roughly a century to offset*." ScienceDaily, 4 October 2018.

134.    The FEIS fails to explain how the adverse effects of the Project would be offset over the next century.  The FEIS must make an informed decision, and it cannot ignore the adverse climatic impacts of the Project over the next ten or longer years.

135.    BOEM and the cooperating agencies' failures are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of NEPA, 42 U.S.C.§ 4332(C)(ii), its implementing regulations at 40 C.F.R. §§ 1508.7, 1508.8, 1508.25, 1508.27, and the APA at 5 U.S.C. § 706(2)(A), and their approvals must be vacated.

### COUNT VI
### FAILURE TO TAKE A HARD LOOK AT THE ADVERSE EFFECT ON COMMERCIAL FISHERIES AND RECREATIONAL FISHING (VIOLATION OF NEPA)

136.    Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs as though fully set forth herein.

137.    The USACE has concluded that other uses such as commercial fishing will be for

---

[2]    Miller    and    Keith,    Climatic    Impacts    of    Wind    Power,    Joule    (2018), https://doi.org/10.1016/j.joule.2018.09.009;  https://www.seas.harvard.edu/directory/dkeith.
[3] https://www.sciencedaily.com/releases/2018/10/181004112553.htm.

all practical purposes excluded from the wind energy area due to difficulties with navigation.

138.    Recreational fishing and other outer continental shelf reasonable uses will have the same difficulties with navigation. BOEM and the cooperating agencies failed to take a hard look at the direct, indirect, and cumulative impacts to commercial fisheries and recreational fishing and other reasonable uses.

139.    The Federal Defendants' failure is arbitrary and capricious and contrary to law. BOEM and the cooperating agencies' failures are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of NEPA, 42 U.S.C.§ 4332(C)(ii), its implementing regulations at 40 C.F.R. §§ 1508.7, 1508.8, 1508.25, 1508.27, and the APA at 5 U.S.C. § 706(2)(A), and their approvals must be vacated

**COUNT VII**
**FAILURE TO TAKE A HARD LOOK AT THE NO-ACTION ALTERNATIVE**
**(VIOLATION OF NEPA)**

140.    Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs as though fully set forth herein.

141.    NEPA requires all federal agencies to consider the potential environmental impacts of their actions and to identify and evaluate reasonable alternatives to proposed actions and those alternatives' environmental impacts, including taking no action.

142.    The FEIS's assumption that, compared to No Action, approving the proposed Project would have a positive impact on total greenhouse gas emissions is wrong and departs from basic economic principles and vastly overstates the Project's purported positive climate impacts.

143.    The FEIS's and BOEM's assumption that the No Action will have no net effect on onshore renewable energy generation, economic benefits or climate benefits contradicts fundamental economic principles. Significant changes in renewable energy supply will affect

renewable energy's price and, therefore, consumption and emission levels.

144.     The FEIS and BOEM fail to analyze how electricity from the Project directly competes with other renewable energy resources in electricity generation, such that increasing the supply of offshore wind results in less American renewable energy generation on-shore, particularly solar electric generation.

145.     The FEIS and BOEM also ignore how overall greenhouse gas emissions and climate impacts will vary among substitute sources of renewable energy generation. The FEIS and BOEM should have—and easily could have—evaluated the No-Action Alternative's climate effects and effects on onshore renewable energy.

> **i.     Basic Economic Principles Provide That Any Significant Change in Supply Will Change Price and Demand and, Therefore, Total Generation and Emissions.**

146.     The basic economic principles of supply and demand provide that significant changes in renewable energy supply will affect renewable energy's price and, therefore, consumption levels.  Increasing the supply of any normal good (including renewable energy) puts downward pressure on that good's market price; this is a basic tenant of the law of supply and demand. N. Gregory Mankiw, *Principles of Economics* 74–78, 80–81 (5th ed. 2008). Lower renewable energy prices can result in lower electricity costs, which in turn encourages higher levels of electricity consumption, while higher renewable energy and electricity prices discourage consumption. *See id*. at 67–68.[4]

---

[4] A court may take notice of basic economic principles of supply and demand, as well as classic economic textbooks and peer reviewed articles. *See Citizens for Alternatives to Radioactive Dumping v. U.S. Dep't of Energy*, 485 F.3d 1091, 1096 (10th Cir. 2007) ("In dealing with scientific and technical evidence, extra-record evidence 'may illuminate whether an [environmental impact statement] has neglected to mention a serious environmental consequence, failed adequately to discuss some reasonable alternative, or otherwise swept stubborn problems or serious criticism . . . under the rug.'") (Alterations in original).

147.    Approving the proposed Project increases the supply of offshore wind generated electricity, lowering demand for U.S.-based onshore renewable energy generation.

148.    Alternatively, in the No-Action Alternative, the demand for U.S.-based onshore renewable energy generation would be higher; and unlike the proposed Project's effects in the first ten or longer years, U.S-based onshore solar electric generation would reduce greenhouse gas emissions and overall climate effects.

149.    Similarly, in the No-Action Alternative, the higher demand for U.S.-based onshore renewable energy generation would result in increased economic benefits for the United States, as compared to the proposed Project's economic benefits.

150.    The Project is one of many projects in process of approval through which offshore wind energy producers intend to decimate U.S. onshore renewable energy producers and other generators in the United States, including Allco.

151.    The FEIS and BOEM fail to analyze the Project's cumulative effects with other projects that have been approved by federal agencies to provide electricity to New England, such as the various hydro-electric projects from Canada, which further decimate U.S. onshore renewable energy producers.

152.    The FEIS fails to analyze the projected massive increase in electricity supply to New England from the Project and cumulatively with other offshore WTGs.  The FEIS fails to analyze the impacts on other renewable energy forms of generation.  The failure to analyze impacts of wind and solar, with or without storage, and other forms of onshore renewable generation, such a renewable hydrogen fuel cells, as a reasonably foreseeable alternative is clear error.

153.    The failure of the FEIS to analyze the potentially devastating impacts on United States onshore renewable energy producers is clear error, arbitrary and capricious and does not

pass muster for informed decision-making.

154.    Electricity from the Project directly competes with other forms of renewable energy resources in the generation of electricity. Economists measure how coal, natural gas, and other fuels act as substitutes in the electricity market by analyzing "cross-price elasticity" (that is, how responsive producers are in swapping inputs when relative prices change). *See* Mankiw, *supra* at 99.  For example, the United States Energy Information Administration ("EIA") found that for the U.S. market, a ten-percent increase in the ratio of the price of coal to the price of natural gas leads to a 1.4-percent increase in the use of natural gas over coal. EIA, *Fuel Competition in Power Generation and Elasticities of Substitution* 1 (2012).  In other words, in that example, the cross-price elasticity of demand for natural gas is 0.14 with respect to coal's price. *Id*.  Other economists reach similar conclusions. James Ko & Carol Dahl, *Interfuel Substitution in U.S. Electricity Generation*, 33 APPLIED ECONOMICS 1833, 1835 (2001) (analyzing "average" cross-price elasticity). *See also* Nate Blair et al., *Long-Term National Impacts of State-Level Policies* (Nat'l Renewable Energy Lab. Conf. Paper 620-40105, June 2006) (discussing how "higher coal prices would dramatically increase" use of renewable wind energy).  These estimates represent short-run elasticities; over time, substitution effects become more pronounced as power plants make technological changes that facilitate fuel-switching, and as long-term investments favor renewable energy. *See* Mankiw, *supra* at 105–106.

155.    Changes in the relative amounts of coal, natural gas, renewable sources, and nuclear energy used to generate electricity—as well as changes in total energy demand—would, in turn, change total greenhouse gases emissions.  In short, the FEIS' unexamined and unsupported implicit assumption that the No-Action Alternative would have no effect on onshore solar energy is contradicted by fundamental economics and market analyses. The FEIS fails to meet NEPA's

requirements, and should be revised and the Federal Defendants' approvals vacated.

156.    If the Project is not approved, utilities in the Northeastern US will acquire other renewable energy production to satisfy their respective renewable energy goals and standards, and therefore, lower greenhouse gas emissions.  In the No-Action Alternative, any renewable energy substituting for the Project may provide a more positive impact on emissions and climate change. Yet, the FEIS does not analyze this environmental impact in its alternatives' analysis.

     **ii.**    **Federal Agencies, Including Interior—During Previous NEPA Reviews— Properly Analyzed The Supply And Demand Of Resources And Resulting Climate Effects And Effect On Resource Values.**

157.    In NEPA reviews for over the past 35 years, the Department of the Interior (the "Interior") has consistently understood that a decision not to take action related to energy production will affect that energy resource's supply and price and thus trigger other actions.  The Interior has further analyzed how such triggered actions generate different consequences for air pollution, climate change, and overall environmental quality. The U.S. Court of Appeals for the D.C. Circuit has praised the Interior's analysis of these substitution effects. As far back as 1979, the Interior has assessed the different environmental effects of energy substitutes under a No-Action Alternative—including different levels of carbon dioxide emissions.

158.    Other agencies, such as the Surface Transportation Board, the United States Forest Service ("USFS"), the State Department, the Office of Surface Mining Reclamation and Enforcement (another Interior sub-agency), the Federal Energy Regulatory Commission ("FERC"), and the Nuclear Regulatory Commission, have also properly analyzed the effects of their energy management decisions in NEPA reviews, consistent with the advice of the U.S. Court of Appeals for the Eighth Circuit and the U.S. District Courts of Colorado and Minnesota.  The FEIS's mistaken assumption that taking no action on the Project, compared to approving it, yields

no net effects on greenhouse gas emissions, fisheries, endangered species, marine mammals and other resource values represents a substantial break with a 35-year-plus history of proper analysis by the Interior and its sister agencies, and is inconsistent with the Interior's actions in other reviews.

### iii.   Federal Agencies (Including Interior) Analyzed The Connections Between Supply, Price, Substitutes, Conservation, And Emissions.

159.    Before the 1982 creation of a sub-agency within the Interior responsible for offshore resources, the Office of the Secretary of the Interior developed the federal offshore oil and gas leasing program, and the Bureau of Land Management ("BLM") prepared environmental impact statements on leasing actions (then called simply "environmental statements"). In BLM's 1979 Final Environmental Statement on a proposed lease sale off the coast of Southern California, the agency analyzed the No-Action Alternative of withdrawing the sale:

> [I]f the subject sale were cancelled, the following energy actions or sources might be used as substitutes: Energy Conservation; Conventional oil and gas supplies; Coal; Nuclear power; Oil shale; Hydroelectric power; Solar energy; Energy imports; . . . . Vigorous energy conservation is an alternative that warrants serious consideration. The Project Independence Report of the Federal Energy Administration claims that energy conservation alone can reduce energy demand growth by 0.7 to 1.2 percent depending on the world price of oil. . . . The environmental impacts of a vigorous energy conservation program will be primarily beneficial.

*Final Environmental Statement, OCS Sale No. 48, Proposed 1979 Outer Continental Shelf Oil and Gas Lease Sale Offshore Southern California*, 1508–09 (1979). *See also* BLM, *Draft Environmental Statement, Proposed Five-Year OCS Oil and Gas Lease Sale Schedule* 63 (1980) ("An alternative . . . to cease leasing . . . would result in the need to meet national energy needs through other sources, or to reduce energy consumption . . . .").

160.    Thus, as early as 1979, the Interior recognized that canceling even a single oil and gas lease would cause the market to respond by substituting not just oil and gas from other sources,

but alternative fuel types as well as increased energy conservation.  BLM further recognized that

the extent of energy conservation as a response depended on the price of the resource being

replaced.  BLM explained in 1979 to decision-makers and the public, over the course of 25 pages

of analysis, how each possible substitute for the foregone offshore leasing carried its own

environmental effects: net beneficial to the extent increased energy conservation or renewable

energy offset the lost offshore oil and gas; a more mixed or net negative effect on environmental

quality with switches to other types and sources of fossil fuels. BLM, *Final Envtl. Stmt. on Sale

No. 48*, *supra* at 1508– 1532. BLM even noted in this 1979 analysis that different energy

substitutes generated different carbon dioxide emissions: "A number of gases are associated with

geothermal systems and may pose health and pollution problems. These gases include . . . carbon

dioxide . . . . However, adverse air quality impacts are generally less than those associated with

fossil-fuel plants." *Id.* at 1525.

### iv.    BOEM Has Used Sophisticated Tools To Assess The Environmental Consequences Of Substitutes And The D.C. Circuit Has Praised Its Modeling.

161.    BOEM develops Five-Year Programs to manage the leasing of offshore (or "Outer

Continental Shelf" ("OCS")) oil and gas resources.  Its most recent past Program covered the years

2012–2017; development of that Program and the related Environmental Impact Statement first

began in 2009. *See* BOEM, *Outer Continental Shelf Oil and Gas Leasing Program: 2012–2017—

Final Programmatic Environmental Impact Statement*, 8-1 (2012).  In the decision document for

that offshore Program, BOEM explained:

> In an environment of strong worldwide demand for oil and natural gas, a
> domestic supply cut equivalent to the production anticipated to result from
> a new Five Year Program would lead to a slight increase in world oil prices
> and a relatively larger increase in U.S. natural gas prices. All other things
> being equal, this would lead to a market response providing . . . a slight
> reduction in oil and natural gas consumed, a substantial increase in oil
> imports, and added supplies provided by onshore hydrocarbon resources.

162.    BOEM uses its *Market Simulation Model* (*MarketSim*) to estimate the amount and

percentage of substitutes that the economy would adopt should a particular program area not be

offered to lease. MarketSim is based on authoritative and publicly available estimates of price

elasticities of supply and demand and substitution effects --

> [I]n the event the NAA [No-Action Alternative] were implemented. . . 68
> percent of the oil and natural gas production foregone from this program
> would be replaced by greater imports, 16 percent by increased onshore
> production, [10 percent by other energy sources] . . . and 6 percent by a
> reduction                     in                      consumption.

BOEM, *Proposed Final Outer Continental Shelf Oil & Gas Leasing Program 2012–2017*, 110

(2012)13; *see also* BOEM, *2012–2017 Final Programmatic Environmental Impact Statement*,

*supra* at 4-643 ("With less oil and gas available from the OCS under the No-Action Alternative,

consumers could obtain oil and gas from other sources, substitute to other types of energy, or

consume less energy overall.").

163.    In a recent case challenging the Interior's 2012–2017 offshore oil and gas leasing

program, the D.C. Circuit favorably reviewed Interior's modeling of how "forgoing additional

leasing on the OCS would cause an increase in the use of substitute fuels . . . and a reduction in

overall domestic energy consumption from greater efforts to conserve in the face of higher prices."

*Ctr. for Sustainable Economy v. Jewell*, 779 F.3d 588, 609 (D.C. Cir. 2015).  Importantly, nothing

in BOEM's modeling is unique to the offshore oil and gas context. According to BOEM,

"MarketSim's economics-based model representation of U.S. energy markets . . . simulates end-

use domestic consumption of oil, natural gas, coal and electricity in four sectors (residential,

commercial, industrial and transportation); primary energy production; and the transformation of

primary energy into electricity." BOEM, *The Revised Market Simulation Model (MarketSim):*

*Model Description* 2 (2012).

164.   The Interior's sophisticated modeling of the environmental effects of energy substitutes under No-Action Alternatives is the culmination of 35 years of analysis.  Interior has used the MarketSim model since at least its 2002–2007 Program for offshore leasing. *See* Minerals Mgmt. Serv. ("MMS"), *Energy Alternatives and the Environment*, 10 (2001)16 ("MMS employs the MktSim2000 model to evaluate the impact of decreased OCS production resulting from no action.").  Since at least the 1990s, the Interior's Environmental Impact Statements have calculated the percentage of offshore production expected to be substituted by various energy alternatives under a No-Action scenario. MMS *Energy Alternatives and the Environment*, 13 (1996)17 ("[F]or each unit of OCS gas not produced because of no action . . . conservation will account for about 0.14 units . . . ."); *see also id.* at 15 ("Significant environmental impacts associated with expanded importation of oil include: the generation of greenhouse gases . . . ."). And going back to the first Five-Year Program in 1980 (when BLM prepared the Environmental Statements), Interior has recognized that not all sources of the same fuel type present the same environmental effects—for example, offshore oil drilling presents lower spill risks than imported oil substituted under the no-action alternative. Interior, *5-Year OCS Leasing Program* 13b (1980).

165.   Similarly, in a 2001 report on its offshore oil leasing program, Interior declared in no uncertain terms that "<u>*Examining other energy sources is an important aspect of the No Action Alternative*</u>" under NEPA reviews. MMS, *Energy Alternatives and the Environment* 1 (2001) (emphasis added).

166.   The FEIS wholly ignores alternative generation resources that would fill the void.  The FEIS assumes that the Project would prevent future natural gas electric generating plants.  Such an assumption is absurd and defeats the entire purpose of analyzing viable replacements when the No-Action alternative is selected.  It is also a rationale that has been

rejected by the courts. The FEIS' analysis is also inconsistent with BOEM and Interior's use of market modeling in other environmental impact statements. Such inconsistent action is itself arbitrary and capricious agency action.

167.   Under NEPA regulations, agencies must consider all reasonable alternatives, including those not specifically under their authority to implement. *See* 40 C.F.R. §1502.14; *see also NRDC v. Morton*, 458 F.2d 827 (D.C. Cir 1972) (explaining that it is the essence and thrust of NEPA that impact statements serve to gather in one place discussion of relative environmental impact of alternatives, and although alternatives required for discussion are those reasonably available, they should not be limited to measures which particular agency or official can adopt; when proposed action is integral part of coordinated plan to deal with broad problem, range of alternatives which must be evaluated is broadened). Thus, the failure to consider and take a hard look at onshore renewable generation resources because they would not require a permit within BOEM's or the cooperating agencies' jurisdiction or are not located offshore is clear error.

168.   The No-Action Alternative must also take into account the fact that on-shore American jobs and tax revenues to the United States would be lost if the Project and the cumulatively foreseeable offshore wind projects are built. The Project and the cumulatively foreseeable offshore wind projects will displace American jobs related to construction and operation of onshore renewable energy projects in the United States. The FEIS has not analyzed those economic impacts and the loss of American jobs and tax revenues if the Project and the cumulatively foreseeable offshore wind projects are built.

169.   The FEIS assumes without adequate support that offshore electricity generation is needed, a need that was never analyzed. There surely cannot be informed decision making when the threshold question—need for the proposed Project—is based merely upon conjecture or an

unlawfully narrowly defined focus limited to use of the outer continental shelf.

170.    Local taxing jurisdictions would realize increases in tax revenues as a result of the renewable generators that would be built onshore instead of the proposed Project and the cumulatively foreseeable offshore wind projects.  Similarly, direct or indirect economic impacts for those alternative onshore renewable United States-based generators would occur within the region under the No-Action Alternative, and indeed would *far exceed* those from the Project and the cumulatively foreseeable offshore wind projects.

171.    Quite simply, the conclusions used for the No-Action Alternative baseline are preposterous, fail to use accepted substitution analysis used by Interior and BOEM and other federal agencies in conducting environmental impact statements, and are the type of uninformed review that has been rejected by the courts.

172.    The "Socioeconomic" impacts of the No-Action alternative are manifestly wrong. The No-Action alternative would result in different renewable energy projects filling its place. And because those alternative projects would be located entirely onshore in the United States, they would far surpass the Project in economic benefits to the United States.   The socioeconomic impacts of the No-Action alternative are also wrong because they do not account for the USACE's conclusion that the commercial fishing industry will be decimated by the Project and the cumulative effect of the balance of the 2,021 WTGs.

173.    The analysis of the No-Action alternative for Air Quality is incorrect.  The Project would be replaced with renewable energy projects located closer to the actual electrical load. Those projects would have the higher air quality benefits, and GHG benefits compared to the Project because they would be more efficient, and would not require the adverse GHG impacts caused from COP for the Project.  Further, the farther generation is from actual load, the more

—

electrical losses incurred. The EPA classifies the Project as a major source of air pollution and thus is subject to Prevention of Significant Deterioration and Nonattainment New Source Review Permitting requirements.

174.    BOEM's and the cooperating agencies' failures are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

175.    For the foregoing reasons, the FEIS and the Federal Defendants have failed to comply with NEPA, and the FEIS and the Federal Defendants' approvals should be vacated.

<u>COUNT VIII</u>
**FAILURE TO TAKE A HARD LOOK AT ALTERNATIVES UNDER THE CLEAN WATER ACT—FAILURE TO COMPLY WITH EPA'S 404(B)(1) GUIDELINES.**

176.    Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs as though fully set forth herein.

177.    Section 404(a) of the CWA authorizes the Secretary of the Army, acting through the Army Corps of Engineers, to issue permits for the discharge of dredged or fill material into navigable waters "after notice and opportunity for public hearings." 33 U.S.C. § 1344(a). In making permitting decisions, the Corps must follow the 404(b)(1) Guidelines. *See id*. § 1344(b); *Bersani v. EPA*, 850 F.2d 36, 39 (2d Cir. 1988).  These Guidelines prohibit the Corps from granting a Section 404 permit "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. §230.10(a). The Corps' own regulations further require the Corps to conduct a public interest review for each proposed discharge, and prohibit the Corps from granting a permit that (1) would "not comply with [EPA's]

404(b)(1) [G]uidelines" and/or (2) that would be "contrary to the public interest." 33 C.F.R.
§320.4(a)(1).

178.   Under EPA's 404(b)(1) Guidelines, an alternative to the proposed discharge is
practicable if it is "available and capable of being done after taking into consideration cost, existing
technology, and logistics in light of overall project purposes." 40 C.F.R. §230.10(a)(2).
Alternatives need not be in locations that are presently owned by a permit applicant so long as they
are otherwise practicable and could "reasonably be obtained, utilized, expanded or managed in
order to fulfill the basic purpose of the proposed activity." *Id.*; *accord Bersani*, 850 F.2d at 39.

179.   "[P]racticable alternatives include, but are not limited to: (i) Activities which do
not involve a discharge of dredged or fill material into the waters of the United States or ocean
waters," *see* 40 C.F.R. §230.10(a)(1)(i), such as onshore renewable energy generation.

180.   The only energy supply alternative briefly mentioned is fossil-fuel plants[5], which
lays the basis for the FEIS' conclusions that the Project would result in climate and air quality
benefits.

181.   Yet that logic lays bare the failure of the Federal Defendants to take a hard look at
alternatives that do not have adverse aquatic consequences.  There is no justification for limiting
the consideration of alternatives in the FEIS and under the 404 Guidelines to different versions of
the Project and a half-baked no action alternative.

182.   "The Project is designed to serve demand for renewable energy in New England."

---

[5] "Because future offshore wind facilities would produce less GHG emissions than fossil fuel–
powered generating facilities with similar capacities, the reduction in GHG emissions from the
Proposed Action when combined with other future offshore wind projects (or avoidance of
increased GHG emissions from equivalent fossil fuel–powered energy production) would result in
long-term beneficial impacts…" FEIS, p. 3-94.

DEIS at 1-1.

183.    The USACE correctly concluded that the project is not water dependent, but then illogically restricted the overall purpose to a water dependent purpose, i.e., placing wind turbines in the water.

184.    If the purpose and need is restricted to offshore wind turbines because of "the Commonwealth's mandate that distribution companies jointly and competitively solicit proposals for offshore wind energy generation (220 Code of Massachusetts Regulations §23.04(5))," then the Federal Defendants have concluded that the obligation of those distribution companies was non-discretionary and mandatory.  The flip side of that coin is that the power purchase agreement is void because the Massachusetts Legislature has no authority to regulate wholesale sales of electricity under the Federal Power Act.  Only the Federal Energy Regulatory Commission has that authority.  *See, Allco Finance Limited v. Klee*, 861 F.3d 82 (2d Cir. 2017).  The permit applicant and the Federal Defendants cannot have it both ways.

185.    "[A]n applicant cannot define a project in order to preclude the existence of any alternative sites and thus make what is practicable appear impracticable." *Sylvester v. U.S. Army Corps of Engineers*, 882 F.2d 407, 409 (9th Cir. 1989).

186.    The FEIS violates the CWA's requirements by not taking a hard look—indeed not taking any look—at the proposed purpose of the Project being able to be accommodated by onshore renewable energy.

187.    A Section 404 permit will not issue "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences" (the least environmentally damaging practicable alternative). 40 C.F.R. §230.10(a). The regulations define

a "practicable alternative" as one that "is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." *Id*. §230.10(a)(2). When, as here, a non-water dependent project would discharge pollutants into a "special aquatic site," the regulations establish a presumption that practicable alternatives not involving special aquatic sites are available, "unless clearly demonstrated otherwise." *Id*. §230.10(a)(3).

188.    The USACE's failure to take the required hard look at alternative violates NEPA and the Guidelines and as a result, the USACE's approvals should be vacated.

189.    The USACE's determination that it was clearly demonstrated that practicable alternatives not involving special aquatic sites were not available is arbitrary and capricious, an abuse of discretion, not supported by substantial evidence and a violation of the Guidelines.

190.    The USACE's failures are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  As a result, the USACE's approvals must be vacated.

**COUNT IX**
**VIOLATION OF THE SECTION 404 GUIDELINES**

191.    Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs as though fully set forth herein.

192.    40 C.F.R. § 230.1(c) explains that "dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern."

193.    Probable impacts of other activities include the balance of the 2,021 wind turbines that the FEIS concludes are foreseeable.

194.    The USACE's failure to take the required hard look at the probable impacts of the balance of the 2,021 wind turbines that the FEIS concludes are foreseeable violates the requirement that it be demonstrated that such a discharge will not have an unacceptable adverse impact.  As a result, the USACE's approvals should be vacated.

195.    The USACE's failures are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." As a result, the USACE's approvals must be vacated.

**COUNT X**
**FAILURE TO TAKE A HARD LOOK AT WHETHER THE PROJECT SATISFIES THE PUBLIC INTEREST REQUIREMENT.**

196.    Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs as though fully set forth herein.

197.    For the Corps to issue a permit for the proposed Project, the proposed use must be in the public interest.

198.    The public interest review must be "based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest." 33 CFR §320.4(a)(1)

199.     "Evaluation of the probable impact which the proposed activity may have on the public interest requires a careful weighing of all those factors which become relevant in each particular case." *Id.*

200.     "The benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments." *Id.*

201.    "The decision whether to authorize a proposal, and if so, the conditions under which it will be allowed to occur, are therefore determined by the outcome of this general balancing

process. That decision should reflect the national concern for both protection and utilization of important resources." *Id.*

202.    "All factors which may be relevant to the proposal must be considered including the cumulative effects thereof: among those are conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people." *Id.*

203.    The FEIS simply fails to offer any explanation as to why Project meets the public interest test.

204.    The ROD offers a half-baked, inconsistent analysis of the public interest that fails to account for the severe adverse impacts caused by the difficulties of navigation and the decimation of the onshore renewable energy industry and the commercial fishing industry. And all the other factors required to be considered under 33 C.F.R. §320.4.

205.    The ROD's analysis of the public interest test is erroneously based upon the much smaller WTG, not the Haliade-X, and the unlawful standard in the Biological Opinion, which improperly narrows and limits the probable effects of the Project and cumulatively foreseeable offshore wind projects.

206.    In order to have taken a hard look at whether the proposed Project meets the public interest test, the USACE would need at a minimum to conduct a thorough review of the electricity supply of the Northeast and alternatives to meet renewable energy demand, base its analysis on the correct WTG, and base the analysis on a biological opinion with a correct standard.  Neither the FEIS nor the ROD make any such effort.

207.    Moreover, in order to determine that the proposed Project meets the public interest test, a thorough review of its potential competitive effects on United States onshore based generators and the direct, indirect and cumulative effects on GHGs and other resource values must be conducted.  Neither the FEIS nor the ROD make any such effort.

208.    The proposed Project does not satisfy the public interest test.  The proposed Project would result in the loss of thousands of American jobs and billions of dollars of economic activity in the United States because the Project will displace renewable energy projects located onshore in the United States.

209.    The proposed Project would raise global warming in the early years of the Project, and overall as compared to renewable energy substitutes such as solar.

210.    The proposed Project will raise temperatures at and near its location adding additional stress on marine life and their habitat that is already under stress.

211.    The proposed Project would create vulnerabilities to the electric grid by concentrating so much electricity from one source.  No analysis has been conducted to compare the Project to distributed generation sources near load that could form the basis for local micro-grids and reduce the grid's risk to severe weather events as well as criminal acts.

212.    The adverse impacts of the Project could be avoided, and all the purported benefits of the Project achieved, under the No-Action Alternative with deployment on onshore solar energy and renewable hydrogen fuel cells.

213.    The FEIS' and the ROD's failure to properly evaluate and take a hard look at whether the proposed Project satisfies the public interest test is arbitrary, capricious, an abuse of discretion, not supported by substantial evidence and a violation of the Guidelines.  As a result, the USACE's approvals must be vacated.

## COUNT XI
**THE USACE CONCLUSION THAT THE PROJECT DOES NOT AFFECT A SPECIAL AQUATIC SITE IS CLEARLY ERRONEOUS, ARBITRARY AND CAPRICIOUS AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE**

214.     Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs as though fully set forth herein.

215.     Where a proposed permit would allow discharge into a special aquatic site, the Corps undertakes a two-step analysis to determine what presumption to apply to its analysis of whether to grant the permit. First, the Corps must properly define the project's "basic purpose" under 40 C.F.R. § 230.10(a)(3). *See, e.g., Sierra Club v. Van Antwerp*, 362 F. App'x 100, 105-06 (11th Cir. 2010); *Town of Abita Springs v. U.S. Army Corps of Eng'rs*, 153 F. Supp. 3d 894, 919 (E.D. La. 2015). Second, the Corps must determine whether the "basic purpose" is "water dependent." *See* 40 C.F.R. § 230.10(a)(3); *Sierra Club*, 362 F. App'x at 106; *Abita Springs*, 153 F. Supp. 3d at 919.  An action is water dependent if it requires access or proximity to, or a location on, water in order to fulfill its basic purpose. *See* 40 C.F.R. §230.10(a)(3).  Thus, when a project's basic purpose is to provide boat access to a river, the project is water dependent because it must be located in water to achieve its basic purpose. *See Nat'l Wildlife Fed'n v. Whistler*, 27 F.3d 1341, 1345-46 (8th Cir. 1994). In contrast, a proposed gold mine is not water dependent even if the applicant wishes to mine in a watershed because mining gold does not always require access or proximity to water. *See Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 947 (9th Cir. 2008).

216.     Here, providing renewable energy to the Northeastern United States is not water dependent.

217.     The Corps found that the Project was not water dependent. *See,* ROD at 31. However, the Corps reached that conclusion by erroneously concluding that the Project does not

discharge into a special aquatic site.

218.    The Project does discharge into a special aquatic site, and for that reason alone, the decision of the USACE must be vacated.

219.    A special aquatic site is one of the type of sites listed in 40 C.F.R. §230.40 (sanctuaries and refuges), §230.41 (wetlands), §230.42 (mud flats), §230.43 (vegetated shallows), §230.44 (coral reefs), §230.45 (riffle and pool complexes).

220.    Appendix K of the FEIS explains that there is a 10-mile impact zone for special aquatic sites.  *See,* Index number 12930-082, p. K-862 ("The analysis for the SEIS for each resource was based on a specific geographic analysis area. As stated in Table A-1, the geographic analysis area for water resources included a 10-mile (16.1-kilometer) radius around the WDA, the OECC, and vessel approach routes to port facilities that would be used by the proposed Project.")

221.    Figure ES-1, at p. ES-7 shows the Project elements.

222.    There are special aquatic sites within the Project's 10-mile impact zone.

223.    For example, coral (40 C.F.R. §230.44) exists off Woods Hole, Massachusetts which is within the 10-mile impact zone of the Offshore Export Cable Corridor ("OECC").  *See*, https://www.nbcboston.com/news/local/massachusetts-woods-hole-researchers-cape-cod-corals/127372/.

224.    Eel grass (40 C.F.R. §230.43) exists in Edgartown Harbor which is within the 10-mile impact zone of the OECC.

225.    Wetlands (40 C.F.R. §230.41) exist in Eel Pond in Edgartown which is within the 10-mile impact zone of the OECC.

226.    The USACE simply made no effort to determine what special aquatic sites are within the impact zone of the Project.

227.    The USACE's conclusion that the Project does not affect a special aquatic site is clearly erroneous, arbitrary and capricious and unsupported by substantial evidence.  As a result, the USACE's decision and permits for the Project must be vacated.

**COUNT XI**
**THE USACE'S FAILURE TO TAKE A HARD LOOK AT WHETHER ONSHORE RENEWABLE ENERGY IS A PRACTICABLE ALTERNATIVE IS CLEARLY ERRONEOUS, ARBITRARY AND CAPRICIOUS AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE**

228.    Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs as though fully set forth herein.

229.    If the Corps finds that a proposed project by its general nature is not water dependent, the Corps must presume that practicable alternatives to the project are available in less sensitive areas. *See* 40 C.F.R. § 230.10(a)(3). Likewise, the Corps must presume that such practicable alternatives have less adverse impact on the aquatic ecosystem. *See id*.  Once a project is determined to be non-water dependent, the burden shifts to the permit applicant to rebut the first presumption by "clearly demonstrat[ing]" that a practicable alternative is not available, *id*., and to rebut the second presumption with "detailed, clear, and convincing information proving that an alternative with less adverse impact is impracticable." *Sierra Club*, 362 F. App'x at 106 (quoting *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1269 (10th Cir. 2004)).  If the basic purpose of a proposed project is water dependent, then these presumptions do not apply.

230.    Thus, if a project is located in a special aquatic site, Corps' determination of the "project's basic purpose and whether it is water dependent are threshold questions that determine the procedure the Corps must follow in granting the applicant a permit." *Id*.    If the Corps incorrectly defines the project's basic purpose or improperly determines that the project is water dependent, then it will not follow the procedure set forth by the 404(b)(1) Guidelines, resulting in

a decision that is arbitrary and in violation of the APA. *See id.; see also, e.g., Nat. Res. Def. Council v. EPA*, 808 F.3d 556, 570 (2d Cir. 2015) (agency action violates APA where agency followed incorrect procedure).

231.    The FEIS makes little mention of "special aquatic sites" as defined in 40 C.F.R. §§ 230.40-230.45.  The FEIS makes no mention of the permit applicant's evidence to rebut the second presumption with "detailed, clear, and convincing information proving that an alternative with less adverse impact is impracticable."

232.    In addition, where a discharge is proposed for a special aquatic site (as is the case here), "all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise." 230.10(a)(3) (emphasis added.)

233.    The USACE found that the overall purpose of the Project "is the construction and operation of a commercial scale wind energy project and associated transmission lines for renewable energy generation and distribution to the Massachusetts energy grid." *See*, ROD at 31.

234.    Of course, if the purpose and need could be constrained to effectively require the allowance of an off shore wind facility, then the least environmentally practical alternative would be a single turbine project.

235.    The failure of the USACE to review onshore renewable energy as a practicable alternative to the proposed discharge and to adhere to the presumption that there are alternatives presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise, is clear error, and arbitrary and capricious and contrary to law.  As a result, the USACE's approvals must be vacated.

## COUNT XII
## FAILURE TO PROPERLY ANALYZE THE EFFECT OF CLIMATE CHANGE ON HURRICANES THAT MAY IMPACT THE PROJECT

236.    Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs as though fully set forth herein.

237.    The FEIS' analysis of severe weather events is seriously flawed.

238.    The FEIS fails to properly analyze the effects of climate change on hurricane activity in the Northeast and the Project area over the next 30 years, which likely cause catastrophic failure of the WTGs, and leave turbine parts and oil and chemical spills in the Atlantic, reaching the shores of New York, Rhode Island, Connecticut, Martha's Vineyard, Nantucket, and Cape Cod, including the individual Plaintiff's property in Edgartown.

239.    It is certainly not a low probability that the Northeast would experience a category 3 or above hurricane over the next 30 years.  To the contrary, it is virtually certain that one or more such events would occur.  The taller the WTGs get, the more susceptible they are to higher wind speeds.

240.    The Federal Defendants did not perform any analysis related to the experimental Haliade-X WTGs, much less take the required hard look.

241.    The FEIS must make an informed decision, and it cannot ignore the adverse climatic impacts of the Project over the next ten or longer years.  It cannot ignore the virtual certainty that a hurricane of category 4 or 5 strength will directly hit the wind energy area over the next 30 years.  It cannot ignore the likelihood of a catastrophic oil spill from a category 4 and 5 hurricane over the next 30 years that could be the size of the Exxon Valdez's spill.  It cannot ignore the devastation and destruction of not only the WTGs that would occur but the devastation on the marine environment.

242.     The failure of the Federal Defendants to review adverse climatic impacts of the Project over the next ten or longer years and the effects of climate change on hurricane activity in the Northeast and the Project area over the next 30 years is clear error, and arbitrary and capricious, violates NEPA, the OCSLA, the MMPA, the Guidelines and is contrary to law.

**COUNT XIII**
**THE IMPACTS OF THE PROJECT ARE OVERESTIMATED, INACCURATE,**
**FLAWED AND INADEQUATELY ANALYZED**

243.     Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs as though fully set forth herein.

244.     The FEIS assumes that taking no action on the Project would have, compared to approval, no net negative effects on various resource values or climate change.  The preceding paragraphs of these comments have explained why that assumption is entirely inconsistent with economic theory, real market conditions, and past agency practices. Consequently, the FEIS presents a deeply inaccurate and misleading comparison of the approval options and No-Action Alternative.

245.     Similarly, the analysis of the No-Action Alternative regarding Air Quality is incorrect.  The Project would be replaced with renewable energy projects located closer to the actual electrical load.  Those projects would have the higher air quality benefits, and GHG and climate benefits compared to the Project because they would be more efficient, and not create the warming created by the Project.  *See,* Harvard Wind Study.

246.     The FEIS is riddled with over-assessments of the purported benefits of the Project.

247.     The FEIS must subtract from its calculation of the Project's economic, energy supply and climate benefits, the lost benefits from all those onshore sources of renewable energy generation that would no longer be built and the decimation of the commercial fishing industry.

248.     Once that is done, the Project may (and likely would) have a net negative impact on economics, climate benefits, fisheries, marine mammals, endangered species, commercial fishing, and all other resource values compared to its substitutes.

249.     The FEIS does not comply with NEPA and the ROD does not comply with the Guidelines, the MMPA, the OCSLA because they fail to analyze those effects. The FEIS' and the ROD's failure to properly evaluate those effects is arbitrary, capricious, an abuse of discretion, unlawful and requires that the Federal Defendants' approvals be vacated.

### COUNT XIV
### FAILURE TO TAKE A HARD LOOK AT AND TO PROPERLY ANALYZE THE EFFECT ON MARINE LIFE AND FISHERIES

250.     Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs as though fully set forth herein.

251.     Neither the FEIS's nor the ROD's analysis accounts for the additional stress on the marine population and their habitat caused by the increase in temperatures caused by the Project itself.  *See*, Harvard Wind Study.

252.     Neither the FEIS's nor the ROD's analysis accounts for the additional stress on the marine population and their habitat caused by the devastation caused by a category 4 or category 5 hurricane hitting the wind energy area ("WEA") and destroying the WTGs, resulting in a catastrophic release of oil and contaminants into the marine environment.

253.     Such incomplete analysis does not comply with NEPA, the Guidelines, the MMPA, and the OCSLA and does not provide information sufficient for the Federal Defendants to make the required determinations.

254.     The Federal Defendants' failures violate NEPA, the Guidelines, the MMPA, and the OCSLA and are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law." As a result, the Federal Defendants' approvals must be vacated.

## COUNT XV
## FAILURE TO SATISFY THE TAKE REQUIREMENT UNDER THE MMPA

255.    Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs as though fully set forth herein.

256.    Section 101(a) of the MMPA (16 U.S.C. §1361) prohibits persons or vessels subject to the jurisdiction of the United States from taking any marine mammal in waters or on lands under the jurisdiction of the United States or on the high seas (16 U.S.C. §1372(a) (l), (a)(2)). Sections 101(a)(5)(A) and (D) of the MMPA provide exceptions to the prohibition on take, which give NMFS the authority to authorize the incidental but not intentional take of small numbers of marine mammals, provided certain findings are made and statutory and regulatory procedures are met. ITAs may be issued as either (1) regulations and associated Letters of Authorization or (2) an Incidental Harassment Authorization ("IHA").

257.    Letters of Authorizations may be issued for up to a maximum period of 5 years, and IHAs may be issued for a maximum period of 1 year. NMFS has also promulgated regulations to implement the provisions of the MMPA governing the taking and importing of marine mammals (50 C.F.R. §216) and has published application instructions that prescribe the procedures necessary to apply for an Incidental Take Authorization ("ITA"). U.S. citizens seeking to obtain authorization for the incidental take of marine mammals under NMFS's jurisdiction must comply with these regulations and application instructions in addition to the provisions of the MMPA.

258.    Once NMFS determines an application is adequate and complete, NMFS has a corresponding duty to determine whether and how to authorize take of marine mammals incidental to the activities described in the application. To authorize the incidental take of marine mammals, NMFS evaluates the best available scientific information to determine whether the take would

have a negligible impact on the affected marine mammal species or stocks and an immitigable impact on their availability for taking for subsistence uses.  NMFS must also prescribe the "means of effecting the least practicable adverse impact" on the affected species or stocks and their habitat, and on the availability of those species or stocks for subsistence uses, as well as monitoring and reporting requirements.

259.    The term "take" means "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal" (16 USC §1362(3)(13)). The incidental take of a marine mammal falls under three categories: mortality, serious injury, or harassment (i.e., injury and/or disruption of behavioral patterns).  Harassment, as defined in the MMPA for non-military readiness activities (Section 3(8)(A)), is any act of pursuit, torment, or annoyance that has the potential to injure a marine mammal or marine mammal stock in the wild (Level A harassment) or any act of pursuit, torment, or annoyance that has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns (Level B harassment).  Disruption of behavioral patterns includes, but is not limited to, migration, breathing, nursing, breeding, feeding, or sheltering.

260.    Authorization for incidental takings shall be granted if NMFS finds that the taking will have a negligible impact on the species or stock(s) and will not have an unmitigable adverse impact on the availability of the species or stock(s) for taking for subsistence uses (where relevant).

261.    An IHA is appropriate if the proposed action would result in harassment only (i.e., injury or disturbance) and is not planned for multiple years.

262.    A LOA is required if the actions will result in harassment only (i.e., injury or disturbance) and is planned for multiple years. For a Letter of Authorization, NOAA Fisheries must issue regulations.

263.    An IHA is inappropriate for multiple reasons.

264.    First, the proposed action will certainly require more than 1 year for construction, causing noise from pile driving, dredge from the disturbance of the sea floor, increased vessel traffic and other effects discussed in the FEIS. *See, e.g.*, FEIS at ES4.1.1 ("construction within the Offshore Export Cable Corridor (OECC) would begin in second quarter 2022; turbine and ESP installation would begin second quarter 2023; and inter-array cable installation would begin in third quarter 2023.")

265.    Second, the warming caused by the Project itself will constitute ongoing take for the life of the Project.

266.    Third, the occurrence of a category 3 or greater hurricane that is virtually certain to occur during the 30-year assumed operating period exceeds the WTGs survival speed.  Prior reported incidences of cyclones exceeding a WTGs survival speed have resulted in a "twisted wreckage."  *See,    e.g.*,    "Cyclone    winds    exceeded    survival    margins," https://www.windpowermonthly.com/article/957297/cyclone-winds-exceeded-survival-margins. In addition to the hurricane-force wind, the turbine's foundation would be contending with large, powerful waves at the same time.  Take that occurs from such an event that is reasonably certain to occur is intentional and not accidental.  Furthermore, the twisted wreckage of the WTGs from such an event have the likely potential to result in an oil spill the size of Exxon Valdez's causing serious injury or mortality to marine mammals.

267.    Fourth, the impact from both Project-caused warming and the eventual hurricane that exceeds the WTGs survival speed results in the inability to find that the take would (i) be of small numbers, (ii) have no more than a "negligible impact" on those marine mammal species or

stocks, and (iii) not have an "unmitigable adverse impact" on the availability of the species or stock for subsistence uses.

268.    Fifth, dredged material disposal that will occur in the geographic analysis for coastal habitats may cause turbidity increases and long-term sedimentation causing effects that last more than one year.

269.    Sixth, the Vineyard Wind project would need to be decommissioned. *See, e.g.*, FEIS at ES4.1.2 ("According to 30 C.F.R. Part 585 and other BOEM requirements, Vineyard Wind would be required to remove or decommission all installations and clear the seabed of all obstructions created by the proposed Project…. Absent permission from BOEM, Vineyard Wind would have to complete decommissioning within 2 years of termination of the lease and either reuse, recycle, or responsibly dispose of all materials removed.")

270.    The need to decommission the Project also removes any ability of the Federal Defendants to issue a permit of any kind under the MMPA because the take will clearly occur at the end of the useful life of the Project far exceeding the five-year statutory limitation when taking into account the construction and operation of the Project.

271.    The Federal Defendants' have also failed to provide substantial evidence that the take from the Project will only affect small numbers of marine mammals.   The noise and other harassment from the Project will affect a greater than small number of right whales and other mammals.

272.    The Federal Defendants' have also failed to provide substantial evidence that using the best available scientific information the take would have a negligible impact on the affected marine mammal species or stocks and an immitigable impact on their availability for taking for subsistence uses.

273.    The issuance of the IHA violates the MMPA.

274.    The Federal Defendants' failures are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

275.    As a result, the Federal Defendants' approvals should be vacated

## COUNT XVI
## THE FEIS FAILS TO TAKE A HARD LOOK AT THE IMPACT ON ENDANGERED SPECIES

276.    Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs as though fully set forth herein.

277.    Congress enacted the Endangered Species Act in 1973 to provide for the conservation of endangered and threatened fish, wildlife, plants, and their natural habitats. 16 U.S.C. §§1531, 1532(3).  The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill* ("*TVA*"), 437 U.S. 153, 180 (1978).

278.    In passing the ESA, Congress made a conscious choice to "give endangered species priority over the 'primary missions' of federal agencies." *Id.* at 185. "The plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost." *Id.* at 184.  To that end, the ESA imposes substantive and procedural obligations on all federal agencies with regard to listed and proposed species and their critical habitats. *See* 16 U.S.C. §§1536(a)(1), (a)(2), (a)(4); *id.* § 1538(a); 50 C.F.R. §402.01. *See also Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 667 (2007).

279.    ESA Section 7 and its implementing regulations require each federal agency, in consultation with the U.S. Fish and Wildlife Service (for land-based and freshwater species) and National Marine Fisheries Services (for marine and anadromous species) to ensure that any action

authorized, funded, or carried out by the agency is not likely to (1) jeopardize the continued existence of any threatened or endangered species or (2) result in the destruction or adverse modification of the critical habitat of such species. 16 U.S.C. §1536(a)(2); 50 C.F.R. §402.14(a).

280.    Under the ESA, "action" is broadly defined to include actions that may directly or indirectly cause modifications to the land, water, or air, and actions that are intended to conserve listed species or their habitat. 50 C.F.R. §402.02. An action would "jeopardize the continued existence of" a species if it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." *Id.* "Destruction or adverse modification" of critical habitat means "a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species." *Id.*

281.    For each federal action, the federal action agency must request from the Services a list of any ESA-listed or proposed species that may be present in the area of the agency action. 16 U.S.C. §1536(c)(1); 50 C.F.R. §402.12. "Action area" means "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. §402.02.

282.    The action agency must make an effects determination based on the sum of the direct, indirect, and cumulative effects of the action, added to the environmental baseline and interrelated and interdependent actions. *Id.*   If the action agency determines that its proposed action will not affect listed species or critical habitat, it is not obligated to consult with the Services. 50 C.F.R. §402.14(b)(1). If it determines that its proposed action may affect any listed species or critical habitat, it must engage in formal consultation. 50 C.F.R. §§402.13, 402.14.   If it determines that its action may affect, but is "not likely to adversely affect" a listed species or critical habitat,

62

then it must obtain written concurrence from the Services. 50 C.F.R. §§402.13(a), 402.14(b)(1). If the action is likely to adversely affect listed species or critical habitat, the action agency and Services must engage in formal consultation. *Id.* § 402.14.

283.    If the Services determine that the action is likely to jeopardize the species or result in the destruction or adverse modification of critical habitat, the Services "shall suggest those reasonable and prudent alternatives which [it] believes" would not result in jeopardy or adverse modification to critical habitat. 16 U.S.C. §1536(b)(3)(A).  If the action is not likely to result in jeopardy or destruction or adverse modification of critical habitat, the Services must provide the action agency with a biological opinion, evaluating how the proposed action will affect the listed species or habitat, together with an incidental take statement including any reasonable and prudent measures necessary to avoid jeopardy. *Id.* §1536(b); 50 C.F.R. §§402.14(g)-(i). Throughout the consultation process, the agencies must use "the best scientific and commercial data available" to evaluate the impacts the action will have on listed species. 16 U.S.C. §§1536(a)(2), (b)(3), (c)(1); 50 C.F.R. §402.14(g).

284.    The ESA authorizes citizen enforcement to stop violations of ESA Section 7. 16 U.S.C. §1540(g).  This citizen-suit provision allows individuals to bring suit "to enjoin any person, including the United States and any other governmental instrumentality or agency…who is alleged to be in violation of any provision of this chapter or regulation issued under authority thereof." *Id.* §1540(g)(1)(A); *see Bennett v. Spear*, 520 U.S. 154, 172-5 (1997) (discussing the ESA citizen-suit provision).

285.    The ESA and its implementing regulations provide that every federal agency "shall" consult with the Services before taking "any action" that could jeopardize listed species or adversely modify critical habitat. 16 U.S.C. §1536(a)(2). "This language admits of no exception."

*TVA*, 437 U.S. at 173. Regulations implementing Section 7 broadly define the scope of agency actions subject to consultation:

> *[A]ll activities or programs of any kind* authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas. Examples include, but are not limited to: (a) actions intended to conserve listed species or their habitat; (b) the promulgation of regulations; (c) the granting of licenses, contracts, leases, easements, rights-of- way, permits, or grants-in-aid; or (d) actions directly or indirectly causing modifications to the land, water, or air.

50 C.F.R. §402.02 (emphasis added).

286.    Neither the FEIS nor the ROD accounts for the additional stress on endangered species and their habitats caused by the increase in temperatures caused by the Project itself. *See*, Harvard Wind Study.

287.    Neither the FEIS nor the ROD accounts for the additional stress on endangered species and their habitats caused by the devastation from a category 4 or category 5 hurricane hitting the WEA (which is virtually certain) and destroying the WTGs, resulting in a catastrophic release of oil and contaminants into the marine environment.

288.    For example, "The North Atlantic right whales primarily migrate into the [Wind Energy] area and engage in short-term feeding before moving onto feeding grounds throughout the Gulf of Maine." *Rapid Climate-Driven Circulation Changes Threaten Conservation of Endangered North Atlantic Right Whales,* by Nicholas R. Record, et al (the "*Record Paper*"). *See*, https://www.boem.gov/press10252016/.  The *Record Paper* indicates that the right whales' food supply is already endangered by the warming ocean.   If the Right Whales' food supply in the wind energy area is diminished, it would adversely affect the Right Whales' ability to continue their journey to the Gulf of Maine.

289.    As discussed above, climate scientists at Harvard University, David Keith et al., concluded that temperatures in the area of wind farms are raised around 1-degree Celsius *by the*

*projects themselves*, which would mean that the ocean around the location of the various off-shore wind farms proposed for New York, Connecticut, Massachusetts and Rhode Island would be warming at an even greater rate than would otherwise occur.  That warming could extend to the Gulf of Maine as well, further endangering the food supply.

290.    Together with the Harvard study, the *Record Paper* establishes that the warming that would be caused by the Project poses a significant risk to the food supply of the Right Whales, which in turn threatens the survival of the Right Whales.

291.    The FEIS and the ROD simply fail to analyze those risks.  The risk of diminished or elimination of the food supply for the Right Whales is a risk that cannot be ignored under NEPA, the MMPA, the OCSLA, the Guidelines and the ESA.

292.    The FEIS and the ROD also wholly ignore the devastation from a category 4 or category 5 hurricane hitting the WEA and destroying the WTGs, resulting in a catastrophic release of oil and contaminants into the marine environment and causing the take, and possibly the extinction, of endangered species, such as the Right Whales, sea turtles, and the piping plover, which nests on beaches that would be contaminated by an oil spill that could be as large as that of the Exxon Valdez.

293.    The FEIS and the ROD entirely fail to consider an important aspect of the problem—the impact the Project and climate change have on the food supply for the Right Whales. That is yet another reason that the FEIS does not conform to NEPA and the ESA and the requirements of the OCSLA, the MMPA and the Guidelines.

294.    The FEIS and the ROD entirely fail to consider an important aspect of the problem—the devastation from a category 4 or category 5 hurricane hitting the WEA and destroying the WTGs, resulting in a catastrophic release of oil and contaminants into the marine

environment and causing the take, and possibly the extinction, of endangered species. That is yet another reason that the FEIS does not conform to NEPA and the ESA and the requirements of the OCSLA, the MMPA and the Guidelines.

295.   The Federal Defendants' failure to take a hard look at the impact on endangered species is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and violates the OCSLA, the MMPA, NEPA, and the Guidelines.   Therefore, the Federal Defendants' approvals must be vacated.

**COUNT XVII**
**THE FEDERAL DEFENDANTS BASED THEIR ANALYSES AND CONCLUSIONS ON AN UNLAWFUL STANDARD**

296.   Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs as though fully set forth herein.

297.   All of the Federal Defendants' approvals are based upon the Biological Opinion. The Biological Opinion based its analysis on unlawful regulatory changes made in 2019.

298.   In 2019, a final rule (the "Final Rule") revising regulations governing cooperation between federal agencies and the Services for federal agency actions that may affect listed species or critical habitat, "Revision of Regulations for Interagency Cooperation," 84 Fed. Reg. 44,976 (Aug. 27, 2019) (the "Interagency Consultation Rule"), was issued.  The Final Rule unlawfully and arbitrarily: limits when a federal agency action would be deemed to destroy or adversely modify designated critical habitat; significantly restricts analysis of the type and extent of effects of a federal agency action; limits when changed circumstances require re-initiation of consultation on a federal agency action; limits federal action agencies' duty to insure mitigation of the adverse effects of their proposals and gives these agencies the ability to make biological determinations that the Services are required to make themselves; places an unexplained time limit on informal

consultation and allows for "programmatic" and "expedited" consultations that lack the required and in-depth, site-specific analysis of a proposed federal agency action.

299.    The Final Rule violates the plain language and purpose of the ESA, its legislative history, numerous binding judicial precedents interpreting the ESA, and its precautionary approach to protecting imperiled species and critical habitat. The Final Rule also lack any reasoned basis and is otherwise arbitrary and capricious under the APA. Moreover, the Services have failed to consider and disclose the significant environmental impacts of the Final Rule in violation of NEPA. Under section 7, the Services' biological opinion must determine whether the action is likely to jeopardize the continued existence of any listed species or adversely modify or destroy any designated critical habitat. 16 U.S.C. §1536(b)(3)(A).

300.    If jeopardy or adverse modification is found, the biological opinion must include "reasonable and prudent alternatives" to the agency action that "can be taken by the federal agency or applicant in implementing" the action and that the Secretary believes would avoid jeopardy or adverse modification. 16 U.S.C. §1536(b)(3)(A). Finally, the biological opinion must include a written statement (referred to as an "incidental take statement") specifying the impacts of any incidental take on the species, any "reasonable and prudent measures that the [Services] consider [] necessary or appropriate to minimize such impact," and the "terms and conditions" that the agency must comply with in implementing those measures. *Id.* §1536(b)(4).

301.    FWS and NMFS share joint responsibility for the protection and conservation of endangered and threatened species under the ESA.  In general, FWS is responsible for terrestrial and inland aquatic fish, wildlife, and plant species, while NMFS is responsible for marine and anadromous species.

302.    The Services adopted joint regulations implementing sections 4 and 7 of the ESA

during the 1980s. *See e.g.*, 45 Fed. Reg. 13,010 (Feb. 27, 1980) (section 4); 48 Fed. Reg. 38,900

(Oct. 1, 1984) (section 4); 51 Fed. Reg. 19,926 (June 3, 1986) (section 7).  Prior to 2019, the

Services had not substantially amended those regulations since that time, although the Services

adopted minor amendments to the processes for listing species, designating critical habitat, and

conducting section 7 consultations in 2015 and 2016. *See* 81 Fed. Reg. 7,439 (Feb. 11, 2016); 81

Fed. Reg. 7,214 (Feb. 11, 2016); 80 Fed. Reg. 26,832 (May 11, 2015).

303.    On July 25, 2018, the Services published three separate notices in the Federal

Register proposing to revise several key requirements of the ESA's implementing regulations. 83

Fed. Reg. 35,174 (July 25, 2018) (the "Proposed 4(d) Rule"); 83 Fed. Reg. 35,178 (July 25, 2018)

(the "Proposed Interagency Consultation Rule"); 83 Fed. Reg. 35,193 (July 25, 2018) (the

"Proposed Listing Rule") (collectively, the "Proposed Rules"). While the Services characterized

the Proposed Rules as changes to assist and increase clarity and efficiency in implementation of

the ESA, in fact the Proposed Rules were identified as a "deregulatory action" pursuant to

President Trump's Executive Order 13771 ("Reducing Regulation and Controlling Regulatory

Costs"), and they would significantly weaken protections for our nation's most imperiled species.

304.    The Interagency Consultation Rule, which is at issue here, improperly:

a. limits the circumstances under which a federal agency action would be deemed
to destroy or adversely modify designated critical habitat by requiring the action
to affect such habitat "as a whole";

b. limits significantly the nature and scope of the analysis of the effects of a federal
agency action by altering the definitions of "effects of the action" and
"environmental baseline" and requiring that the effects be both a "but for" result

of the agency action and "reasonably certain to occur" based on "clear and substantial information";

c. limits the instances where changed circumstances would require re-initiation of consultation on a federal agency action;

d. limits federal action agencies' duty to ensure mitigation of the adverse effects of their proposals and unlawfully delegates to federal action agencies the ability to make biological determinations that the Services are required to make; and

e. allows for broad-based "programmatic" and "expedited" consultations that lack necessary site-specific and in-depth analysis of a proposed federal agency action.

305.   The Final Rule is a major federal action that will significantly affect the human environment under NEPA. The Services, however, provided no environmental analysis of the Proposed Rule under that statute.  Instead, the Services erroneously contend that the Final Rule was categorically excluded from NEPA review because they "are of a legal, technical, or procedural nature," citing 43 C.F.R. § 46.210(i) and NOAA Administrative Order 216-6.

306.   The Biological Opinion in this case, on which all approvals and the FEIS was based uses the unlawful Final Rule as the basis for the Biological Opinion.  The Biological Opinion is thus fatally flawed, and does not conform with the requirements of the ESA, NEPA, the OCSLA, the MMPA or the Guidelines, and cannot be the basis for the FEIS, the ROD or the Federal Defendants' approvals.

307.   For that reason, the FEIS, the ROD and the Federal Defendants have failed to comply with NEPA, the OCSLA, the MMPA, the Guidelines and federal law, and the FEIS and the Federal Defendants' approvals must be vacated.

308.    The Federal Defendants' failure to use the lawful consultation standard is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

309.    The issuance of the Final Rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and must also be vacated.

<u>COUNT XVIII</u>
**FAILURE TO ANALYZE AND DETERMINE WHETHER THE PROPOSED PROJECT MEETS THE REQUIREMENTS OF 50 C.F.R. §216.102 (VIOLATION OF THE MMPA)**

310.    Plaintiffs re-allege and incorporate by reference the allegations contained in each of the forgoing paragraphs as though fully set forth herein.

311.    An IHA may be issued only if the NMFS finds, "based on the best scientific evidence available, that the total taking by the specified activity during the specified time period will have a negligible impact on species or stock of marine mammal(s) and will not have an unmitigable adverse impact on the availability of those species or stocks of marine mammals intended for subsistence uses." 50 C.F.R. §216.102.

312.    No analysis was performed, and certainly no conclusion was made, justifying the Project as meeting the dual high bars that "the total taking …will have a negligible impact" and that "the total taking … will not have an unmitigable adverse impact on the availability of those species or stocks of marine mammals intended for subsistence uses."

313.    Further, the Federal Defendants have failed to address those mandated criteria.

314.    The Federal Defendants' failures are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

315.    As a result, the Federal Defendants' approvals of the Project must be vacated.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

A.      Declare that Federal Defendants' authorizations challenged herein violate NEPA, the MMPA, the OCSLA, and the Guidelines and their implementing regulations (other than the Final Rule);

B.      Vacate Federal Defendants' authorizations and void the approvals of the proposed Vineyard Wind Project;

C.      Enjoin Federal Defendants from approving or otherwise taking action on any applications for permits for the Vineyard Wind Project until Federal Defendants have fully complied with NEPA, the MMPA, the OCSLA, and the Guidelines and their implementing regulations (other than the Final Rule), and prepared an EIS comprehensively analyzing the all direct, indirect, and cumulative effects of the authorizations challenged herein, and taken the required hard look analysis required by the Guidelines, NEPA, the MMPA and the OCSLA;

D.      Vacate the Final Rule;

E.      Declare that no permitting may be issued under the MMPA for the Project because any approval would need to account for decommissioning which is beyond the statutory five-year limit;

F.      Retain continuing jurisdiction of this matter until Federal Defendants fully remedy the violations of law complained of herein, in particular to ensure Federal Defendants take a meaningful hard look at the direct, indirect, and cumulative impacts of the proposed Vineyard Wind Project;

G.      Award Plaintiffs their fees, costs, and other expenses as provided by applicable law;

H.      Issue such relief as Plaintiffs subsequently request or that this Court may deem

just, proper, and equitable.

Respectfully submitted,

THE PLAINTIFFS,

By their attorney,

Dated: July 18, 2021

*/s/Thomas Melone*
Thomas Melone
BBO No. 569232
Allco Renewable Energy Limited
157 Church St., 19th Floor
New Haven, CT 06510
Telephone: (212) 681-1120
Facsimile: (801) 858-8818
Thomas.Melone@AllcoUS.com