**UNITED STATES DISTRICT COURT**

**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| THOMAS MELONE,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>JANET COIT, in her official capacity of Assistant Administrator, of the National Marine Fisheries Service, and the NATIONAL MARINE FISHERIES SERVICE,<br><br>　　　　　　　Defendants**.** | Case No. 1:21-cv-11171<br><br>**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**Leave to file granted on August 24, 2022** |

<u>**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**</u>

　　　Pursuant to Fed. R. Civ. P 15, Plaintiff Thomas Melone hereby files this second amended complaint seeking declaratory and injunctive relief, stating as follows in support:

　　　1.　　This case challenges the issuance of the incidental harassment authorization ("IHA") issued by the Defendants to Vineyard Wind 1 LLC ("Vineyard Wind" or "VW").　It asks the Court to set aside the IHA as having been issued in violation the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. §1371 *et seq*.

**JURISDICTION AND VENUE**

　　　2.　　This action arises under the MMPA and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

　　　3.　　Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 because the action raises a federal question. The Court has authority to issue the requested declaratory and injunctive

relief pursuant to 28 U.S.C. §§2201, 2202, and 5 U.S.C. §§705, 706.

4.     This action reflects an actual, present, and justiciable controversy between Plaintiff and the Defendants within the meaning of the Declaratory Judgment Act, 28 U.S.C. §2201. Plaintiff's interests will be imminently adversely affected and irreparably injured if the Defendants continue to violate the MMPA and if the IHA is not rescinded or set aside.  These injuries are concrete and particularized, and fairly traceable to the Defendants' challenged decisions, providing the requisite personal stake in the outcome of this controversy necessary for this Court's jurisdiction.

5.     The requested relief would redress the actual, concrete injuries to the Plaintiff caused by the Defendants' failure to comply with the MMPA and the APA.

6.     The challenged agency actions are final and subject to judicial review pursuant to 5 U.S.C. §§702, 704 and 706.

7.     Plaintiff has exhausted administrative remedies to the extent required to do so.

8.     Venue in this Court is proper pursuant to 28 U.S.C. §1391(e) because a substantial part of the events or omissions giving rise to this suit occurred in this district, and the proposed Vineyard Wind project would be partially located in this district, and the principal place of business of the developer is in Massachusetts.

## THE PARTIES

9.     Plaintiff Thomas Melone lives part-time in Edgartown, Massachusetts, on Nantucket Sound. Plaintiff Melone lives part-time at his home in Edgartown during the months of May through November with the bulk of the time being from June through September.  Plaintiff Melone has a particularized interest in and is concerned about the adverse effect of the Vineyard Wind project and other foreseeable offshore wind projects will have on the North Atlantic Right

Whale ("NARW") whose critical habitat includes Nantucket Sound.  Plaintiff Melone derives recreational, conservation, environmental well-being and aesthetic benefits from the existence of the NARW and their properly functioning habitat through wildlife observation, study, and education.  Melone believes in developing sustainable and economically viable renewable energy generation in the United States, while maximizing the creation of United States jobs and minimizing the impact to the environment.  Melone believes that offshore wind has too many adverse impacts and creates too much risk and adverse impacts on the marine, coastal and human environment and various species.

10.     Throughout Melone's life he has enjoyed observing marine life and enjoying the recreational, conservation, environmental well-being and aesthetic benefits from doing so.  From local places such as the Jersey shore as a child, to far flung locations as an adult, such as Point Barrow, Alaska, Norway, and Australia, he has enjoyed observing marine life and enjoying the recreational, conservation, environmental well-being and aesthetic benefits from doing so.  He has enjoyed observing dolphins and whales off the coast of Malibu on visits to California and enjoyed the recreational, conservation, environmental well-being and aesthetic benefits from doing so.  He has enjoyed looking for marine life and polar bears off the beach in Point Barrow, Alaska and enjoyed the recreational, conservation, environmental well-being and aesthetic benefits from doing so.  He has enjoyed observing marine life including humpback and orca whales in Prince William Sound, Alaska, and enjoyed the recreational, conservation, environmental well-being and aesthetic benefits from doing so.  He has enjoyed sitting on the beach at night observing penguins march to the ocean in Philip Island, Australia, and enjoyed the recreational, conservation, environmental well-being and aesthetic benefits from doing so.

11.     In respect of the NARW, he first expressed his concerns to the Defendants

regarding the Vineyard Wind project in 2019 in a public comment.  Since that time, he has watched in disbelief as the NARW population declines at an alarming rate and the Defendants authorize exponential increase in the "take" of the NARW.

12.     Melone's first trip planned for observing the NARW in Florida was in December 2020 at Amelia Island, however, due to the COVID-19 pandemic, that trip was cancelled.  In respect of the NARW, Plaintiff Melone went whale watching on New England Aquarium's Whale Watch Cruise on October 1, 2021, looking for the NARW.  Melone did not observe a NARW on that trip, but did observe a handful of humpback whales, another species that Melone derives recreational, conservation, environmental well-being and aesthetic benefits from.  On October 26-27, 2021, Melone attended two full days of events of the NARW Consortium Annual Meeting, learning from experts about the plight of the NARW.  From December 28, 2021, to December 31, 2021, Melone engaged in a NARW-watch in Fernandina Beach, Florida, from a fifth-floor room at the Ritz Carlton using Celestron – SkyMaster 25X100 Astro Binoculars.  Melone observed many porpoises each of the four days, and observed a NARW (Derecha) and her calf on December 30, 2021, at 7:40am.  Melone observed them until 8:00am at which point he reported the sighting on the WhaleAlert app.  After he reported the sighting, he continued to search for them but did not see them.  Shortly after 9am he received a call from a representative from the Florida Fish & Wildlife Conservation Commission ("FL FWCC") asking him about the sighting.  He gave her the information and then she said that their people would be taking off to soon to verify the sighting. The following day the FL FWCC let him know they confirmed the sighting.  Melone intends to annually attend the NARW Consortium Annual Meeting continuing to learn and study the NARW and to annually engage in a NARW watch from Fernandina Beach in December or early January, which is the time of year that NARWs are present in the waters off Fernandina Beach.  Melone

has registered to attend virtually the 2022 NARW Consortium Annual Meeting.  Melone's next scheduled trip to Fernandina Beach for NARW watching is December 28 to December 30, 2022.

13.     The Defendants' failure to comply the MMPA will result in an inadequate mitigation of harm to the NARW and their habitats that benefit Plaintiff Melone. This harms Plaintiff Melone's past, present and future enjoyment of this species and their habitats.   The Defendants' approvals and failure to adhere to the MMPA would imminently harm Melone because it would reduce his likelihood of spotting NARWs in his planned annual trips to Fernandina Beach for NARW watching lessening the aesthetic, environmental well-being, recreational, conservation, and benefits Melone derives from the NARW.  The Defendants' approvals cause the NARW to be taken, interfere with the NARW's natural state and increase their risk of death and serious injury, reducing the likelihood that Plaintiff Melone will observe the NARW in their natural state on future visits. Requiring the Defendants to comply with the MMPA would ensure that the NARW and Plaintiff Melone's cognizable interests in that species would not be substantially adversely affected and would redress those harms to Plaintiff Melone.

14.     Janet Coit is the Assistant Administrator, NMFS, and is sued in her official capacity.

15.     NMFS is an office of the National Oceanic and Atmospheric Administration within the Department of Commerce.  NMFS is responsible for the stewardship of the Nation's ocean resources and their habitat.  NMFS issues IHAs under section 101(a)(5)(D) of the MMPA, 16 U.S.C. §1371(a)(5)(D)).

## STANDING

### A.  Procedural Standing

16.     Plaintiff has standing to challenge the Defendants' action and standing to ensure

that the Defendants' follow all procedural and substantive requirements in their decision-making and under the MMPA.

17.     Plaintiff has a procedural right to comment on the proposed mitigation measures for the NARW.  Defendants have denied the Plaintiff those procedural rights.    If Plaintiff were able to exercise his procedural rights to comment on such issues, his concrete interest could be protected.  Because part of the MMPA requires the Defendants to follow certain procedures including notice and comment, injury alleged to have occurred as a result of violating those procedures confers standing.

18.     Plaintiff's procedural standing would be redressed by an order that requires the Defendants to follow procedural requirements that make it less likely that the Defendants' action will be finalized and ultimately upheld in legal challenges, and less likely that the VW Project would be built.

   **B. Informational Standing.**

19.     Plaintiff Melone engages in advocacy before Congress, federal agencies and State legislatures and agencies to ensure that such entities recognize the benefits of solar energy and the detriments of OSW and implement policy and programs accordingly.  .

20.     A proper legal and factual analysis by the Defendants under the MMPA would produce key information that Plaintiff would use to engage in his regulatory advocacy.  Defendants are required by the MMPA to prepare such information and make it available to Plaintiff.

21.     A proper legal and factual analysis under the MMPA would produce information from a neutral federal agency that has greater credibility and weight than any such information developed and produced by private entities.

22.     The Defendants' failure to prepare a proper legal and factual analysis under the

MMPA denies Plaintiff the key, credible, and weighty information that he would use in engaging in his regulatory advocacy, which information the Defendants are required under the MMPA to prepare and provide to Plaintiffs.

23.     An order for the Defendants to prepare a proper legal and factual analysis under the MMPA would redress the denial of the information by requiring the Defendants to provide a proper legal and factual analysis under MMPA, which will cause the information to be produced and available to Plaintiff for his use in regulatory advocacy.

### C. Species Impacts Standing.

24.     The Plaintiff's cognizable interests as stated above in the NARW has been and would be continued to be harmed by the Defendants' actions, which would harm habitat, reduce the population of the NARW, result in take of the NARW and fail to ensure that not a single whale suffers death or serious injury from the construction and operation activities of Vineyard Wind.

25.     An order vacating the IHA would redress the Plaintiff's injuries.  An order declaring that no permitting may be issued under the MMPA for the Vineyard Wind Project because any approval would need to account for decommissioning which is beyond the statutory five-year limit would redress the Plaintiff's injuries.  An order declaring that no permitting may be issued for the Vineyard Wind Project because take of the NARW by the VW Project is not incidental to the carrying out the construction, operation and decommissioning of the Project would make it less likely that Defendants' action will be finalized and the Project approved and thereby redress the Plaintiff's injuries.

### D. MMPA Standing.

26.     Plaintiff Melone has standing because as stated above Melone derives concrete aesthetic, environmental well-being, recreational, and conservation benefits from the NARW that

would be imminently harmed by the Defendants' failure to follow the requirements of the MMPA.

**E. Administrative Exhaustion.**

27.     While no administrative exhaustion is required, Plaintiff is a party that submitted a comment during the environmental review of the Project.  A commenter during the environmental review of the VW Project filed a sufficiently detailed comment so as to put the lead agency on notice of the issue on which Plaintiffs seek judicial review to the extent necessary.

## LEGAL AND FACTUAL BACKGROUND

**I.     The Marine Mammal Protection Act**.

28.     The MMPA prohibits, with certain exceptions, the "take" of marine mammals in U.S. waters and by U.S. citizens on the high seas, and the importation of marine mammals and marine mammal products into the U.S.   The primary purpose of MMPA is protection of marine animals and the MMPA was not intended to balance interests between other industries and the protected marine mammals. *Committee for Humane Legislation, Inc. v. Richardson*, 414 F. Supp. 297 (D.D.C.), *aff'd*, 540 F.2d 1141 (D.C. Cir. 1976).

## COUNT I (formerly COUNT IV)
## FAILURE TO ADHERE TO THE MMPA NOTICE REQUIREMENTS
## (VIOLATION OF THE MMPA)

29.     Plaintiff re-alleges and incorporates by reference the allegations contained in each of the forgoing paragraphs as though fully set forth herein.

30.     16 U.S.C. §1371(a)(5)(D), provides that "[u]pon request therefor by citizens of the United States who engage in a specified activity (other than commercial fishing) within a specific geographic region, the Secretary shall authorize, for periods of not more than 1 year, subject to such conditions as the Secretary may specify, the incidental, but not intentional, taking by harassment of small numbers of marine mammals of a species or population stock by such citizens

while engaging in that activity within that region if the Secretary finds that such harassment during each period concerned [] will have a negligible impact on such species."

31.     On September 7, 2018, NMFS received a request from Vineyard Wind for an IHA to take marine mammals incidental to pile driving associated with the construction of an offshore wind energy project south of Massachusetts. NMFS000000000003392.  Vineyard Wind submitted revised versions of the application on October 11, 2018 and on January 28, 2019.  *Id.* The application was deemed adequate and complete on February 15, 2019.  *Id*. A notice of proposed IHA was published in the Federal Register on April 30, 2019 (84 FR 18346).  *Id*.

32.     VW submitted a revised application on April 19, 2019.  NMFS000000000003144. The Notice of Proposed IHA made no mention of the revised IHA application submitted in April 19, 2019.

33.     The Notice of Proposed IHA defined the "Specific Geographic Region" as follows: "Vineyard Wind's proposed activity would occur in the northern portion of the 675 square kilometer (km) (166,886 acre) Vineyard Wind Lease Area OCS– A 0501 (Figure 1 in the IHA application), also referred to as the WDA.   At its nearest point, the WDA is just over 23 km (14 mi) from the southeast corner of Martha's Vineyard and a similar distance from Nantucket. Water depths in the WDA range from approximately 37–49.5 meters (m) (121– 162 feet (ft))." NMFS000000000003393.

34.     16 U.S.C. §1371(a)(5)(D)(iii) states that the "Secretary shall publish a proposed authorization not later than 45 days after receiving an application [] and request public comment through notice in the Federal Register, newspapers of general circulation, and appropriate electronic media and to all locally affected communities for a period of 30 days after publication."

35.     The Administrative Record contains no record of notices having been issued

requesting public comment through or in newspapers of general circulation, and appropriate electronic media and to all locally affected communities.

36.     The proposed IHA's comment period closed on May 30, 2019. NMFS000000000003392.

37.     16 U.S.C. §1371(a)(5)(D)(iii) provides that "Not later than 45 days after the close of the public comment period, if the Secretary makes the findings set forth in clause (i), the Secretary shall issue an authorization with appropriate conditions to meet the requirements of clause (ii)." 50 C.F.R § 216.107(c) requires that an "incidental harassment authorization [to] be either issued or denied within 45 days after the close of the public review period." 50 C.F.R. § 216.107(d) requires the notice of issuance or denial of an incidental harassment authorization to be published in the Federal Register within 30 days of issuance of a determination.

38.     NMFS issued the IHA on May 21, 2021 (NMFS000000000003509 and NMFS000000000003514).  The notice of IHA was published in the Federal Register on June 25, 2022. NMFS000000000003515. The IHA states that it is valid from May 1, 2023 through April 30, 2024. *Id.*

39.     The NMFS finding that the total taking by the specified activity during the specified time period will have a negligible impact on species of marine mammals must be based upon "the best scientific evidence available." 50 C.F.R. §216.102(a).

40.     The IHA is invalid because it was issued the IHA without observance of the following procedures required by law:

    a.  NMFS failed to publish a proposed authorization not later than 45 days after receiving the VW application;

    b.  NMFS failed to comply with the requirement of 16 U.S.C. §1371(a)(5)(D)(iii) and 50

C.F.R § 216.107(c) to issue or deny the IHA within 45 days of the end of the public comment period;

c.   NMFS failed to request public comment through newspapers of general circulation, and appropriate electronic media and to all locally affected communities for a period of 30 days after publication, which affected communities include the entire range of the NARW (including Martha's Vineyard and Amelia Island);

d.   NMFS failed to publish the notice of issuance of the IHA within 30 days of issuance;

41.   Plaintiff Melone has been harmed and will continue to be harmed by NMFS's issuance of the IHA without having observed the procedure required by law because Melone was unaware of the application for the IHA during the comment period because of NMFS's failure to issue the required notice and request public comment through newspapers of general circulation (such as the Vineyard Gazette and the Boston Globe both of which Melone reads regularly), and appropriate electronic media and to all locally affected communities, such as Martha's Vineyard, and would have commented if Melone had proper notice.

42.   Plaintiff Melone has been harmed and will continue to be harmed by NMFS's issuance of the IHA without having observed the procedure required by law and NMFS's violations of the various mandatory time restrictions for the issuance of an IHA to Vineyard Wind in additional ways.  First, the MMPA makes it clear that an application needs to be approved or denied within a strict timeframe.  If it is not approved within that timeframe, Melone (like the public) is entitled to consider the application dead, without prejudice to the filing of a new application.  Second, as someone that has a special interest in the NARW, Melone has a valid legal interest in relying on agency accountability and compliance with the procedural requirements for issuance of an IHA which are intended to benefit the public (of which Melone is a member), and

persons such as Melone that have a special interest in marine mammals.  NMFS's violation of procedural requirements harms Melone and completely upends the detailed process specified by Congress.   Third, the law permits the issuance of an IHA only for an application whose notice of proposed IHA is issued no more than 75 days earlier than the IHA, and permits the issuance of an IHA only for an application whose public comment period occurred no later than 45 before the issuance of the IHA.  Those requirements benefit Melone as a member of the public and as a person that has a special interest in marine mammals because they ensure agency decisionmaking and the public right to comment based upon current data, not data that is years old.  Fourth, NMFS's violations have deprived Melone of the ability to comment on a proper notice of proposed IHA. Fifth, NMFS's violation of issuing an IHA that was not immediately preceded by a public comment period as prescribed by the statute, has deprived Melone of the ability to comment on a notice of proposed IHA based upon current scientific information.  Sixth, NMFS's violation of issuing an IHA that was not immediately preceded a notice of proposed IHA, has deprived Melone of receiving information that is based upon current and best scientific information that would explain NMFS's basis for proposing to issue an IHA.

43.    The Vineyard Wind IHA was issued without observance of the procedure required by law, it therefore must be set aside and vacated.

## COUNT II (formerly COUNT XIII)

## NMFS'S VINEYARD WIND INCIDENTAL HARASSMENT AUTHORIZATION VIOLATES THE MMPA

44.    Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs as though fully set forth herein.

45.    Section 101(a) of the MMPA (16 U.S.C. §1361) prohibits persons or vessels subject to the jurisdiction of the United States from taking any marine mammal in waters or on lands under

the jurisdiction of the United States or on the high seas (16 U.S.C. §1372(a) (l), (a)(2)). Sections 101(a)(5)(A) and (D) of the MMPA provide exceptions to the prohibition on take, which give NMFS the authority to authorize the incidental but not intentional take of small numbers of marine mammals, provided certain findings are made and statutory and regulatory procedures are met. Incidental Take Authorizations ("ITAs") may be issued as either (1) regulations and associated Letters of Authorization or (2) an IHA.

46.     50 C.F.R. §216.103 provides the following definitions:

- "Negligible impact is an impact resulting from the specified activity that cannot be reasonably expected to, and is not reasonably likely to, adversely affect the species or stock through effects on annual rates of recruitment or survival."

- "Small numbers means a portion of a marine mammal species or stock whose taking would have a negligible impact on that species."

- "Specified activity means any activity, other than commercial fishing, that takes place in a specified geographical region and potentially involves the taking of small numbers of marine mammals."

- "Specified geographical region means an area within which a specified activity is conducted and that has certain biogeographic characteristics."

47.     Letters of Authorizations may be issued for up to a maximum period of 5 years, and IHAs may be issued for a maximum period of 1 year.  NMFS has also promulgated regulations to implement the provisions of the MMPA governing the taking and importing of marine mammals (50 C.F.R. §216) and has published application instructions that prescribe the procedures necessary to apply for an ITA.  U.S. citizens seeking to obtain authorization for the incidental take of marine mammals under NMFS's jurisdiction must comply with these regulations and application

instructions in addition to the provisions of the MMPA.

48.     Activities that have the potential to result in serious injury or mortality must be authorized under 50 C.F.R. § 216.105, which is through regulations, not an IHA.  *See* 50 C.F.R. § 216.107.

49.     Once NMFS determines an application is adequate and complete, NMFS has a corresponding duty to determine whether and how to authorize take of marine mammals incidental to the activities described in the application.  To authorize the incidental take of marine mammals, NMFS evaluates the best available scientific information to determine whether the take would have a negligible impact on the affected marine mammal species or stocks and an immitigable impact on their availability for taking for subsistence uses.  NMFS must also prescribe the "means of effecting the least practicable adverse impact" on the affected species or stocks and their habitat, and on the availability of those species or stocks for subsistence uses, as well as monitoring and reporting requirements.

50.     The term "take" means "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal" (16 U.S.C. §1362(3)(13)). The incidental take of a marine mammal falls under three categories: mortality, serious injury, or harassment (i.e., injury and/or disruption of behavioral patterns).  Harassment, as defined in the MMPA for non-military readiness activities (Section 3(8)(A)), is any act of pursuit, torment, or annoyance that has the potential to injure a marine mammal or marine mammal stock in the wild (Level A harassment) or any act of pursuit, torment, or annoyance that has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns (Level B harassment).  Disruption of behavioral patterns includes, but is not limited to, migration, breathing, nursing, breeding, feeding, or sheltering.

51.     Authorization for incidental takings shall be granted if NMFS finds that the taking involves small numbers, will have a negligible impact on the species or stock(s) and will not have an unmitigable adverse impact on the availability of the species or stock(s) for taking for subsistence uses (where relevant).

52.     An IHA is appropriate if the proposed action would result in harassment only (i.e., injury or disturbance) and is not planned for multiple years.

53.     A LOA is required if the actions will result in harassment only (i.e., injury or disturbance) and is planned for multiple years. For a Letter of Authorization, NMFS must issue regulations.

54.     An IHA is inappropriate for the Project for multiple reasons.  First, the proposed action for the Project will certainly require more than 1 year for construction, causing noise from pile driving, dredge from the disturbance of the sea floor, increased vessel traffic and other effects discussed in the FEIS.  Second, the Project would be operated and then would need to be decommissioned.  Noise from operation and from vessel traffic will result in take of the NARW. Decommissioning will also result in noise and vessel traffic that will cause take of the NARW. The need to decommission the Project removes any ability of the Defendants to issue a permit of any kind under the MMPA because the take will clearly occur at the end of the useful life of the Project far exceeding the five-year statutory limitation when taking into account the construction and operation of the Project.

55.     Third, Vineyard Wind's activities under the COP (including those that relate to pile driving) have the potential to result in serious injury or mortality and therefore must be authorized under 50 C.F.R. § 216.105, which is through regulations, and not through an IHA.

56.     In a memorandum dated April 22, 2019, Jolie Harrison, the Chief of the NMFS

Permits and Conservation Division concluded that "[t]he possibility of take by serious injury or death is considered unlikely, based on the best available information.  Unlike the use if explosives or mid-frequency sonar, which can kill or seriously injure marine mammals, the sound from pile driving is very unlikely to result in the types of physiological or behavioral reactions that could result in serious injury or death." NMFS 0000003559.   The Permits and Conservation Division's conclusion that serious injury is very unlikely means that the activity still has the potential to result in serious injury or mortality.

57.    Fourth, numerous vessel transits that will be made for pile-driving activities (including high-speed vessel transits) and the other activities under the COP have the potential to result in serious injury or mortality from vessel strikes and therefore must be authorized under 50 C.F.R. § 216.105, which is through regulations, and not through an IHA.

58.    NMFS ignored (and did not take the required hard look at) the potential take from Vineyard Wind's vessels striking the NARW—vessels that in general will have no speed limits—and that will be under severe financial pressure to hit maximum throttle.   The crew transfer vessels ("CTVs") for Vineyard Wind will be more than 98 feet long, with a maximum speed of 29 knots (33mph). [1]  Crew members can work a maximum of 12 hours/day.   NMFS000000000015814. Construction of the project will be based out of New Bedford, MA, which by vessel is a 50 to 60 mile trip to the wind development area (WDA), depending on the route taken. *Id*.  The CTVs will transport crews from New Bedford to the WDA and bring crews back to New Bedford, as crews work on a rotational basis. *Id*.  The 50 to 60 mile trip at 10 knots would take approximately 4.5 to 5 hours each way, which is not feasible when workers can only work offshore a maximum of 12

---

[1]      https://www.oedigital.com/news/498226-st-johns-shipbuilding-starts-building-ctv-for-u-s-offshore-wind-farm.

hours a day. *Id.* As Vineyard Wind told NMFS: "Simply put, the project could not be constructed within one season if there was a 10 knot speed restriction during construction." *Id.*

59.     The EIS indicates that these large and fast crew transfer vessels will account for the lion's share all the Project's vessel trips. (BOEM 34746.)  The Notice of Proposed IHA states that "an average of ~25 vessels will be involved in construction activities on any given day."

60.     So what will that mean for the NARW?  It will mean, for example, that during all times of the year including the peak season for NARW presence—December through early May— the CTVs will be moving at maximum speed in almost all circumstances, far too fast for Protected Species Observers ("PSOs") or other measures to be of any value. A strike of a NARW by a CTV travelling at 30 mph will result in certain death of the whale. Construction of the Vineyard Wind project "within one season" is no justification for dramatically increasing the risk to death to a whale from a vessel strike.

61.     The only reason Vineyard Wind wants to try to construct its project within one season is because it wants to improperly use a 1-year IHA instead to applying for the issuance of 5-year regulations.

62.     NMFS issued proposed regulations on August 1, 2022, proposing new speed limits in the area that all Vineyard Wind vessels will travel.[2]  NMFS's discussion in the proposed regulations confirms that Vineyard Wind's vessel transits have the potential to cause serious injury or mortality of the NARW, thus eliminating the use of an IHA.  NMFS's discussion in the proposed regulations also confirms NMFS did not take the required hard look at risk to the NARW from vessel strikes.

---

[2] Federal Register, Vol. 87, No. 146 at 46921 (August 1, 2022), https://www.federalregister.gov/documents/2022/08/01/2022-16211/amendments-to-the-north-atlantic-right-whale-vessel-strike-reduction-rule.

63.     Crucially, NMFS's proposed regulation are based upon information that it already had in its possession when it issued the Vineyard Wind IHA.  NMFS simply did not take the required hard look, or indeed any look, at the risk to the NARW from vessel strikes and authorizing Vineyard Wind vessels to travel at a speed greater than 10 knots.

64.     In the Notice of Proposed IHA, NMFS described the specific activity as the construction of the Vineyard Wind Offshore Project.  NMFS000000000002974 ("Vineyard Wind, LLC (Vineyard Wind) is proposing to construct an 800 megawatt (MW) commercial wind energy project (the Project) in Lease Area OCS-A 0501, offshore Massachusetts.")  But then illogically, NMFS analyzed take from only the noise from the driving of piles into the ocean floor.   NMFS failed to analyze the entire construction activities offshore.  NMFS also failed to analyze the activities integral to pile driving and construction, such as vessel transits (including CTVs) to and from New Bedford, Massachusetts.

65.     The  Defendants' have also failed to provide substantial evidence that the take from the Project will only affect small numbers of marine mammals.   The noise and other harassment from the Project will affect a greater than small number of NARWs and other marine mammals and NMFS's decision was based on outdated data.

66.     The IHA authorized the take, Level B Harassment, at 20 individual NARWs. NMFS000000000003510.  NMFS based the calculation of twenty on a spreadsheet provided by Vineyard Wind.  NMFS000000000014612.  The spreadsheet calculates the 20 from the following equation: (A) divided by (B) where (A) equals the number of individual NARW sighted in 2018 = 9, (B) 58 equals the number of days in year in which bottlenose dolphin, Short-beaked common dolphin, Fin whale, Gray Seal, Harbor Porpoise, Harbor Seal, Humpback Whale, Long-finned pilot whale, Minke Whale, NARW, Pilot Whale, Seal, Sei whale, Sperm whale, Unidentified Dolphin,

Unidentified Mysticete Whale, Unidentified Shelled Sea Turtle, Unidentified Whale, white-sided dolphin were sighted.

67.     Even assuming NMFS's calculation of take methodology were correct (which it is not), NMFS's methodology shows that the take is more than "small numbers," and above what NMFS concluded was "small numbers."  NMFS concluded that up to 5.4% of a species constituted "small numbers." NMFS000000000003486.   The NMFS calculation of takes was based upon a methodology proposed by Vineyard Wind.   NMFS000000000014612.  The "small number" conclusion was reached because the take of the NARW was 5.0% of the species using the Vineyard Wind methodology.  But no analysis was performed by NMFS supporting its conclusory statement that 5.4% of a species is "small numbers."

68.     The 5.0% was reached by dividing the calculated take—20—by the abundance of the species.  Vineyard Wind and NMFS used old data—394.  The NMFS's conclusion when the IHA was issued was that the population of NARW had dwindled to 356 (i.e., 5.6%). NMFS000000000003484.  The most recent scientific evidence is that the NARW population is now at 336,[3] increasing the take number to 6.0%.

69.     In addition to the denominator being wrong, the numerator is as well. The NMFS analysis hinges on manifestly erroneous assumptions, such as an extremely low level of NARWs in the wind energy area, and ignoring vessel transits and other activity (except for pile driving noise). NOAA's April 15, 2021, featured story entitled: *North Atlantic Right Whales On the Move in the Northeast:* "A very small portion of the right whale population heads south to the waters off

---

[3] H.M. Pettis, et al., *North Atlantic Right Whale Consortium 2021 Annual Report Card: Report to the North Atlantic Right Whale Consortium* (2022), https://www.narwc.org/uploads/1/1/6/6/116623219/2021report_cardfinal.pdf. 7 North Atlantic Right Whale, NMFS (last accessed June 6, 2022), https://www.fisheries.noaa.gov/species/northatlantic-right-whale.

northern Florida and Georgia in the winter—mostly just the moms—to give birth," said Tim Cole, a marine mammal researcher and lead of the center's aerial whale survey team. We try to determine where the rest of the population is and have found them so far this year in large numbers on Nantucket Shoals south of Martha's Vineyard and Nantucket, and in Cape Cod Bay."[4]

70.     Small numbers under the MMPA cannot exceed the PBR, which for the NARW is less than one. The IHA therefore violates the MMPA for this reason as well.

71.     The significant increase of the NARW in the wind energy lease areas south of Martha's Vineyard has been reported in two studies.  E. Quintana-Rizzo et al., "*Residency, demographics, and movement patterns of North Atlantic right whales Eubalaena glacialis in an offshore wind energy development area in southern New England, USA*," Endangered Species Research, Vol. 45: 251–268 (2021) (NMFS 53318-53335) ("Quintana 2021").  O. O'Brien, D. E. Pendleton, L. C. Ganley, K. R. McKenna, R. D. Kenney, E. Quintana-Rizzo, C. A. Mayo, S. D. Kraus & J. V. Redfern,  *Repatriation of a historical North Atlantic right whale habitat during an era of rapid climate change*  (July 20, 2022). https://www.nature.com/articles/s41598-022-16200-8 ("O'Brien 2022").  Both studies were based on information NMFS had when it issued the Vineyard Wind IHA.   NMFS acted arbitrarily and capriciously by using Vineyard Wind's calculation and old data and by ignoring the increased presence of the NARW in, and its increased use of, the wind energy lease areas south of Martha's Vineyard as foraging, socializing and mating grounds.

72.     Even if NMFS's taking calculation of the NARW at 5% of the species were correct (which it is not), that "small numbers" cannot mean five percent of a species facing extinction is confirmed by that phrase's use elsewhere in the MMPA.  Congress imposed an identical "small

---

[4] https://www.fisheries.noaa.gov/feature-story/north-atlantic-right-whales-move-northeast.

numbers of marine mammals" requirement on authorizing activities that may seriously injure or kill marine mammals. 16 U.S.C. § 1371(a)(5)(A)(i); 50 C.F.R. § 216.107(a).  In general, "identical words used in different parts of the same act are intended to have the same meaning." *Healthkeepers*, *Inc. v. Richmond Ambulance Auth.*, 642 F.3d 466, 472 (4th Cir. 2011) (quoting *Helvering v. Stockholms Enskilda Bank*, 293 U.S. 84, 87 (1934)).   If NMFS is right that five percent is a "small number," that would mean Congress intended to allow *each* permittee to injure or kill one out of every twenty animals in each affected marine mammal population.   Yet allowing such extensive harm would directly conflict with the MMPA's protective purpose, as it could quickly lead to the extinction of the species. *See* 16 U.S.C. § 1361(1), (2), (6) (describing the purposes of the MMPA).

73.     To be lawful, an agency's action must "be the product of reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 52, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983).   An agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," and must not "entirely fail[] to consider an important aspect of [a] problem." *Id*. at 43.   NMFS's negligible- impact and small numbers determinations violate these commands by failing to account for the overlapping, additive impacts of the full panoply of Vineyard Wind's COP activities and the other IHAs issued that involve "take" of the NARW.

74.     Under the MMPA, NMFS cannot lawfully authorize any action unless it will have "a negligible impact on [each marine mammal] species or stock." 16 U.S.C. § 1371(a)(5)(D)(i)(I). An impact is "negligible" if it "cannot be reasonably expected" to "adversely affect the species" by reducing "annual rates of recruitment or survival." 50 C.F.R. § 216.103.   Here, NMFS authorized multiple IHAs during similar time periods in areas occupied by the NARW.   But NMFS

never evaluated whether all the IHAs it authorized would have more than a negligible impact on marine mammal populations.   Instead, the agency "consider[ed] the potential impacts" of each application "independently"—that is, in isolation.   The same is true with respect to Vineyard Wind's COP activities.  NMFS acted arbitrarily and capriciously by only looking at take from noise from pile-driving.

75.    NMFS's approach is irrational because it ignores the reality that Vineyard Wind's pile-driving activities will not take place in isolation and marine mammals will not experience its effects in isolation.   Instead, months of survey activity, nearly a year of pile driving, more than a year of construction from Vineyard Wind and then from other offshore wind projects will hit the same marine mammal populations—driving them from their food, potentially separating them from their vulnerable calves, and disrupting their behavior.   The combined activity will have more significant impacts on affected species than a single segmented activity would: they will harass more animals, and they will harass individual animals more times than a single segmented activity would.  By looking at each segmented activity's "impact" in isolation, and ignoring all the other Vineyard Wind COP activities, NMFS refused to consider the ways in which those impacts will build on one another, which refusal was arbitrary and capricious.

76.    NMFS also acted arbitrarily and capriciously and ignored the law when it came to defining the specific geographical region.  The Notice of Proposed IHA unlawfully defined the "specific geographic region" extremely narrowly as "the northern portion of the 675 square kilometer (km) (166,886 acre) Vineyard Wind Lease Area OCS–A0501." NMFS000000000003393.  The result is an understatement of impacts.   NMFS's statement of the specified geographical region is unlawful and arbitrary and capricious because it is not based upon any analysis of *biogeographic* characteristics.   Even the narrowest approach would include in the

"specified geographic region" at a minimum the entire area south of Martha's Vineyard that has now become an important mating, socializing and foraging habitat for the NARW, as depicted in Figure 1 from the O'Brien study and shown below:



**Figure 1.** Known right whale habitats in the Northwest Atlantic. (**a**) Gray polygons encompass known right whale habitats; blue ovals represent emerging habitats. Black box and insets show the New England Aquarium broad-scale survey area. (**b**–**d**) Broad-scale survey effort (black lines) and right whale sightings (red circles) during three different time periods: (**b**) 2011–2012, (**c**) 2013–2015, (**d**) 2017–2019. White shading represents MA/RI wind energy lease areas. MV = Martha's Vineyard, N = Nantucket. Figure was created using ArcGIS Pro (version 2.9.2).

77.     More broadly, the specified region should be based upon the range of the NARW in the United States because from a biogeographic standpoint, the region in which the NARW exists defines the biogeographic region as to them.  But here the Court does not need to decide at this point which region is the appropriate based certain biogeographic characteristics.  That is because NMFS took no look, much less a hard look, at the proper specified geographical region based upon biogeographic characteristics.

78.     Under NMFS's approach there is no limit to how small Vineyard Wind could slice its activities so it appears that the "take" of the NARW represents small numbers.  Under NMFS's irrational approach Vineyard Wind would be able to divvy even its pile driving activities into one IHA for each pile even though driving all piles, like all Vineyard Wind's COP activities are necessary for the construction of its project.

79.     The Notice of Proposed IHA states that "an average of ~25 vessels will be involved in construction activities on any given day," yet NMFS assumes away any noise impact from the 25 vessels each day based upon the unproven and arbitrary assumption that "marine mammals in the area are presumably habituated to vessel noise," because "[e]xisting vessel traffic in the vicinity of the project area south of Massachusetts is relatively high."

80.     The Defendants' have also failed to provide substantial evidence that using the best available scientific information that the take would have a negligible impact on the NARW.  NMFS failed to use the best scientific evidence in issuing the IHA and calculating take.  NMFS erroneously limited the take analysis to noise from pile driving.  NMFS did not analyze any other COP activity of Vineyard Wind and did not take into account the cumulative effect on the NARW of all the take authorized by NMFS.  The take and small numbers analyses were based off old data.  The NMFS analysis used the number 9 for the number of sightings of NARW in an undefined

area.  Even assuming that number were true in some prior year, the most recent scientific   data

shows (which NMFS possessed at the time the Vineyard Wind IHA was issued) that the NARW

have moved-in to the Wind Energy Area all year round, are arriving earlier, staying longer and

increasing in numbers, and that the area is an important foraging and socialization area.  The most

recent surveys conducted by Quintana 2021 and O'Brien 2022 indicate that right whale presence

in the RI/MA WEA, which includes the project development area (WDA), is quite high during the

summer and extends into the fall. (NMFS 53329, 53331.) This finding is consistent with the

growing body of evidence that right whale migration and behavior patterns have shifted

dramatically due to environmental conditions. (BOEM 77331.) Right whales now spend time in

the Vineyard Wind WDA year-round. (NMFS 53324, 53329, 53331.)

81.    NMFS also failed to take a hard look at whether all VW's construction activities

have the potential to result in serious injury or mortality to the NARW.  NMFS failed to make a

finding that the VW construction activities do not have the potential to result in serious injury or

mortality of the NARW.  In order to go down the path of an IHA rather than regulations, NMFS

must first find that the VW construction activities do not have the potential to result in serious

injury or mortality of the NARW.  *See* 50 C.F.R. § 216.107.  NMFS failed to make such a finding.

82.    NMFS improperly segmented its analysis, considering Vineyard Wind's

construction surveys and pile driving as unrelated activities, and ignoring all other Vineyard Wind

construction, and operation and decommissioning activities.

83.    By its plain language the incidental harassment take authorization under Section

1371(a)(5)(D) requires the aggregation of all "request[s] by citizens" for the same kind of activity

within the same specified geographical region.   "Specified geographical region means an area

within which a specified activity is conducted and that has certain biogeographic characteristics."

50 C.F.R. §216.103.  NMFS unlawfully ignored the other requests by citizens for the same type of activity—construction and operation of offshore wind farms in the geographical region.

84.     An IHA may not authorize the intentional taking by harassment of even a single marine mammal.  Vineyard Wind's soft-start is intentional take.    The    IHA    requires    and authorizes, as Level B harassment, Vineyard Wind to initiate each pile driving event with a "soft start" where the pile driving hammer will be throttled back to less than maximum power, thus giving the whales a "warning" of what is to come. (BOEM 34742, 77310, 77458.)  The theory is that the "soft start" will convince the whales to leave the construction zone before the full-magnitude pile driving begins. (BOEM 77458.)    The "soft start", however, is not incidental harassment but purposeful, intentional harassment, a type of hazing, designed to push the NARW out of their habitat.  It is not accidental.  *See*, 50 C.F.R. 216.103 ("Incidental harassment, incidental taking and incidental, but not intentional, taking all mean an accidental taking.")  Thus Vineyard Wind's soft start constitutes an intentional take that NMFS cannot authorize.

85.     Vineyard Wind's soft start also constitutes unauthorized Level A harassment. Level A harassment, as defined in the MMPA for non-military readiness activities (Section 3(8)(A)), is any act of pursuit, torment, or annoyance that has the potential to injure a marine mammal or marine mammal stock in the wild.   Even if the "soft start" strategy effectively pushes all right whales out of the Level A exposure zone (i.e., 7.25 km from the pile driving area), there is no evidence the whales will be safe.    On the contrary, there is considerable evidence that the whales will be exposed to increased threats from fishing gear entanglement and vessel strikes. For example, Area 537 is one of the most heavily fished areas in the Massachusetts OCS with hundreds perhaps thousands of VBR trap/pots for lobster and crab. (BOEM 77581; BOEM 194539.)   By forcing right whales out of the WDA, the Vineyard Wind soft start program will drive the whales

right into this network of fishing ropes, heightening the threat of entanglement.   The threat of vessel strikes against whales will also increase outside the WDA, as vessels in this area are not subject to NMFS's sometimes applicable 10 knot speed limit; nor are they required to have a PSO onboard looking for whales.

86.     In addition, to the extent the soft start forces feeding whales to leave and try to locate food elsewhere, the loss of foraging opportunity, in itself, may be damaging, especially given data showing that malnutrition has caused female North Atlantic right whales to lose weight and exhibit signs of reduced physical health. (NMFS 26386-26401.)  NMFS contends that right whales which have been prevented from foraging in the WDA during pile driving will simply come back and resume feeding once the pile driving stops. (BOEM 77460-63.)  There is, however, no evidence to support this argument.

87.     Vineyard Wind's pile-driving activities do not constitute incidental take. Vineyard Wind is conducting its construction activities in the region where the NARW now live year-round and which is now critical foraging and mating grounds.  Quintana 2021, O'Brien 2022.  Justice (then Judge) Ketanji Brown Jackson stated that "[K]nowing and intentional takes cannot be deemed incidental." *Pac. Ranger, LLC v. Pritzker*, 211 F. Supp. 3d 196, 202 (D.D.C. 2016).

88.     Justice Jackson's opinion in *Pritzer* with amazing prescience is precisely on point with the facts of Vineyard Wind:

> Applied to the "take" context, the terms "accidental" and "non-intentional" therefore plainly do not describe the harassment of whales that occurs when commercial fishermen know that whales are in the vicinity of where they wish to conduct a highly disruptive multi-hour tuna-fishing operation and nevertheless press on with that operation.

89.     Here, Vineyard Wind will be conducting a highly disruptive multi-hour pile-driving operation knowing that whales are in the vicinity.   Therefore, the "take" involved in the Vineyard

Wind pile driving operation is "knowing," and is neither "accidental" nor "non-intentional."   As such, under Justice Jackson's MMPA definition, none of the Vineyard Wind pile driving can be authorized under the MMPA using an IHA.

90.     NMFS's determination that the measures incorporated into the IHA result in the least practicable impact on the NARW is arbitrary and capricious.   NMFS failed to pay particular attention mating and foraging grounds of the NARW in the wind energy lease areas south of Martha's Vineyard.

91.     "North Atlantic right whales are vulnerable to vessel strike due to their coastal distribution and frequent occurrence at near-surface depths, and this is particularly true for females with calves. The proportion of known vessel strike events involving females, calves, and juveniles is higher than their representation in the population (NMFS 2020)." Federal Register, Vol. 87, No. 146, at 46922-46923 (2022) ("NMFS Proposed Speed Rules").   "Reducing vessel speed is one of the most effective, feasible options available to reduce the likelihood of lethal outcomes from vessel collisions with right whales."  *Id.* at 46923. "Vessel strikes continue to occur all along the U.S. coast from the Gulf of Maine to the Florida coast. There is no indication that strike events only occur in ''hot spots'' or limited spatial/ seasonal areas." *Id*. at 46924. in many cases, the location of the strike event remains unknown." Id.  "[T]he current speed rule and other vessel strike mitigation efforts are insufficient to reduce the level of lethal right whale vessel strikes to sustainable levels in U.S. waters." *Id*. at 46925.  "It remains unclear how right whales respond to close approaches by vessels (<1509 ft (460 m)) and the extent to which this allows them to avoid being struck." *Id*. at 46926.

92.     NMFS has determined that the Potential Biological Removal ("PBR") for the NARW, defined by the MMPA as ''the maximum number of individuals, not including natural

mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population'' is 0.7 whales.  NMFS Proposed Speed Rules at 46922.  "This means that for the species to recover, the population cannot sustain, on average over the course of a year, the death or serious injury of a single individual due to human causes." *Id.* NMFS has determined that speed of vessels is the most relevant factor in causing death from vessel strikes.  *Id.* at 46923.  Yet NMFS has failed to proscribe a speed limit on all Vineyard Wind's vessels, all the time, as part of the measures so as to result in the least practicable impact on the NARW.   NMFS has failed to take a hard look at the measures needed to ensure that there is no death or serious injury to even a single whale from Vineyard Wind's COP activities.  But what is clear from the NMFS Proposed Speed Rules is that a 10-knot speed limit on all vessels at all times of the year (with no exceptions) practicable and is the *maximum* that could be allowed but even with speed limit below 10-knots a strike to a single NARW would cause serious injury.

93.     NMFS failures are arbitrary and capricious and fail to observe the requirements of the MMPA. NMFS's failure to impose a 10-knot (or under) speed limit for all vessels all of the time is arbitrary and capricious and violates its obligation to prescribe measures that result in the least practicable impact on the NARW.   NMFS's failure to impose a complete shut-down of all Vineyard Wind activity for a minimum number of days (such as 10 days as proposed in NMFS Proposed Speed Rules in the case of dynamic speed zones) if a whale of any kind is located either through passive acoustic monitoring or sonar or visually by anyone, including a report made to WhaleAlert app is arbitrary and capricious and violates NMFS's obligation to prescribe measures that result in the least practicable impact on the NARW.

94.     NMFS is also violating its obligations under 16 U.S.C. §1371(a)(5)(D)(iv) which *requires* NMFS to "modify, suspend, or revoke an authorization if the Secretary finds that the

provisions of clauses (i) or (ii) are not being met."  16 U.S.C. §1371(a)(5)(D)(iv) thus requires an ongoing review of whether the take involves small numbers, the take would have a negligible impact of the species, and the measures satisfy the least practicable impact standard.  The evidence discussed in the NMFS Proposed Speed Rules establishes that NMFS must modify, suspend, or revoke an authorization because the provisions of clauses (i) or (ii) are not being met based upon current scientific information.

95.    NMFS is also violating its obligations under 16 U.S.C. §1371(a)(5)(D)(iv) and 16 U.S.C. §1371(a)(5)(D)(ii)(II) because it has issued numerous other IHAs authorizing take of the NARW that precede the authorized dates of the Vineyard Wind IHA.  Those numerous IHAs continue the death by a thousand cuts for the NARW.  By the time the Vineyard Wind IHA dates kick-in, the NMFS will have already authorized take since 2019 of 310 NARW (252 of which have been authorized since the Vineyard Wind IHA was issued) as shown below:

| Project | Covered activities | Beginning of covered period | End of covered period | NARW Level B Harassment Takes | Date IHA Issued |
|---|---|---|---|---|---|
| Vineyard Wind 1 | Pile driving only | 5/1/2023 | 4/30/2024 | 20 | 5/21/2021 |
| South Fork Wind LLC | Construction | 11/15/2022 | 11/14/2023 | 13 | 12/21/2021 |
| Park City Wind LLC | Marine surveys | 9/1/2022 | 8/31/2023 | 30 | 7/19/2022 |
| NextEra | Marine surveys | 7/1/2022 | 6/30/2023 | 8 | 6/29/2022 |
| VEPCO | Marine surveys | 5/27/2022 | 5/26/2023 | 5 | 5/27/2022 |
| Ocean Wind II LLC | Marine surveys | 5/10/2022 | 5/9/2023 | 11 | 5/9/2022 |
| Orsted Wind Power North America LLC (Delaware) | Marine surveys | 5/10/2022 | 5/9/2023 | 11 | 5/6/2022 |
| Ocean Wind LLC | Marine surveys | 5/10/2022 | 5/9/2023 | 9 | 5/9/2022 |
| Kitty Hawk | Marine surveys | 8/1/2022 | 7/31/2023 | 2 | 4/20/2022 |
| Atlantic Shores Offshore Wind LLC | Marine surveys | 4/20/2022 | 4/19/2023 | 17 | 4/18/2022 |
| Orsted Wind Power NA | Marine surveys | 3/3/2022 | 9/24/2022 | 37 | 3/3/2022 |
| Vineyard Wind 1 | Marine surveys | 7/21/2021 | 7/20/2022 | 10 | 7/21/2021 |

| LLC | | | | | |
|---|---|---|---|---|---|
| Vineyard Wind LLC | Marine surveys | 6/21/2021 | 6/20/2022 | 10 | 7/15/2021 |
| Vineyard Wind 1 | Marine surveys | 7/21/2021 | 7/20/2022 | 10 | 7/21/2021 |
| Mayflower Wind Energy LLC | Marine surveys | 7/1/2021 | 6/30/2022 | 9 | 7/1/2021 |
| Vineyard Wind LLC | Marine surveys | 7/15/2021 | 6/20/2022 | 10 | 7/15/2021 |
| Garden State Offshore Energy LLC | Marine surveys | 6/11/2021 | 6/10/2022 | 14 | 6/11/2021 |
| Ocean Wind LLC | Marine surveys | 5/10/2022 | 5/9/2023 | 9 | 5/9/2022 |
| Atlantic Shores Offshore Wind LLC | Marine surveys | 4/20/2021 | 4/19/2022 | 8 | 4/16/2021 |
| Skipjack Offshore Energy LLC | Marine surveys | 4/5/2021 | 4/4/2021 | 3 | 4/5/2021 |
| Orsted Wind Power North America | Marine surveys | 3/3/2022 | 9/24/2022 | 37 | 3/3/2022 |
| Equinor Wind, LLC | Marine surveys | 9/20/2020 | 9/19/2021 | 14 | 9/20/2020 |
| Mayflower Wind Energy, LLC | Marine surveys | 7/23/2020 | 7/22/2021 | 3 | 7/23/2020 |
| Vineyard Wind LLC | Marine surveys | 6/21/2020 | 6/20/2021 | 10 | 4/15/2020 |
| Skipjack Offshore Energy, LLC | Marine surveys | 11/25/2019 | 11/24/2020 | 3 | 11/25/2019 |
| Ørsted Wind Power LLC | Marine surveys | 9/26/2019 | 9/25/2020 | 10 | 9/26/2019 |
| Equinor Wind U.S. LLC | Marine surveys | 4/25/2019 | 4/24/2020 | 7 | 4/25/2019 |

96.    NMFS has an obligation under 16 U.S.C. §1371(a)(5)(D)(iv) and 16 U.S.C. §1371(a)(5)(D)(ii)(II) to take all these IHAs into account (particularly those issued after the Vineyard Wind IHA was issued) and to make new determinations that the requirements of the MMPA would still be met (which they would not be).  NMFS's failure to make new determinations is arbitrary and capricious and contrary to its obligations under the MMPA.

97.    NMFS has also acted arbitrarily and capriciously and failed to adhere to its obligation under 16 U.S.C. §1371(a)(5)(D)(iv) and 16 U.S.C. §1371(a)(5)(D)(ii) by failing analyze how the proposed Vineyard Wind activities and the activities of the other IHAs that are in effect

will also increase the risk of collisions between NARWs and vessel traffic unrelated to offshore wind activities as both navigate around the various offshore wind activities in question while they occur.

98.     The issuance of, and failure to modify,  suspend, or revoke, the IHA for the Project violates the MMPA.  In issuing the IHA and failing to modify, suspend, or revoke, the IHA, NMFS acted arbitrarily, capriciously, abused its discretion, and acted not in accordance with law.  As a result, the Vineyard Wind IHA should be vacated.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.     Vacate and set aside the IHA issued to Vineyard Wind on May 21, 2021;

B.     Enjoin Defendants from issuing future 1-year IHAs for the Vineyard Wind project;

C.     Declare that no harassment authorizations may be issued under the MMPA for the Vineyard Wind Project because any approval would need to account for decommissioning which is beyond the statutory five-year limit;

D.     Declare that no harassment authorizations may be issued for the Vineyard Wind Project because take of the NARW is not incidental to the carrying out the construction, operation and decommissioning of the Project;

E.     Declare that "small numbers" under the MMPA means a number no greater than the PBR for the NARW;

F.     Award Plaintiff his costs and other expenses as provided by applicable law; and

G.     Issue such relief as Plaintiff subsequently requests or that this Court may deem just, proper, and equitable.

Respectfully submitted,

THE PLAINTIFF,

Dated: September 2, 2022                    */s/Thomas Melone*
                                            Thomas Melone
                                            BBO No. 569232
                                            Allco Renewable Energy Limited
                                            157 Church St., 19th Floor
                                            New Haven, CT 06510
                                            Telephone: (212) 681-1120
                                            Facsimile: (801) 858-8818
                                            Thomas.Melone@AllcoUS.com

<u>Certificate of Service</u>

I HEREBY CERTIFY that on this 2nd day of September 2022, a true and complete copy of the foregoing has been filed with the Clerk of the Court pursuant to the Court's electronic filing procedures, and served on each party's respective counsel of record via the Court's electronic filing system.

*/s/Thomas Melone*