# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

THOMAS MELONE,

               Plaintiff,

v.

JANET COIT, in her official capacity of Assistant
Administrator, of the National Marine Fisheries Service,
and the NATIONAL MARINE FISHERIES SERVICE,

               Defendants.

Case No. 1:21-cv-11171

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Thomas Melone
BBO No. 569232
Allco Renewable Energy Limited
157 Church St., 19th Fl., New Haven, CT 06510
Tele: (212) 681-1120, Facsimile: (801) 858-8818
Thomas.Melone@AllcoUS.com


September 7, 2022

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................. i
TABLE OF AUTHORITIES ..................................................................................................... ii
INTRODUCTION .................................................................................................................... 1
STANDARD OF REVIEW ...................................................................................................... 3
STANDING .............................................................................................................................. 4
ARGUMENT ........................................................................................................................... 4

I.     COUNT I—THE VW IHA WAS ISSUED WITHOUT OBSERVANCE OF
THE PROCEDURE REQUIRED BY LAW ............................................................ 4

    A. NMFS Failed To Issue The Notice Of Proposed IHA Within The Time
Period Required By The Statute ................................................................................ 6

    B. NMFS Failed To Provide The Required Notice Of Proposed IHA ........................... 6

    C. NMFS Failed To Comply With The Requirement Of 16 U.S.C.
§1371(a)(5)(D)(iii) And 50 C.F.R § 216.107(c) To Issue Or Deny The
IHA Within 45 Days Of The End Of The Public Comment Period ........................ 6

    D. NMFS Failed To Publish The Notice Of Issuance Of The IHA Within 30
Days Of Issuance ...................................................................................................... 7

II.    COUNT II—THE VW IHA DOES NOT COMPLY WITH THE MMPA ............... 7

    A. The Vineyard Wind IHA Does Not Satisfy The Small Numbers
Requirement ............................................................................................................. 8

       1. The VW IHA "Take" Does Not Constitute Small Numbers ........................... 9

       2. Defendants' Segmentation of Vineyard Wind's Activities Is
Unlawful ....................................................................................................... 10

       3. NMFS Has Unlawfully Ignored Other NMFS Authorizations ....................... 11

       4. NMFS Failed To Properly Define The "Specified Geographical
Region" ........................................................................................................ 11

       5. NMFS Acted Arbitrarily And Capriciously By Using Old Data .................... 12

    B. NMFS's Negligible Impact Analyses Irrationally Considered the Impacts
of Pile-Driving In Isolation .................................................................................... 12

    C. The Takes Caused By Vineyard Wind's Activities Are Not Incidental ................. 14

       1. Vineyard Wind's Soft-Start Is Intentional Take ............................................. 14

       2. VW's Soft Start Also Constitutes Unauthorized Level A Harassment ........... 15

       3. Vineyard Wind's Pile-Driving Activities Do Not Constitute
Incidental Take ............................................................................................. 17

    D. VW's Activities Do Not Meet The One Year Requirement For An IHA ............... 18

    E. NMFS Violated the MMPA By Failing To Adequately Address The Risk
Of Repeated Harassment From Overlapping Or Continuous Activity .................... 18

    F. The NMFS Proposed Speed Rules Confirm NMFS Has Failed In Its Duty
To Prescribe Measures That Would Have The Least Practicable Impact On
The NARW .............................................................................................................. 19

    G. The PSO Measure Is Inadequate And Flawed ....................................................... 20

CONCLUSION ...................................................................................................................... 20

# TABLE OF AUTHORITIES

**CASES**

*Bennett v. Spear*, 520 U.S. 154 (1997) ..................................................................18

*Committee for Humane Legislation, Inc. v. Richardson*, 414 F. Supp. 297 (D.D.C.), *aff'd*, 540 F.2d 1141 (D.C. Cir. 1976)..................................................................7

*Concerned Friends of the Winema v. U.S. Forest Service* No. 1:14-CV-737-CL, 2016 WL 10637010, at *8-9 (D. Or. Sept. 12, 2016), *R. & R. adopted by* 2017 WL 5957811 (D. Or. Jan. 18, 2017)...................................................................13

*Conservation Council for Haw. v. NMFS*, 97 F. Supp. 3d 1210 (D. Haw. 2015) ......14

*Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020)..................5

*Intertribal Sinkyone Wilderness Council v. NMFS*, 970 F. Supp. 2d 988 (N.D. Cal. 2013) ........12

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29 (1983) ..................4, 12

*NRDC v. Evans*, 364 F. Supp. 2d 1083 (N.D. Cal. 2003) ...........................................5, 9

*NEC Corp. v. Intel Corp.*, No. C-84-20799-WPG, 1989 WL 67434 (N.D. Cal. Feb. 6, 1989) ..................................................................9

*NLRB v. Beverly Enterprises-Massachusetts, Inc.,* 174 F.3d 13, 23 (1st Cir. 1999) ......................3

*Ocean Mammal Inst. v. Gates*, 546 F. Supp. 2d 960 (D. Haw. 2008), modified in part, No. CIV. 07- 00254DAELEK, 2008 WL 2020406 (D. Haw. May 9, 2008) ...............................12

*Ohio River Valley Envtl. Coal., Inc. v. Kempthorne*, 473 F.3d 94 (4th Cir. 2006) ......................18

*Pac. Ranger, LLC v. Pritzker*, 211 F. Supp. 3d 196 (D.D.C. 2016) ..........................................17

*Penobscot Air Servs. v. FAA,* 164 F.3d 713 (1st Cir. 1999) .....................................................3

*Penobscot Nation v. Frey*, 3 F.4th 484 (1st Cir. 2021) ............................................................10

*Sullivan v. Stroop*, 496 U.S. 478, 110 S. Ct. 2499 (1990) .....................................................10

*Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560 (2012). ......................................................9

*U.S. Air Tour Ass'n v. FAA*, 298 F.3d 997 (D.C. Cir. 2002) ..................................................13

**STATUTES**

5 U.S.C. §§ 701-706 ..................................................................................................3

5 U.S.C. §706(2)(D).........................................................................................4, 5, 6

16 U.S.C. §1361 ..................................................................................5, 10, 14

16 U.S.C. §1362 ..................................................................................................7

16 U.S.C. §1371 ..................................................................................*passim*

16 U.S.C. 1372 ..................................................................................................5

17 U.S.C. §405(a)(1)..........................................................................................9

**OTHER AUTHORITIES**

50 C.F.R. §216.103 ..................................................................11, 12, 15, 17

50 C.F.R. §216.107 ..................................................................6, 7, 10

Model Penal Code in § 2.02(2) ..................................................................17, 18

H.R. Rep. No. 97-228, at 11 (1981)..........................................................................14

54 Fed. Reg. 40,338, 40,342 (Sept. 29, 1989) ........................................................................14

"Amendments to the North Atlantic Right Whale Vessel Strike Reduction Rule,"
    published in the Federal Register Vol. 87, No. 146 at 46921 on August 1, 2022 ...................2

Quintana-Rizzo et al., "Residency, demographics, and movement patterns of North
    Atlantic right whales Eubalaena glacialis in an offshore wind energy development
    area in southern New England, USA," Endangered Species Research, Vol. 45: 251–
    268 (2021) ..........................................................................................................................2, 17

*O. O'Brien et al., Repatriation of a historical North Atlantic right whale habitat during
    an era of rapid climate change* (July 20, 2022)........................................................2, 3, 11, 17

Webster's Third New International Dictionary 2149 (1986)...........................................................9

Merriam-Webster Online Dictionary (2022) .................................................................................9

## INTRODUCTION

*"**death by a thousand cuts[~]** A slow death by the torture of many small wounds, none lethal in itself, but fatal in their cumulative effect."[1]*

In addition to lobster-trapping and commercial and recreational vessel strikes, now the North Atlantic Right Whale ("NARW") is under attack by offshore wind ("OSW") developers enabled by an administration operating under the misguided and ill-conceived notion that OSW is necessary to reduce the country's carbon emissions. The OSW attack comes as the NARW population is now estimated to be at only 336 individuals and its Potential Biological Removal ("PBR") is down to 0.7. SUF12. "This means that for the species to recover, the population cannot sustain, on average over the course of a year, the death or serious injury of a single individual due to human causes."[2] SUF13. This also means that under 16 U.S.C. §1371(a)(5)(D) of the Marine Mammal Protection Act ("MMPA"), the National Marine Fisheries Service ("NMFS") must not issue an Incidental Harassment Authorization ("IHA") for any take of the NARW unless (1) NMFS can, and does, prescribe measures necessary to ensure that death or serious injury of a single whale does not occur, (2) NMFS prescribes the methods of taking by harassment and other means of effecting *the least practicable impact* on the NARW, (3) NMFS makes a finding that the activity (and similar activity of citizens in a common geographic area defined by biogeographic characteristics) does not have the potential to cause death or serious injury to single whale, (4) NMFS makes an affirmative finding that such collective harassment during each period concerned (which cannot exceed one year) *will* have a negligible impact on such species, and (5) the take involves small numbers of individuals. NMFS has failed to meet all of those criteria. 16 U.S.C. §1371(a)(5)(D)(iv) also imposes *a continuing obligation* on NMFS which *requires* NMFS to modify, suspend, or revoke an authorization if the requirements for issuance of an IHA for the collective activity are no longer being met. 16 U.S.C. §1371(a)(5)(D)(iv) thus requires a constant review, based upon the best scientific evidence, of whether the take continues to satisfy those five criteria. NMFS has failed in that duty too.

---

[1] *Merriam-Webster's Dictionary of Allusions*, E. Webber & M. Feinsilber (1999), ISBN 0-87779-628-9, at 145.

Defendants issued an IHA on May 21, 2021, to Vineyard Wind ("VW IHA"), notice of which was published in the Federal Register on June 25, 2021, SUF10, ignoring every procedural requirement imposed by Congress. The VW IHA states that it is valid from May 1, 2023 through April 30, 2024. *Id.* The VW IHA authorizes "take" by Level B Harassment of 20 NARW related to *pile-driving activity*. Since the issuance of the VW IHA, NMFS has authorized an additional 319 takes of the NARW through more IHAs issued to OSW developers. SUF49. A politically captive NMFS has simply become a rubber-stamp for "take" applications from OSW developers.

Yet the new NMFS Proposed Speed Rules confirm what NMFS knew (but ignored) when it issued the VW IHA—speed kills. In issuing the VW IHA, NMFS ignored the potential take from offshore wind vessel strikes—vessels that in general will have no speed limits—and that will be under severe financial pressure to hit maximum throttle. For example, the crew transfer vessels ("CTVs") for Vineyard Wind will be more than 98 feet long, with a maximum speed of 29 knots (33mph). SUF16. Crew members can work a maximum of 12 hours/day. *Id.* Construction of the project will be based out of New Bedford, MA, which by vessel is a 50-to-60-mile trip to the wind development area ("WDA"), depending on the route taken. *Id.* The CTVs will transport crews from New Bedford to the WDA and bring crews back to New Bedford, as crews work on a rotational basis. *Id.* The 50-to-60-mile trip at 10 knots (a speed South Fork Wind agreed to and is the general speed limit in the Proposed NMFS Speed Rules) would take approximately 4.5 to 5 hours each way, which (while a practicable alternative, *see* SUF47), is inconsistent with the 1-year limitation of the VW IHA and VW's profitability. What that means for the NARW is that during the peak season for NARW presence—December through early May—the CTVs will be moving at maximum speed, far too fast for Protected Species Observers ("PSOs") to be of any value, and causing certain serious injury or death to a NARW during a collision. Making matters worse, two recent scientific studies[3] confirm what

---

[2] Federal Register, Vol. 87, No. 146, at 46922 (2022) ("NMFS Proposed Speed Rules").
[3] E. Quintana-Rizzo *et al.*, "*Residency, demographics, and movement patterns of North Atlantic right whales Eubalaena glacialis in an offshore wind energy development area in southern New*

NMFS also knew (but ignored) when it issued the VW IHA—that as climate refugees, the NARW have returned year-round to their historical feeding and mating grounds—the wind energy lease areas south of Martha's Vineyard—as illustrated below from *O'Brien 2022*. SUF15.



**Figure 1.** Known right whale habitats in the Northwest Atlantic. (**a**) Gray polygons encompass known right whale habitats; blue ovals represent emerging habitats. Black box and insets show the New England Aquarium broad-scale survey area. (**b**– **d**) Broad-scale survey effort (black lines) and right whale sightings (red circles) during three different time periods: (**b**) 2011– 2012, (**c**) 2013– 2015, (**d**) 2017– 2019. White shading represents MA/RI wind energy lease areas. MV = Martha's Vineyard, N = Nantucket. Figure was created using ArcGIS Pro (version 2.9.2).

## STANDARD OF REVIEW

Plaintiff's claims are reviewable under the Administrative Procedure Act ("APA"), which empowers courts to set aside agency actions that are unsupported by substantial evidence, or that are "arbitrary and capricious" or "otherwise not in accordance with law" or that are taken "without observance of procedure required by law." 5 U.S.C. §§ 701-706.  Under the APA, a reviewing court must not reduce itself to a "rubber stamp" of agency action." *NLRB v. Beverly Enterprises-Massachusetts, Inc.,* 174 F.3d 13, 23 (1ˢᵗ Cir. 1999), *Penobscot Air Servs. v. FAA,*

---

*England, USA,*" Endangered Species Research, Vol. 45: 251–268 (2021) (NMFS 53318-53335) ("*Quintana 2021*").  O. O'Brien *et al.*, *Repatriation of a historical North Atlantic right whale*

164 F.3d 713, fn. 2 (1ˢᵗ Cir. 1999). Under the substantial evidence standard, an agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

The arbitrary and capricious test, however, is more demanding. It is not satisfied merely when an agency decision is rational, based on consideration of the relevant factors, and within the scope of the authority delegated to the agency by the statute. *Id.* at 42. An agency decision is arbitrary and capricious if (i) the agency has relied on factors which Congress has not intended it to consider, (ii) "entirely failed to consider an important aspect of the problem," (iii) "offered an explanation for its decision that runs counter to the evidence before the agency," or (iv) "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs.*, 463 U.S. at 43. The hard look doctrine requires the reviewing court to determine whether the agency "examin[ed] the relevant data and articulat[ed] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* at 42 (internal quotation marks omitted) (citation omitted). "The reviewing court should not attempt itself to make up for such deficiencies; [it] may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id.* at 43.

## STANDING

Plaintiff challenges the issuance of the VW IHA. Plaintiff has standing, as demonstrated by the accompanying declaration of Thomas Melone. Defendants' actions, and the resulting harm to the NARW, injure Plaintiff by interfering with his use, enjoyment of ocean and marine life and harms the concrete aesthetic, environmental well-being, recreational, and conservation benefits he derives from the NARW. The relief Plaintiff seeks will redress these injuries.

## ARGUMENT

**I.    COUNT I—THE VW IHA WAS ISSUED WITHOUT OBSERVANCE OF THE PROCEDURE REQUIRED BY LAW**.

5 U.S.C. §706(2)(D) requires this Court to set aside and vacate the VW IHA because it

---

*habitat during an era of rapid climate change* (July 20, 2022). ("*O'Brien 2022*").

was issued without observance of procedure required by law.  *See,* 5 U.S.C. §706(2)(D) ("The reviewing court shall [] (2) hold unlawful and set aside agency action, findings, and conclusions found to be [made]—[] (D) without observance of procedure required by law.")

Congress enacted the MMPA to protect marine mammal populations "in danger of extinction or depletion as a result of man's activities." 16 U.S.C. §1361(1).  The heart of the MMPA is a prohibition on the "taking"—including the harassment—of marine mammals. *Id.* §§1371(a), 1372(a).  "The default provision of the MMPA is that 'no permit may be issued for the taking of any marine mammal.' 16 U.S.C.  §1371(a)." *NRDC v. Evans*, 364 F. Supp. 2d 1083, 1104 (N.D. Cal. 2003) ("*Evans*") (emphasis in original). "The intent of Congress is that the taking of even a single marine mammal is to be avoided.  Incidental takes [] must be small and have a negligible impact on the affected species or stock of marine mammals." *Evans* at 1104.

Section 1371(a)(5)(D) of the MMPA permits NMFS to authorize (for periods of not more than 1 year), upon request by citizens of the United States who engage in a specified activity (other than commercial fishing) within a specific geographic region, the incidental, but not intentional, taking by harassment of small numbers of marine mammals of a species or population stock by such citizens while engaging in that activity within that region if NMFS finds that such harassment during each period concerned will have a negligible impact on such species or stock. The authorization for such activity must prescribe permissible methods of taking by harassment pursuant to such activity, and other means of effecting the least practicable impact on such species and its habitat, paying particular attention to rookeries, mating grounds, and areas of similar significance. 16 U.S.C. §1371(a)(5)(D)(ii)(I).

The MMPA provides for strict procedural time requirements that must be met in order to an IHA to be properly issued.  Procedural requirements imposed on an agency can often seem like an idle and useless formality.  *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1909 (2020).  But they serve important values of administrative law.  *Id.*  They promote "agency accountability." *Id.*  "[T]he Government should turn square corners in dealing with the people." *Id.* (internal citation omitted.)  Because NMFS unlawfully dispensed with the

requirements imposed by Congress, it issued the VW IHA "without observance of procedure required by law," 5 U.S.C. §706, and must therefore be vacated.

### A. NMFS Failed To Issue The Notice Of Proposed IHA Within The Time Period Required By The Statute.

16 U.S.C. §1371(a)(5)(D)(iii) states that the "Secretary shall publish a proposed authorization not later than 45 days after receiving an application." The VW IHA application was deemed adequate and complete on February 15, 2019. SUF7. A notice of proposed IHA was published in the Federal Register on April 30, 2019 (84 FR 18346). SUF8. The notice of proposed VW IHA was published 29 days later than required by the statute. The notice was therefore invalid. The result is the issuance of the VW IHA without adhering to the statutory notice requirements, which invalidates the VW IHA.

### B. NMFS Failed To Provide The Required Notice Of Proposed IHA.

16 U.S.C. §1371(a)(5)(D)(iii) states that the "Secretary shall publish a proposed authorization not later than 45 days after receiving an application [] and request public comment through notice in the Federal Register, newspapers of general circulation, and appropriate electronic media and to all locally affected communities for a period of 30 days after publication." NMFS failed to request public comment through newspapers of general circulation, and appropriate electronic media and to all locally affected communities for a period of 30 days after publication, which affected communities include the entire range of the NARW (including Martha's Vineyard and Amelia Island). SUF17,18. NMFS's failure to adhere to the notice requirements of 16 U.S.C. §1371(a)(5)(D)(iii) means that the VW IHA was issued "without observance of procedure required by law." The VW IHA is thus invalid and must be set aside.

### C. NMFS Failed To Comply With The Requirement Of 16 U.S.C. §1371(a)(5)(D)(iii) And 50 C.F.R § 216.107(c) To Issue Or Deny The IHA Within 45 Days Of The End Of The Public Comment Period.

16 U.S.C. §1371(a)(5)(D)(iii) provides that "[n]ot later than 45 days after the close of the public comment period, if the Secretary makes the findings set forth in clause (i), the Secretary shall issue an authorization with appropriate conditions to meet the requirements of clause (ii)." 50 C.F.R §216.107(c) requires an "incidental harassment authorization [to] be either issued or

denied within 45 days after the close of the public review period."

A notice of proposed VW IHA was published in the Federal Register on April 30, 2019 (84 FR 18346) SUF8. The public review period closed on May 30, 2019. *Id.* NMFS issued the VW IHA on May 21, 2021. SUF10. The VW IHA was required to be issued no later than July 14, 2019. It was not issued until nearly two years later. The VW IHA was issued "without observance of procedure required by law." The VW IHA is thus invalid and must be set aside.

### D. NMFS Failed To Publish The Notice Of Issuance Of The IHA Within 30 Days Of Issuance.

50 C.F.R. §216.107(d) requires the notice of issuance or denial of an IHA to be published in the Federal Register within 30 days of issuance of a determination. NMFS issued the VW IHA on May 21, 2021. SUF10. The notice of IHA was published in the Federal Register on June 25, 2021, SUF11, not within the required 30 days. The VW IHA was therefore issued "without observance of procedure required by law," and as a result is invalid and must be set aside.

## II. COUNT II—THE VW IHA DOES NOT COMPLY WITH THE MMPA.

The MMPA prohibits, with certain exceptions, the "take" of marine mammals in U.S. waters. The term "take" means "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal" (16 U.S.C. §1362(13)). The incidental take of a marine mammal falls under three categories: mortality, serious injury, or harassment (i.e., injury and/or disruption of behavioral patterns). Harassment, as defined in the MMPA for non-military readiness activities, is any act of pursuit, torment, or annoyance that has the potential to injure a marine mammal in the wild (Level A harassment) or any act of pursuit, torment, or annoyance that has the potential to disturb a marine mammal in the wild by causing disruption of behavioral patterns (Level B harassment). Disruption of behavioral patterns includes, but is not limited to, migration, breathing, nursing, breeding, feeding, or sheltering.

The primary purpose of MMPA is protection of marine animals. The MMPA was not intended to balance interests between other industries and the protected marine mammals. *Committee for Humane Legislation, Inc. v. Richardson*, 414 F. Supp. 297 (D.D.C.), *aff'd*, 540 F.2d 1141 (D.C. Cir. 1976). The MMPA provide exceptions to the prohibition on take, which

give NMFS the authority to authorize the incidental, but not intentional take, of small numbers of marine mammals, provided certain findings are made and statutory and regulatory procedures are met. Incidental take authorizations ("ITAs") may be issued as either (1) regulations and associated Letters of Authorization ("LOA") or (2) an IHA.  An IHA is appropriate if the proposed action would result in harassment only (i.e., injury or disturbance) and is not planned for multiple years.  An LOA is required if the actions will result in harassment only (i.e., injury or disturbance) and is planned for multiple years.   For an LOA, the Defendants must issue regulations.  An LOA may be issued for up to a maximum period of 5 years, and IHAs may be issued for a maximum period of 1 year.

Once NMFS determines an application is adequate and complete, NMFS has a corresponding duty to determine whether and how to authorize take of marine mammals incidental to the activities described in the application.  To authorize the incidental take of marine mammals, NMFS is required to evaluate the best available scientific information to determine the common geographic area defined by biogeographic characteristics in which the activity occurs, whether the take would have a negligible impact on the affected marine mammal species, and whether the take involves small numbers of individuals.  NMFS must also prescribe the "means of effecting the least practicable adverse impact" on the affected species and their habitat, as well as monitoring and reporting requirements.  For an IHA to be used for the activity of U.S. citizens in a common geographic area defined by biogeographic characteristics, NMFS must also determine that the harassment during each period concerned (which cannot exceed one year) does not have the potential to cause death or serious injury (otherwise an LOA must be used).   16 U.S.C. §1371(a)(5)(D)(iv) also imposes a continuing obligation on NMFS which requires NMFS to modify, suspend, or revoke an authorization if the requirements for issuance of an IHA for the collective activity are no longer being met.

### A.  The Vineyard Wind IHA Does Not Satisfy The Small Numbers Requirement.

The MMPA permits Defendants to authorize the harassment of only "small numbers of marine mammals of a species or population stock." 16 U.S.C. §1371(a)(5)(D)(i).   The statutory

phrase "small numbers of marine mammals" is not defined in the MMPA. "When a term goes undefined in a statute, we give the term its ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). In the only decision to squarely grapple with the meaning of "small numbers" under the MMPA, a federal court concluded that "[a] definition of 'small number' that permits the potential taking of as much as 12% of the population of a species is plainly against Congress' intent." *Evans* at 1152. When interpreting nearly identical language in the Copyright Act of 1976, courts have unanimously concluded that the statutory phrase "a relatively small number," 17 U.S.C. §405(a)(1), excludes proportions over ten percent. *See, e.g.*, *NEC Corp. v. Intel Corp.*, No. C-84-20799-WPG, 1989 WL 67434, at *4 (N.D. Cal. Feb. 6, 1989) ("An examination of twenty federal court decisions that have considered the matter discloses none in which 10.6% was held to be a relatively small number. The highest percentage found to have been within the exception is 9% "). These decisions relied on the plain meaning of "relatively small number," not any consideration unique to the Copyright Act.

**1. The VW IHA "Take" Does Not Constitute Small Numbers.**

"The plain language indicates that 'small numbers' is a separate requirement from 'negligible impact.'" *Evans*, 364 F. Supp. 2d at 1102. A number is small if it is "few in number," "little," Webster's Third New International Dictionary 2149 (1986), or "little or close to zero in an objectively measurable aspect (such as quantity)." Merriam-Webster Online Dictionary (2022), https://www.merriam-webster.com/dictionary/small (accessed September 7, 2022). NMFS interpreted the small numbers requirement as applied to the VW IHA (which was irrationally limited to noise from pile-driving) as meaning 5.4% for dolphins and 5.0% for NARW. SUF19. Five percent of a population that is facing extinction and whose PBR is 0.7 is not a "few" members of the population or a "little" number. If 370,000 (5.4% of) Massachusetts residents lost power after a storm, no reasonable person would say a "small number" of residents were affected. Common usage makes clear that a "small number of marine mammals" cannot mean one out of every twenty animals of a species facing extinction.

That "small numbers" cannot mean five percent of a species facing extinction, and cannot

exceed the PBR, is confirmed by that phrase's use elsewhere in the MMPA. Congress imposed an identical "small numbers of marine mammals" requirement on authorizing activities that may seriously injure or kill marine mammals. 16 U.S.C. §1371(a)(5)(A)(i); 50 C.F.R. §216.107(a). "'[I]dentical words used in different parts of the same act are intended to have the same meaning.'" *Penobscot Nation v. Frey*, 3 F.4th 484, 497 (1st Cir. 2021) quoting *Sullivan v. Stroop*, 496 U.S. 478, 484, 110 S. Ct. 2499 (1990). If NMFS were right that five percent is a "small number," that would mean Congress intended to allow *each* permittee to injure or kill one out of every twenty animals in each affected marine mammal population. Yet allowing such extensive harm would directly conflict with the MMPA's protective purpose, as it could quickly lead to the extinction of the species, *see* 16 U.S.C. § 1361(1), (2), (6) (describing the purposes of the MMPA), and certainly would in the case of the NARW.

In the case of the NARW, because the PBR is 0.7, the population cannot sustain, on average over the course of a year, the death or serious injury of a single individual due to human causes. Thus, because the small numbers requirement of 16 U.S.C. §1371(a)(5)(A)(i) and 50 C.F.R. §216.107(a), could not exceed 0.7, and the language is the same as applied to harassment, small numbers must mean a number no greater than the PBR for the species. Thus, no take of any kind of the NARW can be considered to be "small numbers."

### 2. Defendants' Segmentation of Vineyard Wind's Activities Is Unlawful.

NMFS improperly segmented its analysis, considering VW's construction surveys and pile driving as unrelated activities, and ignoring all other VW construction, operation and decommissioning activities. Under NMFS's approach there is no limit to how small VW could slice its activities so it appears that the "take" of the NARW represents small numbers. Under NMFS's irrational approach VW would be able to divvy up even its pile driving activities into one IHA for each pile even though driving all piles, like all of VW's construction and operations plan ("COP") activities, are necessary for the construction of its project. NMFS's approach was arbitrary and capricious because NMFS "entirely failed to consider an important aspect of the problem," which are all the other activities of VW's COP.

**3.  NMFS Has Unlawfully Ignored Other NMFS Authorizations**.

By its plain language an incidental harassment take authorization under section 1371(a)(5)(D) requires the aggregation of all "request[s] by citizens" for the same kind of activity within the same specified geographical region.  "Specified geographical region means an area within which a specified activity is conducted and that has certain biogeographic characteristics."  50 C.F.R. §216.103.  NMFS has acted arbitrarily and capriciously in ignoring the other requests by citizens for the same type of activity—surveys for, and construction and operation of OSW farms in the geographical region that shares biogeographic characteristics— both at the time of the issuance of the VW IHA, and now in respect to its duty to ensure the requirements for an IHA are still currently met using the best available science. SUF49.

**4.  NMFS Failed To Properly Define The "Specified Geographical Region."**

The Notice of Proposed IHA unlawfully defined the "specific geographic region" extremely narrowly as "the northern portion of the 675 square kilometer (km) (166,886 acre) Vineyard Wind Lease Area OCS–A 0501."  SUF22.  The result is an understatement of impacts. NMFS's statement of the specified geographical region is unlawful and arbitrary and capricious because it is not based upon any analysis of biogeographic characteristics.  The specified geographical region must be determined based upon common biogeographic characteristics. 50 C.F.R. §216.103.  Even the narrowest approach would include in the "specified geographic region" at a minimum the entire area south of Martha's Vineyard that has now become an important mating and foraging habitat for the NARW, as depicted in Figure 1 from the *O'Brien 2022*.  More broadly, the specified region should be based upon the range of the NARW in the United States because from a biogeographic standpoint, the region in which the NARW exists defines the biogeographic region as to them.  But here the Court does not need to decide at this point which region is the appropriate one based certain biogeographic characteristics because NMFS took no look, much less a hard look, at the proper specified geographical region based upon biogeographic characteristics.

### 5.  NMFS Acted Arbitrarily And Capriciously By Using Old Data.

An agency's reliance on outdated information is by definition arbitrary and capricious. *Intertribal Sinkyone Wilderness Council v. NMFS*, 970 F. Supp. 2d 988, 998-1002 (N.D. Cal. 2013) (invalidating NMFS's reliance on outdated exposure thresholds the agency had abandoned elsewhere); *Ocean Mammal Inst. v. Gates*, 546 F. Supp. 2d 960, 975 (D. Haw. 2008), modified in part, No. CIV. 07- 00254DAELEK, 2008 WL 2020406 (D. Haw. May 9, 2008) (same).

In calculating the number of "takes" and the percent of the species the "takes" would be, NMFS relied on a spreadsheet and methodology that was based upon outdated population numbers for the NARW and outdated information regarding sightings of the NARW and the presence of the NARW in the wind energy area.  SUF33-37.  Even assuming the data used by VW and NMFS was correct in 2019 (which Plaintiff disputes), it was outdated in 2021 when the IHA was issued.   Population numbers for the NARW dropped and sightings and presence in the wind energy area increased dramatically. *Id.*, SUF 12, 15.   NMFS's use of outdated information is arbitrary and capricious requiring the VW IHA to be vacated.

### B.  NMFS's Negligible Impact Analyses Irrationally Considered the Impacts of Pile-Driving In Isolation.

To be lawful, an agency's action must "be the product of reasoned decisionmaking." *State Farm*, 463 U.S. at 52.   An agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," and must not "entirely fail[] to consider an important aspect of [a] problem." *Id*. at 43.   NMFS's negligible-impact determination violates these commands by failing to account for the overlapping, additive impacts of the full panoply of VW's COP activities and the other IHAs issued that involve "take" of the NARW.   Under the MMPA, NMFS cannot lawfully authorize any action unless it will have "a negligible impact on [each marine mammal] species or stock." 16 U.S.C. §1371(a)(5)(D)(i)(I). An impact is "negligible" if it "cannot be reasonably expected" to "adversely affect the species" by reducing "annual rates of recruitment or survival." 50 C.F.R. §216.103.   Here, NMFS authorized multiple IHAs during similar time periods in areas occupied by the NARW.  SUF49.  But NMFS has never evaluated whether all the IHAs it authorized

would have more than a negligible impact on the NARW.    Instead, the agency "consider[ed] the potential impacts" of each application "independently"—that is, in isolation.

NMFS's approach is irrational because it ignores the reality that VW's pile-driving activities will not take place in isolation and NARWs will not experience its effects in isolation. Instead, years of survey activity, nearly a year of pile driving, more than a year of construction from VW and then the same activities, some concurrently, from other OSW projects will hit the same NARW population—driving them from their food, potentially separating them from their vulnerable calves, and disrupting their behavior. The combined activity will have more significant impacts on the NARW than a single segmented activity would: they will harass more animals, and they will harass individual animals more times than a single segmented activity would.  By looking at each segmented activity's "impact" in isolation, and ignoring all the other VW COP activities and other OSW activities, NMFS refused to consider the ways in which those impacts will build on one another.

Courts have recognized in analogous contexts that an agency's analysis of a proposed action is irrational if it fails to consider the real-world environmental stressors that will influence how, and how significantly, the proposed action affects the environment. For example, in *Concerned Friends of the Winema v. U.S. Forest Service*, the court held that the agency improperly evaluated "the adverse effects of . . . grazing on [a] sensitive species" when it considered only authorized grazing, ignoring unauthorized grazing occurring in the same place. No. 1:14-CV-737-CL, 2016 WL 10637010, at *8-9 (D. Or. Sept. 12, 2016), *R. & R. adopted by* 2017 WL 5957811 (D. Or. Jan. 18, 2017); *see also U.S. Air Tour Ass'n v. FAA*, 298 F.3d 997, 1001, 1018-19 (D.C. Cir. 2002) (finding arbitrary agency decision to analyze only noise from air tours and not from other flights in measuring flight noise levels at the Grand Canyon).

NMFS itself has previously agreed that, in evaluating whether an activity's impact will be negligible, it must consider the other stressors to which it will be added.   In promulgating its definition of "negligible impact," NMFS asserted that "the impacts . . . from successive or contemporaneous activities must be added to the baseline of existing impacts to determine

negligible impact." 54 Fed. Reg. 40,338, 40,342 (Sept. 29, 1989).   NMFS recognized that even impacts that are "fairly minor" could "be more than negligible when measured against a baseline that includes a significant existing take of marine mammals from the other activities." *Id.* Inexplicably, NMFS failed to add the impact of each segmented activity and the other VW COP activities to the impact of the pile-driving activities.   Instead, Defendants adopted a "see no evil" approach by only looking at what Vineyard Wind asked it to—pile-driving only, and letting VW treat its necessary construction surveys as a separate unrelated activity. SUF49.   NMFS's approach irrationally ignores the reality that VW's other COP activities and the other authorized take of other OSW projects will hit the same NARWs over and over again.

The flaw in NMFS's approach is perhaps best exposed by the absurd results it would permit. The primary purpose of the "negligible impact" standard is to prevent the "extinction or depletion" of marine mammal species, 16 U.S.C. §1361(1), by "ensuring that marine mammals are maintained at healthy population levels," H.R. Rep. No. 97-228, at 11 (1981); *see* 16 U.S.C. § 1361(2).   But, by its rationale here, if NMFS concluded that injuring ten endangered whales would have a negligible impact on the species, it could authorize applicants to simultaneously injure *all* remaining whales—perhaps repeatedly—so long as it did so in separate authorizations and no individual applicant injured more than ten.   By that logic, even if an activity would, when added to other stressors on the species, lead to extinction, NMFS could authorize that activity so long as its impact was "negligible" if viewed in isolation.   At least one court has refused to allow NMFS to apply the "negligible impact" standard in a way that would risk "authorizing the wiping out of endangered and threatened species." *Conservation Council for Haw. v. NMFS*, 97 F. Supp. 3d 1210, 1221 (D. Haw. 2015)*.* This court should do the same. NMFS's negligible-impact analyses, which irrationally considered only the VW pile driving activity in isolation is unlawful and arbitrary and capricious.

### C.  The Takes Caused By Vineyard Wind's Activities Are Not Incidental.

### 1.  Vineyard Wind's Soft-Start Is Intentional Take.

An IHA may not authorize the intentional taking by harassment of even a single marine

mammal. The IHA requires and authorizes, as Level B harassment, Vineyard Wind to initiate each pile driving event with a "soft start" where the pile driving hammer will be throttled back to less than maximum power, thus giving the whales a "warning" of what is to come. SUF40. The theory is that the "soft start" will convince the whales to leave the construction zone before the full-magnitude pile driving begins. *Id.* The "soft start", however, is not incidental harassment but purposeful, intentional harassment, a type of hazing, designed to push the NARW out of their habitat. It is not accidental. *See*, 50 C.F.R. §216.103 ("Incidental harassment, incidental taking and incidental, but not intentional, taking all mean an accidental taking.") Thus, Vineyard Wind's soft start constitutes an intentional take that NMFS cannot authorize, and that VW cannot lawfully engage in.

### 2. VW's Soft Start Also Constitutes Unauthorized Level A Harassment.

Level A harassment, as defined in the MMPA for non-military readiness activities, is any act of pursuit, torment, or annoyance that has the potential to injure a marine mammal in the wild. Even if the "soft start" strategy effectively pushes all right whales out of the Level A exposure zone (i.e., 7.25 km from the pile driving area), there is no evidence the whales will be safe. On the contrary, there is considerable evidence that the whales will be exposed to increased threats from fishing gear entanglement and vessel strikes. For example, Area 537 is one of the most heavily fished areas in the Massachusetts Outer Continental Shelf with hundreds perhaps thousands of vertical buoy rope trap/pots for lobster and crab. SUF41. By forcing right whales out of the WDA, the VW soft start program will drive the whales right into this network of fishing ropes, heightening the threat of entanglement. The threat of vessel strikes against whales will also increase outside the WDA, as vessels in this area are not subject to NMFS's sometimes applicable 10 knot speed limit; nor are they required to have a PSO onboard looking for whales. *Id.*

In addition, to the extent the soft start forces feeding whales to leave and try to locate food elsewhere, the loss of foraging opportunity, in itself, may be damaging, especially given data showing that malnutrition has caused female NARWs to lose weight and exhibit signs of

reduced physical health. SUF42.  NMFS contends that right whales which have been prevented from foraging in the WDA during pile driving will simply come back and resume feeding once the pile driving stops. *Id.*  There is, however, no evidence to support this argument. For example, NMFS cites Goldbogen et al. 2013a and Melcon et al. 2012 for the proposition that "exposed animals will be able to return to normal behavioral patterns (i.e., socializing, foraging, resting, migrating) after the exposure ends," claiming these two studies reflect the "best available information". BOEM 77462.  In fact, however, the Goldbogen and Melcon studies focus on blue whales exclusively, not right whales, NMFS 8424, et seq. [Goldbogen]; NMFS 39898, et seq. [Melcon].  The Goldbogen article discusses blue whale "lunge feeding", which has nothing to do with right whale responses to noise; and the Melcon study addresses blue whale responses to mid-frequency sound, whereas right whales hear at a low-frequency. NMFS 8424 [Goldbogen]; NMFS 39898 [Melcon].  More importantly, neither study asserts that whales, once exposed to harassment-level noise, will quickly return to normal behaviors once the noise comes to a stop.

The more relevant studies indicate that "low-frequency-sound" whales, such as the right whale, BOEM 77335, behave unpredictably to repeated pulse noise, such as pile driving, which means NMFS has no way of knowing whether the right whales, once driven off their preferred feeding grounds and forced to find food elsewhere, will return to the WDA to restart their foraging effort. *See* NMFS 56428-29, 56437, 56440-41, 56448, 56463, 56466, 56469.  NMFS never discloses, much less analyzes, the impacts of pushing right whales out of the WDA for three to six hours at a time (each pile driving event takes about 3 hours, and VW has given itself the option of conducting two such events per day)  In fact, NMFS's latest update to its discussion of the NARW on its website,[4] lists "ocean noise" as one of the top four threats to the NARW's survival, SUF38, undermining NMFS's conclusions with respect to not only the soft-start intentional take, but that existing ocean noise has no effect on the NARW. *See*, NMFS 3393 ("marine mammals in the [VW] area are presumably habituated to vessel noise.")

> Ocean noise from human activities such as shipping, boating, construction, and energy exploration and development has increased in the Northwest Atlantic.

---

[4] https://www.fisheries.noaa.gov/species/north-atlantic-right-whale.

Noise from these activities can interrupt the normal behavior of right whales and interfere with their communication. It may also reduce their ability to detect and avoid predators and human hazards, navigate, identify physical surroundings, find food, and find mates.

In terms of the statutory requirements, the NMFS has no basis on which to conclude that the impacts of pushing the whales out of their home through intentional hammer noise, "cannot be reasonably expected" to "adversely affect the species" by reducing "annual rates of recruitment or survival." 50 C.F.R. §216.103.   NMFS certainly did not take the required hard look at the issue.

### 3. Vineyard Wind's Pile-Driving Activities Do Not Constitute Incidental Take.

Vineyard Wind is conducting its construction activities in the region where the NARW now live year-round and which is now critical foraging and mating grounds. [*Quintana 2021, O'Brien 2022*.]    Justice (then Judge) Ketanji Brown Jackson stated that "[K]nowing and intentional takes cannot be deemed incidental." *Pac. Ranger, LLC v. Pritzker*, 211 F. Supp. 3d 196, 202 (D.D.C. 2016).   Justice Jackson's opinion in *Pritzer* with amazing prescience is precisely on point with the facts of Vineyard Wind:

> Applied to the "take" context, the terms "accidental" and "non-intentional" therefore plainly do not describe the harassment of whales that occurs when commercial fishermen know that whales are in the vicinity of where they wish to conduct a highly disruptive multi-hour tuna-fishing operation and nevertheless press on with that operation.

Here, VW will be conducting a highly disruptive multi-hour pile-driving operation knowing that whales are in the vicinity.   Therefore, the "take" involved in the VW pile driving operation is "knowing," and is neither "accidental" nor "non-intentional."    As such, under Justice Jackson's MMPA definition, none of the VW pile driving can be authorized under the MMPA using an IHA.  In addition to being a knowing "take" under Justice Jackson's MMPA definition, VW's take is done knowingly and purposely under the standards of the Model Penal Code ("MPC") which defines knowingly as follows: "A person acts knowingly with respect to a material element of an offense when…he is aware that his conduct is of that nature…if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result" (Model Penal Code in § 2.02(2)(b)). A person "purposely" commits an

act if he acts with a "conscious object[ive] to engage in conduct of that nature or to cause such a result; and [] if the element involves the attendant circumstances, he is aware of the existence of such circumstances or he believes or hopes that they exist." *Id*. § 2.02(2)(a).  VW's take of the NARW is done both knowingly and purposely under the MPC definition.  It is done knowingly because the take is practically certain to occur.  It is done purposely because it is VW's "conscious object[ive] to engage in conduct of that nature," i.e., conduct that will take, and VW is aware of the "existence of such circumstances" that take will occur.

### D.   VW's Activities Do Not Meet The One Year Requirement For An IHA.

An IHA is appropriate if the proposed action would result in harassment only and is not planned for multiple years.    The VW FEIS at 3-78 (BOEM 68581) acknowledges that it is estimated that it will take 2 years to construct the project. SUF24.  Once BOEM gave the VW the approval of its COP, VW moved ahead to implement the COP.  The COP's activities include surveying the area of the project, physical construction, operation and decommissioning.  On July 21, 2021, NMFS issued an IHA (valid from 7/21/2021- 7/20/2022) to VW for the surveying component of the COP. SUF49.  Authorized take of the NARW in that IHA is 10. NMFS's issuance of the surveying piece confirms that VW's COP activities are anticipated for more than 1 year, and thus an IHA is not authorized.  Of course, it is plainly evident that the gamut of COP activities will take more than 1 year, including decommissioning, which is acknowledged by the FEIS at 3-78. BOEM 68581, SUF25.

### E.   NMFS Violated the MMPA By Failing To Adequately Address The Risk Of Repeated Harassment From Overlapping Or Continuous Activity.

As a corollary to its obligation to rely on the best available science, NMFS cannot rely on assumptions or guesswork or presumptions about critical issues or fail to address known risks. When the agency, rather than analyzing a potential risk, simply assumes it will not occur based on "speculation or surmise," as NMFS did here, its analysis is arbitrary and capricious. *See Bennett v. Spear*, 520 U.S. 154, 176 (1997); *see also Ohio River Valley Envtl. Coal., Inc. v. Kempthorne*, 473 F.3d 94, 102-04 (4th Cir. 2006) (finding that agency's "failure to analyze" effects of an action in way that might make program "less environmentally protective" rendered

approval arbitrary).  But that is exactly what NMFS did by starting its analysis with its irrational "presumption" that existing ocean noise no longer adversely affects the NARW.  NMFS 3393.

In addition to underestimating the number of harassments by using the outdated data, NMFS failed to rationally address the impact of repeat harassment on the NARW.   The Notice of Proposed IHA states that "an average of ~25 vessels will be involved in construction activities on any given day," yet NMFS assumes away any noise impact from the 25 vessels each day based upon the unproven assumption (what NMFS describes as a presumption) that "marine mammals in the area are presumably habituated to vessel noise," because "[e]xisting vessel traffic in the vicinity of the project area south of Massachusetts is relatively high."   In other words, things must be okay with the NARW vis-à-vis existing ocean noise because they are not all dead yet and they keep coming back to the area.

"Studies indicate noise from shipping increases stress hormone levels in NARWs (Rolland et al. 2012), and modeling suggests that their communication space has been reduced substantially by anthropogenic noise (Hatch et al. 2012). The authors also suggest that physiological stress may contribute to suppressed immunity and reduced reproductive rates and fecundity in NARWs (Hatch et al. 2012; Rolland et al. 2012)." BOEM 68581.  Before issuing the VW IHA, NMFS failed to properly analyze the effects on the NARW of the repeated harassment.  NMFS also failed in its duty under 16 U.S.C. §1371(a)(5)(D)(iv) to continually monitor whether based upon the best scientific evidence the take authorized involves small numbers, the take would have a negligible impact of the species, and the measures satisfy the least practicable impact standard based upon the repeated and cumulative harassment from VW and all the other OSW IHAs issued to date.

## F. The NMFS Proposed Speed Rules Confirm NMFS Has Failed In Its Duty To Prescribe Measures That Would Have The Least Practicable Impact On The NARW.

"North Atlantic right whales are vulnerable to vessel strike due to their coastal distribution and frequent occurrence at near-surface depths, and this is particularly true for females with calves. The proportion of known vessel strike events involving females, calves, and

juveniles is higher than their representation in the population." SUF45.  "Reducing vessel speed is one of the most effective, feasible options available to reduce the likelihood of lethal outcomes from vessel collisions with right whales."  *Id.* "Vessel strikes continue to occur all along the U.S. coast from the Gulf of Maine to the Florida coast. There is no indication that strike events only occur in ''hot spots'' or limited spatial/ seasonal areas." *Id.*  In many cases, the location of the strike event remains unknown." *Id.*  "[T]he current speed rule and other vessel strike mitigation efforts are insufficient to reduce the level of lethal right whale vessel strikes to sustainable levels in U.S. waters." *Id.*  "It remains unclear how right whales respond to close approaches by vessels (<1509 ft (460 m)) and the extent to which this allows them to avoid being struck." *Id.*

That information was known to NMFS when it issued the VW IHA.  NMFS ignored it and decided not to impose an across-the-board speed limit on all VW's vessels of no greater than 10 knots, even though such a speed limit is practicable, SUF47, and clearly necessary (at a minimum) to minimize the adverse impact on the NARW.  NMFS's failure to impose the 10-knot speed limit on all VW's vessels is arbitrary and capricious and requires the VW IHA to be vacated.

### G.  The PSO Measure Is Inadequate And Flawed.

The PSO measures are inadequate and flawed. SUF50-55.  They do not result in sufficient protection for the NARW even in combination with the other measures, and rely mainly on good fortune.  As a result, they do not satisfy the least practicable impact standard to ensure a negligible impact on the NARW.

### CONCLUSION

The Court should vacate the VW IHA and grant the relief requested in the Second Amended Complaint (ECF No. 143).

Respectfully submitted,

Dated: September 7, 2022            */s/ Thomas Melone*
    at Edgartown, MA            Thomas Melone, BBO No. 569232
                Allco Renewable Energy Limited
                157 Church St., 19th Fl., New Haven, CT 06510
                Tele: (212) 681-1120, Facsimile: (801) 858-8818
                Thomas.Melone@AllcoUS.com

<u>Certificate of Service</u>

I HEREBY CERTIFY that on this 7th day of September 2022, a true and complete copy of the foregoing has been filed with the Clerk of the Court pursuant to the Court's electronic filing procedures, and served on counsel of record via the Court's electronic filing system.

*/s/Thomas Melone*