UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| Thomas MELONE, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 1:21-cv-11171-IT |
| | * | |
| Janet COIT, et al., | * | |
| | * | |
| Defendants. | * | |

<u>MEMORANDUM & ORDER</u>

August 4, 2023

TALWANI, D.J.

Plaintiff Thomas Melone's <u>Second Amended Complaint</u> [Doc. No. 143] alleges that

Defendants National Marine Fisheries Service and its Assistant Administrator for Fisheries

(collectively, "NMFS") violated the Marine Mammal Protection Act ("MMPA"), 16 U.S.C.

§ 1371, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702-706, in issuing an

Incidental Harassment Authorization ("IHA") to Defendant-Intervenor Vineyard Wind 1, LLC

("Vineyard Wind"). This action is one of four challenges in this District to a wind energy project

offshore of the coast of Martha's Vineyard and Nantucket (the "Vineyard Wind Project").[1]

Both sides have moved for summary judgment. Pl. Mot. for Summ. J. [Doc. No. 144];

Fed. Defs. Mot. for Summ. J. [Doc. No. 152]; Vineyard Wind Mot. for Summ. J. [Doc. No. 156].

NMFS and Vineyard Wind assert that Melone lacks standing and, in any event, that they are

entitled to summary judgment because NMFS complied with the MMPA. Melone asserts that he

---

[1] See <u>Nantucket Residents Against Turbines et al. v. U.S. Bureau of Ocean Energy Mgmt.</u>, 1:21-
cv-11390-IT, <u>appeal docketed</u>, No. 23-1501 (1st Cir. June 13, 2023); <u>Seafreeze Shoreside, Inc.,
et al. v. Dep't of Interior, et al.</u>, 1:22-cv-11091-IT; <u>Responsible Offshore Development Alliance
v. Dep't of Interior, et al.</u>, 1:22-cv-11172-IT.

has standing as a result of his environmental interest in right whales, and that he is entitled to summary judgment and vacatur of the IHA because NMFS acted arbitrarily, capriciously, and otherwise in violation of law in issuing the IHA.

For the reasons that follow, the court finds that Melone has standing but has failed to show that NMFS acted arbitrarily, capriciously, or otherwise unlawfully in issuing the IHA.

## I.      Procedural Background

Melone, together with Allco Renewable Energy Limited and Allco Finance Limited, the owner, operator, and developer of various solar electric generating facilities, initiated this action on July 18, 2021, asserting over a dozen claims challenging the Vineyard Wind project against numerous federal defendants. Compl. [Doc. No. 1]. The court allowed Vineyard Wind to intervene, Memorandum & Order [Doc. No. 43], and issued a scheduling order requiring the Administrative Record to be served by April 12, 2022, and any motions related to disputes about that record to be filed no more than 30 days thereafter, Scheduling Order [Doc. No. 47].

Plaintiffs filed their First Amended Complaint [Doc. No. 58] on February 23, 2022. By April 12, 2022, NMFS had served the certified Administrative Record. Fed. Defs. Notice of Conventional Filing of Administrative Record [Doc. No. 101]. NMFS filed addenda on May 19, June 13, and July 1, 2022. Fed. Defs. Notices of Filing Certified Index [Doc. Nos. 105, 119, 128]. Although the parties made numerous requests to modify the Scheduling Order [Doc. No. 47], see Motions [Doc. Nos. 108, 139, 160], no party sought to extend the deadline for motions related to disputes about the Administrative Record.

On September 2, 2022, after the court had allowed the severance of certain claims, Memorandum & Order [Doc. No. 120], the voluntary dismissal of others, Order [Doc. No. 137], and a motion to amend, Electronic Order [Doc. No. 142], Melone filed the Second Amended

Complaint [Doc. No. 143], listing NMFS (and its administrator) as Defendants. Count I alleges that NMFS failed to adhere to MMPA's Notice requirements in violation of 16 U.S.C. § 1371(a)(5)(D). Count II alleges that the IHA issued to Vineyard Wind violates the MMPA.

The pending cross-motions for summary judgment were filed thereafter.

## II.     Standing

The court begins with NMFS and Vineyard Wind's contention that Melone has failed to demonstrate a concrete injury sufficient to establish Article III standing and Melone's response that he has procedural standing, "informational standing," and standing on behalf of the right whales to bring claims under the APA and MMPA.

### A. Background as to Plaintiff's Standing

Melone owns a house on Nantucket Sound in Edgartown, Massachusetts, where he lives part-time from May through November. Joint Statement of Undisputed Facts ("Joint SOF") ¶ 1 [Doc. No. 169]; Decl. in Supp. of Mot. for Summ. J. ("Melone Decl.") ¶ 5 [Doc. No. 145-2].[2] Melone has enjoyed observing marine life throughout his lifetime. Melone Decl. ¶ 7 [Doc. No. 145-2] (discussing Melone's observation of various animals other than the right whale).

Melone regularly reads the Vineyard Gazette and Boston Globe newspapers. He did not see any discussion of the proposed IHA in either newspaper. Id. at ¶ 17. Melone did not know that a notice of proposed IHA had been issued during the public comment period for the IHA at issue, or at any later time prior to the May 2021 issuance of the IHA for Vineyard Wind. Melone Reply Decl. in Supp. of Pl. Mot. for Summ. J. and in Opp. to the Defs.' and Intervenor's Mots. for Summ. J. ("Melone Reply Decl.") ¶ 8 [Doc. No. 164].

_____

[2] The Melone Declaration is filed as pages 496-506 of the multi-document Appendix in Support of Plaintiff's Motion for Summary Judgment [Doc. No. 145-2].

In May 2019, Melone expressed concern regarding the right whale in a comment on a supplement to the Draft EIS for the Vineyard Wind Project. Id. at ¶ 8, Ex. 2. Melone's first trip to observe right whales in Florida was planned for December 2020 at Amelia Island in Florida "which is when and where [right whales] are expected to be present," however, the trip was cancelled as a result of the COVID-19 Pandemic. Melone Decl. ¶ 9 [Doc. No. 145-2]; Joint SOF ¶ 51 [Doc. No. 169]. On October 1, 2021, Melone attended a whale watching cruise with the New England Aquarium, expecting to see right whales. Melone Decl. ¶ 9 [Doc. No. 145-2]. In December 2021, Melone engaged in a right whale watch from a hotel room in Fernandina Beach, Florida, and, during that time Melone observed one right whale and her calf. Id. at ¶ 10. Melone intends to engage in a similar whale watch from Fernandina Beach annually. Id. As of his September 7, 2022 Declaration, Melone had another trip scheduled for December 28, 2022, to January 1, 2023. Id.

From October 26-27, 2021, Melone attended the 2021 Right Whale Consortium Annual Meeting. Id. at ¶ 9. As of his September 7, 2022 Declaration, Melone had attended the 2022 Annual Meeting virtually and intended to register to attend the 2023 Right Whale Consortium Annual Meeting virtually. Melone Reply Decl. ¶¶ 4-5 [Doc. No. 164].

**B.  Applicable Law**

The doctrine of standing is rooted in Article III of the Constitution, which confines federal courts to the adjudication of actual "cases" and "controversies." See U.S. Const. Art. III, § 2, cl. 1; Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992). Standing consists of three elements: "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016), as revised (May 24, 2016) (quoting

Defs. of Wildlife, 504 U.S. at 560-61). "The standing inquiry is claim-specific: a plaintiff must

have standing to bring each and every claim that she asserts." Katz v. Pershing, LLC, 672 F.3d

64, 71 (1st Cir. 2012) (citing Pagán v. Calderón, 448 F.3d 16, 26 (1st Cir. 2006)).

To establish the first element of standing, an injury-in-fact, a plaintiff must demonstrate

"an invasion of a legally protected interest" that is "concrete and particularized" and "actual or

imminent, not conjectural or hypothetical." Defs. of Wildlife, 504 U.S. at 560. "The

particularization element of the injury-in-fact inquiry reflects the commonsense notion that the

party asserting standing must not only allege injurious conduct attributable to the defendant but

also must allege that he, himself, is among the persons injured by that conduct." Hochendoner v.

Genzyme Corp., 823 F.3d 724, 731-32 (1st Cir. 2016).

Standing also requires causation and redressability, which "'overlap as two sides of a

causation coin.'" Carpenters Indus. Council v. Zinke, 854 F.3d 1, 6 n.1 (D.C. Cir. 2017) (quoting

Dynalantic Corp. v. Dep't of Def., 115 F.3d 1012, 1017 (D.C. Cir. 1997)). "[I]f a government

action causes an injury, enjoining the action usually will redress that injury." Id.[3]

Because standing is not a "mere pleading requirement[] but rather an indispensable part

of the plaintiff's case," standing must be supported "with the manner and degree of evidence

required at the successive stages of the litigation." Defs. of Wildlife, 504 U.S. at 561; see also

People to End Homelessness v. Develco Singles Apartments Assoc., 339 F.3d 1, 8 (1st Cir.

2003). While at the pleadings stage, "general factual allegations of injury" may suffice, and at

summary judgment, such allegations must be supported by affidavits which will be taken to be

true, where standing remains a controverted issue at trial, the specific facts establishing standing

---

[3] Neither NMFS nor Vineyard Wind challenge causation or redressability on summary judgment.

"must be 'supported adequately by the evidence adduced at trial.'" Id. (quoting Gladstone

Realtors v. Village of Bellwood, 441 U.S. 91, 114, 115 n.31 (1979)).

### C.  Count II: Violation of the MMPA

Melone states that he "derive[s] recreational, conservation, environmental well-being and

aesthetic benefits from the existence of the [right whale] and their properly functioning habitat

through wildlife observation, study, and education," Melone Decl. ¶ 6 [Doc. No. 145-2], and

asserts that he has demonstrated by way of his whale watching activities an interest in right

whales sufficient to state an injury-in-fact for standing as to Count II of the Second Amended

Complaint [Doc. No. 143] for violation of the MMPA. NMFS and Vineyard Wind object that

Melone's whale watching activities all post-date the filing of the Complaint [Doc. No. 1], see

Fed. Defs. Mem. in Opp. to Pl. Mot. for Summ. J. and in Supp. of Cross-Mot. for Summ. J.

("Fed. Defs. Opening Mem.") 6-7 [Doc. No. 153]; Vineyard Wind's Mem. of Law in Supp. of

Mot. for Summ. J. and in Opp. to Pl. Mot. ("Vineyard Wind Opening Mem.") 3-4 [Doc. No.

157]. However, Defendants ignore Melone's planned trip to observe right whales in December

2020, before the lawsuit was filed, which was cancelled because of the COVID-19 Pandemic.

Melone Decl. ¶ 9 [Doc. No. 145-2].

Relying on Lujan v. Defenders of Wildlife, 504 U.S. at 566-67, NMFS and Vineyard

Wind also argue that Melone's activities are too distant geographically. See Fed. Defs. Reply

Mem. in Supp. of Cross-Mot. for Summ. J. ("Fed. Defs. Reply") 2 [Doc. No. 167] (contending

that "a stated interest in observing a particular species 'anywhere on the globe' does not establish

'a factual showing of perceptible harm' or a specific connection between the federal action and

any appreciable harm to Plaintiff"); Vineyard Wind Opening Mem. 4-5 [Doc. No. 157]

(contending that Plaintiff must produce expert testimony regarding right whale migratory

patterns and how Defendants' actions could diminish the viewing of right whales.).

In Defenders of Wildlife, the Supreme Court considered whether the affiants had alleged sufficient injury-in-fact for standing where they expressed only vague intentions to visit species halfway across the world. Here, in contrast, Melone is not expressing uncertain intentions to view animals in far-flung destinations. Rather, he is attesting to concrete plans to observe a finite population of right whales in one of the few areas on the East Coast where they can be observed. Whether Melone observes right whales off the coast of Martha's Vineyard or Nantucket, Massachusetts, or Fernandina Beach, Florida, is irrelevant where it is the same population of less than 400 right whales that migrate from one location to the other, and it is the same population as to which NMFS has authorized incidental harassment through the Vineyard Wind IHA.

NMFS also argues that Melone has not established causation and redressability sufficient to confer standing. NMFS contends that Melone "cannot show that there is a requisite causal connection between [NMFS's] actions and any effects on future whale-watching activities…[and] [f]urthermore, Plaintiff cannot show that it is likely, as opposed to merely speculative, that a favorable decision will redress any injury." Fed. Defs. Reply 4 n.2 [Doc. No. 167] (citing Defs. of Wildlife, 504 U.S. at 561). Melone responds that NMFS's actions will increase the risk of right whale death or serious injury, thereby "reducing the likelihood that [he] will observe the [right whale] in their natural state on future visits," see Melone Decl. ¶ 11 [Doc. No. 145-2], that "even a small probability of great harm may be sufficient[,]" and that he has sufficiently alleged the risk of great harm, Pl. Surreply Mem. in Supp. of Pls. Mot. and in Opp. to Defs. and Intervenor's Mots. for Summ. J. ("Pl. Surreply") 6 [Doc. No. 173].

Melone need only allege "a small probability of a great harm," Kerin v. Titeflex Corp., 770 F.3d 978, 983 (1st Cir. 2014), to "take the suit out of the category of the hypothetical –

provided of course, that the relief sought would, if granted reduce the probability," Mountain

States Legal Found. v. Glickman, 92 F.3d 1228, 1234-35 (D.C. Cir. 1996). Given the minute

remaining population, Melone has sufficiently alleged a small probability that the death of even

one whale in connection with the Vineyard Wind Project may impact Melone's ability to view

right whales.

### D.  Count I: Violation of the MMPA's Procedural Requirements

Melone asserts that, as to Count I, he has standing where he was deprived of notice and

thus the opportunity to comment on the IHA. He states further that he was entitled to presume

that, if the IHA was not approved in a timely fashion, it was "dead," and a new application

would need to be filed. Melone Decl. ¶ 18 [Doc. No. 145-2]. He contends that, because of his

special interest in the right whale, he has a "valid legal interest in relying on agency

accountability and compliance procedural requirements for issuance of an IHA[.]" Id. Finally,

Melone alleges that, because of the delay in issuance, he was also deprived of the opportunity to

comment on a proposed IHA that is "based upon current scientific information." Id. NMFS and

Vineyard Wind contend that Melone does not have standing where the missed opportunity to

comment on the proposed IHA did not cause him harm, he was otherwise informed of the

Project, and he was actively engaged in the comment process.

Where Melone has alleged a sufficient injury-in-fact as to his MMPA substantive claim,

that injury-in-fact may confer standing as to his procedural claim under the MMPA. Summers v.

Earth Island Inst., 555 U.S. 488, 497 (2009) ("a person who has been accorded a procedural right

to protect *his concrete interests* can assert that right without meeting all the normal standards of

redressability and immediacy."). NMFS contends that Plaintiff is not within the "zone of

interests" contemplated by the timing-related requirements in the MMPA and that he cannot

articulate any cognizable injury as a result of the timing-related delays in consideration and issuance of the IHA. Fed. Defs. Opening Mem. 35-36 [Doc. No. 153]. However, where NMFS does not cite any authority so limiting the zone of interests under the MMPA, and Plaintiff has established a sufficiently particularized injury-in-fact to confer standing under Count II, that injury is sufficient to bring Plaintiff within the zone of interests under the MMPA.[4]

The parties do not dispute causation or redressability as to Count I, except to the extent that NMFS contends that Plaintiff's claims regarding the procedural defects are moot, which is more properly addressed as part of NMFS's argument regarding harmless error.

Accordingly, the court concludes that Plaintiff has established standing with respect to Count I.

### III.     Background Concerning the Project

The following background is drawn from the Administrative Record, as certified by the U.S. Bureau of Ocean Energy Management ("BOEM") and NMFS, and is common to all four challenges to the Project.[5]

#### A.  BOEM's Development of The Wind Energy Area

In 2009, BOEM began evaluating the possibility of developing wind energy in the Outer Continental Shelf offshore from Massachusetts pursuant to BOEM's authority under the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331, et seq. Final Environmental Impact

---

[4] Melone also alleges injury-in-fact based on his entitlement to receive information. However, where Plaintiff has sufficiently alleged injury-in-fact as to procedural standing, the court need not address this additional basis for standing.

[5] The Administrative Record and addenda were conventionally filed, see Fed. Defs. Notices [Doc. No. 101, 106, 119], with indices docketed electronically, see Fed. Defs. Notices [Doc. Nos. 99, 105, 118]. Portions of the Administrative Record are docketed electronically as part of the parties' Joint Appendix [Doc. No. 117].

Statement ("Final EIS") Vol. II, BOEM_0068786 at -9170. In December 2010, BOEM published an initial Request for Interest ("RFI") regarding wind energy development in the Outer Continental Shelf offshore from Massachusetts. The RFI also invited public submissions on environmental issues. Id.; see also Joint Record of Decision ("Joint ROD"), BOEM_0076799 at -6802 (citing 75 Fed. Reg. 82,055 (Dec. 29, 2010)). In response to comments, BOEM reduced the planning area by 50%. Final EIS Vol. II, BOEM_0068786 at -9170.

In February 2012, BOEM published a Call for Information and Nominations in the Federal Register to gauge interest in commercial leases for wind energy projects. Id. (citing 77 Fed. Reg. 5821 (Feb. 6, 2012)). BOEM also published a notice of intent to prepare an environmental assessment in connection with potential wind energy leases and site assessment activities offshore from Massachusetts. Id.

In May 2012, BOEM identified a further reduced area for consideration for potential wind energy development ("the Wind Energy Area") in the Outer Continental Shelf south of Nantucket and Martha's Vineyard, Massachusetts, based on public comments concerning high sea duck concentrations and an area of high-value fisheries. Final EIS Vol. II, BOEM_0068786 at -9170. BOEM then prepared an Environmental Assessment, regarding the proposed Wind Energy Area, to guide its leasing. See 2014 Revised Env't Assessment, BOEM_0000090 at -118.

In June 2014, BOEM issued its Revised Environmental Assessment concerning the proposed wind energy area. Id. At the time, BOEM concluded leasing and site assessment actions would not significantly impact the environment. Id. at -100.

On June 18, 2014, BOEM published a proposed sale notice and invited public comment on a proposal to sell four wind energy leases in the Wind Energy Area. Final EIS Vol. II, BOEM_0068786 at -9171. Following public comment, BOEM published a final sale notice

reflecting its intent to sell commercial wind energy leases in the Wind Energy Area, including Lease "OCS-A 0501." <u>See</u> Final EIS Vol. II, BOEM_0068786 at -9171, -9235.

### B. BOEM's Award of the Lease

In January 2015, BOEM conducted a competitive lease sale for Lease OCS-A 0501 (the "Lease"), ultimately awarding the Lease to Offshore MW, LLC, later renamed Vineyard Wind 1, LLC. Final EIS Vol. II, BOEM_0068786 at -9171. The lease area covers 166,886 acres in the Outer Continental Shelf (the "Lease Area"). <u>Id.</u>; April 1, 2015 Lease, BOEM_0000764 at -0776. The Lease became effective April 1, 2015. <u>Id.</u> at BOEM_0000764.

The Lease granted Vineyard Wind the right to seek approval for a Site Assessment Plan ("SAP") and a Construction Operations Plan ("COP"). <u>Id.</u> On November 22, 2017, Vineyard Wind submitted a Site Assessment Plan ("SAP") to BOEM for the Vineyard Wind Lease Area. May 10, 2018 Approval of SAP, BOEM_0013366. On May 10, 2018, BOEM approved Vineyard Wind's SAP, subject to numerous conditions, including for the protection of cultural resources, marine mammals and sea turtles, and implementation of mitigation measures. <u>Id.</u>

### C. Biological Review(s) of the Project's Impacts by BOEM and NMFS

#### 1. Environmental Impact Statement(s) prepared by BOEM

On December 19, 2017, Vineyard Wind submitted to BOEM for consideration under OCSLA a proposed COP for the Project to be constructed in 65,296 acres of the Vineyard Wind Lease Area, referred to as the Wind Development Area or "WDA." Dec. 19, 2017 COP Submission Letter, BOEM_0006004-06; December 19, 2017 COP BOEM_0001361-6003. On March 30, 2018, BOEM published a notice of its intent to prepare an EIS for the COP. 83 Fed. Reg. 13,777 (Mar. 30, 2018), BOEM_0012028. The notice described the Project and invited the public to participate in public comment and public scoping meetings BOEM later conducted. <u>Id.</u>; BOEM_012406-13078 (April 2018 meeting transcripts)). On December 7, 2018, BOEM

published a notice of availability of the Draft EIS in the Federal Register. 83 Fed. Reg. 63,184 (Dec. 7, 2018), BOEM_0034694. As summarized in the notice, the Draft EIS analyzed the proposed COP and several alternatives, including different locations for cable landfall, reduction in project size, several options for turbine layout, and a no-action alternative. Id. The notice invited public comment and/or participation at public hearings BOEM later conducted. Id.; see also BOEM_035872-36269 (Draft EIS public meeting transcripts).

Vineyard Wind submitted numerous updates to the proposed COP over the course of BOEM's review. See Final EIS Vol. I, BOEM_0068434 at -8440 (listing prior iterations of the COP). The updates addressed comments from BOEM, modified the Project design envelope, and accounted for the possibility of higher capacity wind turbine generators, which would ultimately reduce the number of wind turbines to be installed and reduce the total Project area. See, e.g., Jan. 22, 2021 Letter from Vineyard Wind to BOEM, BOEM_0067698-7701.

On June 12, 2020, BOEM published a notice in the Federal Register that the supplement to the Draft EIS ("Supplemental Draft EIS") was available on BOEM's website, invited public comment in connection with the notice and participation at public meetings BOEM later held virtually. 85 Fed. Reg. 35,952 (June 12, 2020), BOEM_0057578; June-July 2020 Public Meeting Transcripts, BOEM_058001-59241. BOEM prepared the Supplemental Draft EIS "in consideration of the comments received during the [NEPA] process and in connection with cooperating agencies." Supplemental Draft EIS, BOEM_0056950 at -6954. In particular, BOEM expanded its analysis of the reasonably foreseeable effects from cumulative activities for offshore development, included previously unavailable fishing data, considered a new transit lane alternative through the WDA, and addressed changes to the proposed COP since publication of the Draft EIS. Joint ROD, BOEM_0076799 at -6803-04; 85 Fed. 35,952 (June 12, 2020),

BOEM_0057578; Supplemental Draft EIS, BOEM_0056950 at -6954. The transit lane alternative that was included was in response to a proposal from the Responsible Offshore Development Alliance for a northwest/southeast transit corridor to facilitate transit for fishing vessels from southern New England to fishing areas. Supplemental Draft EIS, BOEM_0056950 at -6958.

On December 1, 2020, Vineyard Wind notified BOEM that it was withdrawing the proposed COP from review in order to conduct a technical and logistical review of the turbines selected for inclusion in the final Project design. Dec. 1, 2020 Vineyard Wind Letter to BOEM, BOEM_0067649-50; see also Final EIS Vol. I, BOEM_0068434 at -8440 n.3. Vineyard Wind's notice of withdrawal indicated that Vineyard Wind intended to rescind the withdrawal upon completion of its due diligence review. Dec. 1, 2020 Vineyard Wind Letter to BOEM, BOEM_0067649-50. On December 16, 2020, following Vineyard Wind's notification that it was withdrawing the COP pending further technical and logistical review, BOEM published a notice in the Federal Register stating that "since the COP has been withdrawn from review and decision-making, there is no longer a proposal for major federal action awaiting technical and environmental review, nor is there a decision pending before BOEM…[the] notice advises the public that the preparation of an EIS is no longer necessary, and the process is hereby terminated." Fed. Reg. 81,486 (Dec. 16, 2020), BOEM_0067694.

On January 22, 2021, Vineyard Wind notified BOEM that Vineyard Wind had completed its review and "had concluded that the proposed turbines did not fall outside of the project design envelope being reviewed in the COP" and requested that BOEM resume review of the COP, most recently updated on September 20, 2020. Joint ROD, BOEM_0076799 at -6804.

On March 3, 2021, BOEM published a notice in the Federal Register stating it was

13

resuming preparation of a final environmental impact statement related to the COP. Joint ROD, BOEM_0076799 at -6804. On March 12, 2021, BOEM posted the Final EIS, which consists of 1,600 pages in four volumes assessing the environmental, social, economic, historic, and cultural impacts of the Vineyard Wind Project, from construction to decommissioning, on BOEM's website and issued a notice of availability in the Federal Register. 86 Fed. Reg. 14,153 (Mar. 12, 2021), BOEM_0071036; see also Final EIS, BOEM_0068434-70061.

### 2. *Biological Opinion*

On December 6, 2018, BOEM sent a request to NMFS to conduct a biological consultation pursuant to Section 7 of the Endangered Species Act ("ESA"). BOEM ESA Consultation Request, BOEM_0034533-4688. BOEM made the request in its capacity as the lead Federal agency in the Section 7 consultation process for the Vineyard Wind Project on behalf of itself, the Army Corps of Engineers ("Corps"), and NMFS Office of Protected Resources ("NMFS/OPR"). 2021 Biological Opinion, BOEM_0077276 at -7280. On May 1, 2019, NMFS's Greater Atlantic Regional Office ("NMFS/GAR") agreed to initiate formal consultation to consider the effects of the proposed actions on ESA-listed whales, including the North Atlantic right whale, sea turtles, fish, and the critical habitat for various species that may be present in the proposed action area. NMFS Initiation Letter, NMFS 16008. On September 11, 2020, NMFS/GAR issued a biological opinion (the "2020 BiOp") pursuant to its obligations under Section 7(a)(2) of the ESA on behalf of itself, BOEM, NMFS/OPR, and the Corps. Sept. 11, 2020 NMFS BiOp Transmittal Letter to BOEM, NMFS 16027-28; 2020 BiOp, NMFS 16029-354. The 2020 BiOp concluded that the "proposed action may adversely affect but is not likely to jeopardize the continued existence" of the North Atlantic right whales, among other species. Sept. 11, 2020 NMFS BiOp Transmittal Letter, NMFS 16029; 2020 BiOp, NMFS 16029 at -6317.

On May 7, 2021, BOEM requested that NMFS/GAR reinitiate its biological consultation. 2021 BiOp, BOEM_0077276 at -7281; May 7, 2021 Letter from BOEM to NMFS/GAR, BOEM_0076721. On May 27, 2021, NMFS/GAR advised BOEM that it agreed that consultation must be reinitiated and that it anticipated such consultation would result in a new BiOp that would replace the 2020 BiOp. 2021 BiOp, BOEM_0077276 at -7281. The biological consultation was reinitiated to consider (i) the effects of monitoring surveys identified in the Joint ROD by BOEM, at NMFS's recommendation, as conditions of COP approval, which were not considered in the 2020 BiOp, and (ii) new information concerning the status of the right whale. 2021 BiOp Transmittal Mem., NMFS 017683 at -7683-84; BOEM Mem. to Record, BOEM_077788-89.

On October 18, 2021, NMFS/GAR issued the reinitiated BiOp, and on November 1, 2021, NMFS reissued the reinitiated BiOp ("2021 BiOp") with corrections after typos and other non-substantive errors were identified and corrected. See Oct. 18, 2021 NMFS Transmittal Letter to BOEM, NMFS 16668; Nov. 1, 2021 Transmittal Letter, NMFS 17172; 2021 BiOp, BOEM_0077276-7779. The 2021 BiOp supersedes the 2020 BiOp. Nov. 1, 2021 Transmittal Letter, NMFS 17172 at -74; Oct. 18, 2021 NMFS Transmittal Letter to BOEM, NMFS 16668 ("this Opinion replaces the Opinion we issued to you on September 20, 202[0]"). In formulating its biological opinions, NMFS/GAR considered documents prepared by BOEM, including each iteration of the EIS, Vineyard Wind's proposed COP and updates, BOEM's COP Approval, and the Incidental Harassment Authorization issued by NMFS/OPR, discussed further below. 2021 BiOp, BOEM_0077276 at -7285-86, -88, -63-64. The 2021 BiOp analyzed the direct and indirect effects of the approved COP, the modifications proposed by BOEM, and those proposed by NMFS/OPR in the IHA. Id. NMFS/GAR also updated the 2021 BiOp to reflect the best scientific

information available concerning right whales and explain whether any of the new information
affected the analysis. Oct. 15, 2021 Transmittal Mem., NMFS 17683 at -86-87.

Like the 2020 BiOp, the 2021 BiOp concludes the proposed action is not likely to
jeopardize the continued existence of the right whales. 2021 BiOp, BOEM_0077276 at -7657.
Also like the 2020 BiOp, the 2021 BiOp included an incidental take statement ("ITS") and
imposed reasonable and prudent measures and their implementing terms and conditions to
minimize and document the take of ESA-listed species. 2021 BiOp, BOEM_0077276 at -7657-
78; 2020 BiOp, NMFS 16029-354. The 2021 BiOp reflects that NMFS anticipates the incidental
take of up to 20 right whales by Level B harassment, harassment that has the potential to "disturb
a marine mammal…in the wild by causing disruption of behavioral patterns," due to exposure to
pile driving noise based on the "maximum impact scenario" for the Project. 2021 BiOp
BOEM_0077660-62, -7299. The maximum impact scenario is defined as 90 monopiles being
placed in the Wind Development Area, with 12 jackets, at a rate of one pile being driven per day,
assuming only 6 decibels of attenuation, or reduction of sound through mitigation measures.
2021 BiOp, BOEM_0077276 at -7660-61. The 2021 BiOp notes that Vineyard Wind may install
fewer turbines and models the corresponding decrease in likely harassment to right whales and
other animals. Id. The 2021 BiOp concludes that "neither Vineyard Wind nor NMFS expect[s]
serious injury or mortality to result from this activity, and therefore, NMFS has determined that
an IHA is appropriate." Id. at -7284; see also id. at -7658 (reflecting in all modeled scenarios that
no injury is anticipated with respect to right whales). BOEM and NMFS/OPR each adopted the
2021 BiOp. 2021 BiOp, BOEM_0077276 at -7788; NMFS 3557. The 2021 BiOp concluded,
based on all scenarios modeled with 12 decibels sound attenuation, that no right whales would be
subject to Level A harassment, which is defined under the Marine Mammal Protection Act

16

("MMPA") as "harassment" that has the potential to injure a marine mammal. 2021 BiOp, BOEM_0077276 at -7299-300.[6] The 2021 BiOp includes an analysis of the effect of Project vessels, estimating that the Project will increase overall vessel traffic by 4.8% during the construction phase and by 1.6% during the operational phase of the Project. Id. at -7508. The 2021 BiOp concludes, based on traffic, combined with mitigation measures and other requirements for project vessels, that it is "extremely unlikely that a project vessel will collide with a whale." Id. at -7527.

On December 1, 2021, NMFS filed a Memorandum for the Record regarding the issuance of the 2021 BiOp, reflecting that the NMFS Permits and Conservation Division (PR1) was adopting the 2021 BiOp. NMFS Mem. to Record, NMFS 3557. On January 20, 2022, BOEM determined, pursuant to 50 C.F.R. § 402.15(a), that "because the activities authorized under BOEM's COP approval—including the monitoring surveys—are subject to the terms and conditions and reasonable and prudent measures found in the 2021 BiOp, no further action is required in order for Vineyard Wind to proceed with construction and operation of the Project." BOEM Information Mem. to Record, BOEM_077788-89.

### D.  Other Agency Review[7]

#### 1.  Incidental Harassment Authorization

Meanwhile, on September 7, 2018, Vineyard Wind submitted a request under the MMPA

---

[6] Vineyard Wind did not seek authorization for Level A harassment because it anticipated that that such harassment "will be avoided through enhanced mitigation and monitoring measures proposed specifically for North Atlantic right whales." 2021 BiOp, BOEM_0077276 at -7451.

[7] The Vineyard Wind Project was also subject to review by other agencies whose actions were not challenged by Plaintiff here or in the Related Actions. See Final EIS Vol. II, BOEM_0068786 at -9170-78 (discussing review under several other statutes, including the Coastal Zone Management Act, the National Historic Preservation Act, and the Magnuson-Stevens Fishery Conservation and Management Act).

to NMFS/OPR for an Incidental Harassment Authorization, seeking authorization of the likely incidental taking by harassment that may occur from impact pile driving in connection with the Project. Draft IHA Application, NMFS 14218-14550; Transmittal Email, NMFS 14451. In October 2018, and then January 2019, Vineyard Wind submitted revised versions of its IHA application to NMFS/OPR. Transmittal Emails, NMFS 14457, NMFS 14581; January 2019 Draft IHA Application, NMFS 14737-4984. The Vineyard Wind IHA Application was deemed complete on February 15, 2019. 84 Fed. Reg. 18,346 (April 30, 2019), NMFS 3392. Notice inviting public comment on the proposed IHA was published in the Federal Register 74 days later, on April 30, 2019. Id. The public comment period closed on May 30, 2019. Id.

Approximately two years later, on May 21, 2021, NMFS issued the IHA to Vineyard Wind. May 21, 2021 Letter Issuing IHA, NMFS 3514; IHA, NMFS 3489-3509. On June 25, 2021, NMFS/OPR issued notice of its approval of an IHA under the MMPA, 16 U.S.C. §§ 1361, et seq., NMFS 3415; see also 86 Fed. Reg. 33,810 (June 25, 2021) ("Notice of Issuance of IHA"), NMFS 3515-3556. The notice responded to the public comments NMFS/OPR received, explained the basis for the agency's decision, and described the mitigation, monitoring, and reporting requirements that were imposed by the IHA. Notice of Issuance of IHA, NMFS 3515-3556.

The IHA is valid from May 1, 2023, through April 30, 2024. IHA, NMFS 3489. The IHA authorizes a maximum take by Level B harassment of 20 incidents to right whales. Notice of Issuance of IHA, NMFS 3515 at -3551. The Notice of Issuance defines Level B Harassment as "the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering." Notice of Issuance of IHA, NMFS 3515 at -3532; see also 50

C.F.R. § 216.3.

       *2.   Clean Air Act Permits*

On August 17, 2018, Vineyard Wind applied to the U.S. Environmental Protection

Agency ("EPA") for a permit under the Clean Air Act concerning construction of a wind farm.

2021 BiOp, BOEM_0077276 at -7282-83. On April 19, 2019, Vineyard Wind submitted a

subsequent application for an operating permit in accordance with 310 C.M.R. 7.00. Id. On June

28, 2019, the EPA issued a draft permit for public comment. Id. On May 19, 2021, the EPA

issued a permit to Vineyard Wind. Id.

       *3.   Rivers and Harbors & Clean Water Act Permits*

On December 26, 2018, the Corps issued a public notice in the Federal Register regarding

proposed permits under the Rivers and Harbors Act and Section 404 of the Clean Water Act, to

permit Vineyard Wind to construct, maintain, and eventually decommission an 800 megawatt

wind energy facility, two electronic service platforms, scour protection around the bases of the

wind turbine generators and electronic service platforms, connection between the turbines and

the service platforms, and two export cables with scour protection within a single 23.3 mile long

corridor. Joint ROD, BOEM_ 0076799 at -6803, -6807. The public comment period ran from

December 26, 2018, to January 18, 2019. Joint ROD, BOEM_0076799 at -6828. The Corps did

not receive any comments from the public during or after the public comment period. Id. The

Corps issued a permit, with special conditions, to Vineyard Wind on August 9, 2021. 2021 BiOp,

BOEM_0077276 at -7282.

### E.  The Approved Vineyard Wind Project

On May 10, 2021, BOEM, NMFS, and Corps issued a Joint ROD adopting the Final EIS.

Joint ROD, BOEM_0076799-898. The Joint ROD consolidated the records of decision by each

respective agency, specifically, BOEM's action to approve the COP under OCSLA, the Corps'

issuance of permits under the Clean Water Act and Rivers and Harbors Act, and NMFS/OPR's issuance of an IHA under the MMPA. Joint ROD, BOEM_0076799-898. The Joint ROD reflects that BOEM's approval of the COP would be subject to mitigation and monitoring measures outlined in the Final EIS and any additional technical, navigational, and safety conditions imposed by BOEM. Joint ROD, BOEM_0076799 at -6820-21, -6827.

On July 15, 2021, BOEM issued final approval of Vineyard Wind's COP under OCSLA. July 15, 2021 VWI COP Project Easement and Approval Letter ("COP Approval Letter"), BOEM_0077150-265. The Project, as approved, will involve 84 or fewer wind turbines to be installed in 100 of the locations proposed by Vineyard Wind in the Wind Development Area, in an east-to-west orientation, with a minimum spacing of 1 nautical mile each. Joint ROD, BOEM_0076799 at -6821. The Project is located approximately 14 nautical miles south of Nantucket Island and Martha's Vineyard at its nearest point. Final EIS Vol. II, BOEM_0068786 at -8863. As part of construction of the Project, project-related vessels will travel primarily from New Bedford, Massachusetts, approximately fifty miles from the WDA, although some vessel trips will originate in Canadian ports. 2021 BiOp, BOEM_0077276 at -7294.

BOEM's final approval is subject to numerous terms and conditions, including compliance with all "statutes, regulations, and permits and authorizations issued by Federal and state agencies for the [P]roject." COP Approval Letter, BOEM 077150 at -152. The COP Approval Letter also noted that all activities authorized thereunder by BOEM "will be subject to any terms and conditions and reasonable and prudent measures resulting from a BOEM-reinitiated consultation for the Project's BiOp." COP Approval Letter, BOEM 077150 at -7152. The IHA set forth a number of minimization and monitoring measures, which were incorporated into the conditions of the COP Approval and set forth in the 2021 BiOp. IHA, NMFS 3489-3509.

Numerous other measures were laid out in the Joint ROD pertaining to right whales and other

ESA-listed animals. See Joint ROD, Appendix A, BOEM_0076852-897. The mitigation

measures include:

1. **Seasonal restriction on pile driving.** Pile driving is not permitted from January 1 through April 30 to avoid the time of year with highest densities of right whales in the Project Area. Pile driving is not permitted in December, except in the event of unanticipated delays, and will require enhanced protection measures and approval by BOEM. 2021 BiOp, BOEM_0077276 at -7451-52; IHA, NMFS 3489 at -3490.

2. **A "soft start" pile driving procedure**. Vineyard Wind will begin pile driving activities with three rounds of three impact hammer strikes at a reduced energy, each followed by a one-minute waiting period. Vineyard Wind will use this "soft start" approach for each pile to be driven at the beginning of a day's pile driving activities, and at any point where pile driving has ceased for thirty minutes or longer. 2021 BiOp, BOEM_0077276 at -7458. This "soft start" procedure is designed to "provide a warning to any marine mammals" and the opportunity to disperse from the area prior to higher intensity pile driving, to reduce the change of Level A or Level B harassment of right whales. 2021 BiOp, BOEM_0077276 at -7458.

   Although NMFS expects soft-start procedures to reduce the effects of pile driving on right whales, NMFS was unable to modify the estimated taken numbers to account for such benefit because NMFS could not predict the extent to which soft start would reduce exposure. 2021 BiOp, BOEM_0077276 at -7458.

3. **The use of protected species observers.** Vineyard Wind must employ qualified, trained protected species observers ("PSOs") to conduct monitoring for marine mammals during pile driving activity. These individuals must be approved by NMFS and are subject to certain conditions, including that they must be independent observers, rather than construction personnel. IHA, NMFS 3489 at - 3499-3500. At least two PSOs must be stationed on the pile driving vessel at all times sixty minutes prior to, during, and thirty minutes after pile driving. IHA, NMFS 3489 at -3490.

4. **Passive Acoustic Monitoring & Other Reporting**. Passive Acoustic Monitoring ("PAM") will be used "record ambient noise and marine mammal vocalizations in the [L]ease [A]rea before, during, and after [construction] to monitor project impacts relating to vessel noise, pile driving noise, [wind turbine] operational noise, and to document whale detections in the WDA." 2021 BiOp, BOEM_0077276 at -7298. PAM-generated noise data must be interpreted by an expert trained to discern the species of whale making sounds detected. Id.

5. **The establishment of pile driving clearance zones.** Vineyard Wind PSOs must

establish clearance zones for right whales between sixty minutes prior pile driving activities and thirty minutes after completion of pile driving activities. The clearance zones range depending on the time of year from 2-10 km for visual and 5-10 km for PAM. Zones are the smallest from June to December 31, when the BiOp concludes there is a lower probability of right whales being present in the pile driving area. 2021 BiOp, BOEM_0077276 at -7319.

Vineyard Wind vessels must also use all other available sources of information on right whale presence, including the Right Whale Sightings Advisory System, WhaleAlert app, and monitoring of Coast Guard channels to plan vessel routes. IHA, NMFS 3489 at -3496.

6. **Vessel Speed Restrictions.** Vessels must comply with the NOAA Ship Strike Rules' speed restrictions, that restrict speed to 10 knots in certain restricted zones. IHA, NMFS 3489 at -3497; see also 2021 BiOp, BOEM_0077276 at -7520. All vessels travelling over 10 knots must have a dedicated visual observer on duty at all times, such as a PSO or crew member. IHA, NMFS 3489 at -3496. Where a crew transfer vessel is not subject to the 10-knot speed limit, it must employ an additional PSO or other enhanced detection method to monitor for right whales, in addition to PAM. Id. at -3497.

7. **Heightened Measures in Dynamic Management Areas and Slow Zones.** Dynamic Management Areas ("DMA"), as defined by the 2008 NOAA Ship Strike Rules (73 Fed. Reg. 60,173), are temporary protection zones designed to reduce lethal right whale strikes and are triggered when three or more whales are sighted within 2-3 miles of each other outside of the seasonal protection zones, See 2021 BiOp, BOEM_0077276 at -7675. NMFS adopted an additional protective measure, referred to as Right Whale Slow Zones, based on acoustical detection of a vocalizing right whale. When a right whale is detected acoustically, notifications of a "Slow Zone," covering a protective circle with a radius of 20 nautical miles from any point of detection, are triggered. Id.; see also NOAA Fisheries, Help Endangered Whales: Slow Down in Slow Zones (Dec. 23, 2021) available at https://www.fisheries.noaa.gov/feature-story/help-endangered-whales-slow-down-slow-zones. In instances where a DMA or Slow Zone has been triggered, NMFS requires that Vineyard Wind use an increased number of PSOs, and establish an extended exclusion zone with PAM, in addition to other restrictions established by the rules pertaining to DMAs and Slow Zones. 2021 BiOp, BOEM_0077276 at -7675.

As the 2021 BiOp acknowledges, numerous mitigation measures are designed not only to protect right whales from harassment, but also to protect other species. For instance, Vineyard Wind is required to implement PSOs for several species of sea turtles, and the soft-start pile driving procedures are designed to disperse any undetected sea turtles, right whales, and other marine

species from the Area. See 2021 BiOp, BOEM_0077276 at -7480-82, -7458.

## IV.   Extra-Record Evidence

Plaintiff submitted a number of exhibits in connection with his summary judgment briefing. See Pl. App'x [Doc. No. 145-2]. The court rejects this proposed supplementation of the Administrative Record.

As a threshold matter, the attempted supplementation is untimely. Under the court's Scheduling Order [Doc. No. 47], the deadline for raising disputes about the Administrative Record was "no more than 30 days after service of the administrative record," which occurred by April 12, 2022, [Doc. No. 101]. Plaintiff failed to bring any such motion.

Melone's contentions that the offered documents are admissible under Federal Rule of Evidence 201 and that the court may take judicial notice of them, see Melone Decl. ¶¶ 19-26 [Doc. No. 145-2], are also in direct tension with the court's task of reviewing the agency's action "on the basis of the record before it." Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985). Under the APA, a review court is required to "review the whole record or those parts of it cited by a party," 5 U.S.C. § 706, and "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court," Camp v. Pitts, 411 U.S. 138, 142 (1973). Supplementation on judicial review "is therefore the exception, not the rule, and is discretionary with the reviewing court." Town of Winthrop v. F.A.A., 535 F.3d 1, 14 (1st Cir. 2008).

Plaintiff contends that supplementation is warranted because "political pressure justifies expanding the record, and given the [lightening] speed at which the Biden administration approved the project after it took office, political pressure seems to have been applied." Pl. Opp. 37 [Doc. No. 163]. Plaintiff cites Sokaogon Chippewa Community. v. Babbitt, 961 F. Supp.

1276, 1280 (W.D. Wis. 1997) in support, but the court in <u>Sokaogon Chippewa Community</u> permitted supplementation only of materials that supported the plaintiff's argument of improper influence, and not as to any issue. <u>Id.</u> at 1280. Here, Plaintiff has not offered any extra-record exhibits to support an argument that there was undue political pressure in the process, nor do his underlying claims relate to concerns about political pressure.

Melone also cites <u>Tummino v. Torti</u>, 603 F. Supp. 2d 519 (E.D.N.Y. 2009), where plaintiffs alleged political pressure impacted an agency's decision-making. The court permitted supplementation of the record, however, only after the Plaintiff had made a "strong showing of bad faith or improper behavior." <u>Id.</u> at 543 (quotations omitted). The First Circuit has similarly recognized that "a 'strong showing of bad faith or improper behavior' may also provide occasion to 'order[] the supplementation of the administrative record.'" <u>City of Taunton v. U.S. EPA</u>, 895 F.3d 120, 127 (1st Cir. 2018) (quoting <u>Town of Norfolk v. U.S. Army Corps of Eng'rs</u>, 986 F.2d 1438, 1458-59 (1st Cir. 1992)). Plaintiff has failed to make a "strong showing" of such conduct to warrant supplementation here. <u>Town of Norfolk</u>, 968 F.2d at 1459-60.

Plaintiff contends further that the court should permit the offered exhibits because of the complexity of the issues and to ensure that the court has explored all relevant factors. The First Circuit has permitted supplemental evidence where it would facilitate comprehension of the record or the agency decision, such as where the decision involves "highly technical, environmental matters" or where the court is faced with a "failure to explain administrative action as to frustrate effective judicial review." <u>City of Taunton</u>, 895 F.3d at 127 (quotations omitted). But Plaintiff fails to explain how these documents offer distinct or helpful explanations to the court that are not available in the Record before it.

Plaintiff states that two of the exhibits[8] reflect information that NMFS had in its possession at the time the Vineyard Wind IHA was issued in 2021, see Pl. Opp. 37-39 [Doc. No. 163], but offers no support for that assertion. In response to NMFS's contention that all of the offered Exhibits post-date the agency action at issue, Plaintiff contends that NMFS is under a continuing duty to review the validity of the IHA issuance such that the rules concerning the Administrative Record do not apply here. But Plaintiff's lone cited case, Center for Biological Diversity v. Ross, 349 F. Supp. 3d 38, 47–48 (D.D.C. 2018), only permitted extra-record evidence in connection with forward-looking ESA claims, and not the two APA-based counts, which were confined to the record. Id. at 40; see also id. at 41 ("[a]s both sides agree, the Court need not address Plaintiffs' APA and MMPA claims, the adjudication of which is confined to the administrative record."). The court noted the difference between claims that challenge specific administrative decisions, as here, where review is limited to the administrative record, and the forward-looking claims under Sections 7 and 9 of ESA involved there. Id. at 47. Plaintiff's further argument that supplementation is warranted here because it is often permitted in NEPA review cases is irrelevant, where none of NMFS's actions under NEPA are at issue.

Finally, many of the offered documents are needlessly cumulative of the Record. For instance, Melone offers O'Brien 2022 largely for the proposition that the area where Vineyard

---

[8] The exhibits are Melone Declaration Exhibit A (O'Brien, D. E.Pendleton, L. C. Ganley, K. R. McKenna, R. D. Kenney, E. Quintana-Rizzo, C. A. Mayo, S. D. Kraus & J. V. Redfern, Repatriation of a historical North Atlantic right whale habitat during an era of rapid climate change (July 20, 2022) (available at https://www.nature.com/articles/s41598-022-16200-8 ("O'Brien 2022") [Doc. No. 145-2]), Exhibit B (H.M. Pettis, et al., North Atlantic Right Whale Consortium 2021 Annual Report Card: Report to the North Atlantic Right Whale Consortium (2022), https://www.narwc.org/uploads/1/1/6/6/116623219/2021report_cardfinal.pdf ("2021 Report Card") [Doc. No. 145-2]), and Exhibit C ("Amendments to the North Atlantic Right Whale Vessel Strike Reduction Rule," published in the Federal Register Vol. 87, No. 146 at 46921 on August 1, 2022 ("Proposed NMFS Speed Rules") [Doc. No. 145-2]).

Wind is conducting its construction activities is part of a critical foraging and mating ground, but he fails to explain how O'Brien 2022 is not cumulative of another study already in the Record and on which he relies for this same proposition, Quintana-Rizzo, et al., "Residency, demographics, and movement patterns of North Atlantic right whales Eubalaena glacialis in an offshore wind energy development area in southern New England, USA," Endangered Species Research, Vol. 45: 251-268 (2021) ("Quintana-Rizzo"), NMFS 53318-335. See Pl. Opening Mem. 17 [Doc. No. 145]; Pl. Opp. 25-26, 31-32 [Doc. No. 163].

Accordingly, Plaintiff has not met the high bar required to demonstrate supplementation of the Administrative Record is warranted.

## V.     Discussion

### A.  Overview of the Statutory Scheme

#### 1.  Marine Mammal Protection Act

The MMPA establishes a general moratorium prohibiting the taking of marine mammals, 16 U.S.C. § 1371(a), with certain exceptions. Relevant here is subsection (5)(D) which authorizes incidental harassment as described in greater detail below. Because the MMPA does not have a citizen-suit provision, challenges to the MMPA, including to issuance of an IHA, are reviewed pursuant to the APA's arbitrary and capricious standard. See Ctr. For Bio. Diversity v. Ross, 2020 WL 1809465 at *4 (D.D.C. April 9, 2020) (citing 16 U.S.C. § 1371); see also Nat. Res. Def. Council, Inc. v. Evans, 279 F. Supp. 2d 1129, 1142 (N.D. Cal. 2003) ("Citizens challenging actions done under the MMPA must sue under the APA.").

#### 2.  Administrative Procedure Act

A summary judgment motion has a "special twist in the administrative law context." Bos. Redevelopment Auth. v. Nat'l Park Serv., 838 F.3d 42, 47 (1st Cir. 2016) (quotations omitted). In an APA action, a motion for summary judgment serves as "a vehicle to tee up a case for

judicial review and, thus, an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action was arbitrary and capricious." Id. (citing cases); see also 5 U.S.C. § 706(2)(A) ("The reviewing court shall…hold unlawful and set aside agency action…found to be…arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]").

Because the APA affords great deference to agency decision-making and agency actions are presumed valid, "judicial review [under the APA], even at the summary judgment stage, is narrow." Assoc'd Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997) (citing Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 415-16 (1971)). Courts should "uphold an agency determination if it is 'supported by any rational view of the record.'" Marasco & Nesselbush, LLP v. Collins, 6 F.4th 150, 172 (1st Cir. 2021) (quoting Atieh v. Riordan, 797 F.3d 135, 138 (1st Cir. 2015)). Even where an inquiring court disagrees with the agency's conclusions, the court cannot "'substitute its judgment for that of the agency.'" Bos. Redevelopment Auth., 838 F.3d at 47 (quoting Assoc'd Fisheries, 127 F.3d at 109). Rather, an agency's action should only be vacated where it "has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Nat'l Ass'n of Home Builders v. Defs. of Wildlife, 551 U.S. 644, 658 (2007) (quotations omitted).

**B.  Count I: MMPA Timing and Publication Requirements**

*1.  NMFS Violated Timing and Publication Requirements*

Plaintiff contends that NMFS did not comply with three timing-related requirements

under 16 U.S.C. § 1371(a)(5)(D)(iii) when it issued the IHA to Vineyard Wind. 16 U.S.C.

§ 1371(a)(5)(D)(iii) provides that:

> The Secretary shall publish a proposed authorization not later than 45 days
> after receiving an application under this subparagraph and request public
> comment through notice in the Federal Register, newspapers of general
> circulation, and appropriate electronic media and to all locally affected
> communities for a period of 30 days after publication. Not later than 45 days
> after the close of the public comment period, if the Secretary makes the
> findings set forth in clause (i),[9] the Secretary shall issue an authorization with
> appropriate conditions to meet the requirements of clause (ii).[10]

Plaintiff contends that: (a) NMFS failed to issue a notice of proposed IHA within 45 days of

receiving Vineyard Wind's application; (b) NMFS did not issue the required kinds of notice for

the proposed IHA (i.e. through newspapers of general circulation and appropriate electronic

media and to all locally affected communities);[11] and (c) NMFS did not issue or deny the

---

[9] The findings in clause (i) are that the harassment at issue: "(I) will have a negligible impact on
such species or stock, and (II) will not have an unmitigable adverse impact on the availability of
such species or stock for taking for [permissible] subsistence uses[.]" Id. § 1371(a)(5)(D)(i).

[10] The requirements of clause (ii) are that the authorization for the activity shall prescribe, where
applicable: "(I) permissible methods of taking by harassment pursuant to such activity, and other
means of effecting the least practicable impact on such species or stock and its habitat, paying
particular attention to rookeries, mating grounds, and areas of similar significance, and on the
availability of such species or stock for taking for [permissible] subsistence uses. . . , (II) the
measures that the Secretary determines are necessary to ensure no unmitigable adverse impact on
the availability of the species or stock for taking for [permissible] subsistence uses . . . , and (III)
requirements pertaining to the monitoring and reporting of such taking by harassment, including
requirements for the independent peer review of proposed monitoring plans or other research
proposals where the proposed activity may affect the availability of a species or stock for
[permissible] taking for subsistence uses . . . ." Id. § 1371(a)(5)(D)(ii).

[11] Plaintiff appears to concede that NMFS did not fail entirely in providing notice and that any
deficiency is limited to the lack of newspaper notice. Pl. Surreply 7-8 [Doc. No. 173].

proposed IHA within 45 days after the close of the public comment period. Pl. Opening Mem. 4-7 [Doc. No. 145].

 In response to the first charge, NMFS deemed Vineyard Wind's IHA application complete on February 15, 2019, but did not issue the notice of the proposed IHA until April 30, 2019. Fed. Def. Opening Mem. 29 [Doc. No. 153]. Accordingly, the notice was issued 29 days late.

As to the second charge, NMFS asserts that it published the proposed authorization and requested public comment "in a manner consistent with" the statutory requirement. Id. at 31. NMFS states that the proposed IHA was published in print and electronic versions of the Federal Register, and in electronic media, including on NMFS's website and on the General Services Administration's Federal Infrastructure Permitting Dashboard website. Id. at 32. NMFS states further that the proposed IHA and link to the supporting material were also sent to specific federal legislators and to various environmental groups, the Marine Mammal Commission, and BOEM. Id. at 32-33. NMFS concedes, however, that it did not request public comment on the proposed IHA through newspapers of general circulation. Id. at 33.

On the third charge, NMFS does not dispute that it did not issue the IHA within 45 days after the close of the public comment period, but almost two years later. Id. at 34.

### 2. The Error is Harmless

Plaintiff argues that each of these violations requires vacatur of the IHA. See Pl. Opening Mem. 5-6 [Doc. No. 145]. NMFS contends that (1) the remedy for non-compliance is not vacatur, and (2) the non-compliance here was harmless error. Vineyard Wind adds that Plaintiff has not shown that the lack of notice of which he complains had any effect on the public opportunity for comment. Vineyard Wind. Opening Mem. 18-19 [Doc. No. 157].

The APA instructs that reviewing courts shall "hold unlawful and set aside agency action,

fundings, and conclusions found to be…not in accordance with law" or "without observance of procedure as required by law[.]" 5 U.S.C.§ 706(2). The APA further instructs that, in making such a determination "due account shall be taken of the rule of prejudicial error," id., "i.e., whether the error caused actual prejudice." Save Our Heritage, Inc. v. F.A.A., 269 F.3d 49, 61 (1st Cir. 2001). Indeed, "[t]he doctrine of harmless error is as much a part of judicial review of administrative action as of appellate review of trial court judgments." Id. In applying this analysis in Conservation Law Foundation v. Evans, 360 F.3d 21 (1st Cir. 2004), the First Circuit framed the inquiry as whether a notice and comment violation had a "'bearing on the procedure used or the substance of [the] decision reached.'" Id. at 29 (quoting Riverbend Farms, Inc. v. Madigan, 958 F.2d 1479, 1487 (9th Cir.1992)).

Melone contends that he was harmed, first, by missing the opportunity to comment for lack of notice, and second, by not receiving information pertaining to the IHA within the "Congressionally mandated timeframe." Pl. Surreply 8-9 [Doc. No. 173]. Both arguments fall short.

As to the first, Melone contends that, had he known about the IHA process, he would have offered specific comments pertaining to the IHA. But this contention does not show (i) that the notice and comment process was inadequate, or (ii) that the defect had any bearing on the process. To the contrary, the Record reflects that NMFS conducted a notice-and-comment period, and provided notice to the general public by numerous, well-established means. Accordingly, Melone has not demonstrated that the publication defects amount to anything more than harmless error.

As to the timing-related defects, Melone has similarly not demonstrated they amount to more than harmless error. Melone avers generally that the delays in issuance of the IHA mean

that he was deprived of information he was entitled to on a statutorily mandated timeline, and, because of the lapse in time between the proposed IHA and the issuance of the IHA, NMFS ultimately relied on stale data, depriving Melone "of the ability to comment on a notice of proposed []IHA based upon current scientific information." Pl. Opp. 36 [Doc. No. 163] (arguing that NMFS was required to issue an IHA that "immediately preceded a notice of proposed IHA" and thus a notice and comment period in which Plaintiff could participate); see also Melone Decl. ¶ 18 [Doc. No. 145-2]. As discussed infra, the court rejects Melone's argument that NMFS violated the IHA by relying on "old data." Where Melone has failed to demonstrate any impact to the process as a result of the delay in issuance of the IHA, and moreover, where the Record demonstrates the delay occurred in conjunction with a lengthy interagency review process, the court concludes that the delay amounted to harmless error.

Finally, even if the defects were not harmless error, Plaintiff has not demonstrated that vacatur would be an appropriate remedy. Plaintiff's citation to Department of Homeland Secretary v. Regents of the University of California, 140 S. Ct. 1891, 1909 (2020), is misplaced, as Regents relates to the reasoning offered by an administrative agency in taking agency action, not in adhering to timing-related or other procedural requirements. See id. at 1907-09.

In sum, the court finds that although NMFS did not comply with the procedures required under the MMPA, the impact of the violation amounts to harmless error. Accordingly, as to Count I, Plaintiff's Motion for Summary Judgment is denied, and NMFS and Vineyard Wind's Motions are granted.

### C.  Count II: Plaintiff Claims that the IHA Issued to Vineyard Wind Violates the MMPA

Plaintiff contends that NMFS's interpretation of numerous aspects of Section 1371(a)(5)(D) improperly led to the issuance of an IHA to Vineyard Wind, and that such action

is arbitrary, capricious, and unlawful. NMFS contends that the decision to issue the IHA survives Plaintiff's APA and MMPA challenge where NMFS properly construed the statute, conducted a thorough analysis of the proposed IHA, and issued an IHA that is fully supported by the Administrative Record, and where the result is supported by an extensive multi-year environmental review conducted by numerous federal and state agencies under NEPA.

The First Circuit has recently reiterated "the familiar Chevron two-step analysis" in considering an Agency's interpretation of a statute. Relentless, Inc. v. U.S. Dep't of Com., 62 F.4th 621, 628 (1st Cir. 2023) (quoting Bais Yaakov of Spring Valley v. ACT, Inc., 12 F.4th 81, 86 (1st Cir. 2021). The first question is always "whether Congress has directly spoken to the precise question at issue." Id. (quoting Bais Yaakov, 12 F.4th at 86 (quoting Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842 (1984)). To determine this question, courts "apply the 'ordinary tools of statutory construction.'" Id. (quoting Flock v. U.S. Dep't of Transp., 840 F.3d 49, 55 (1st Cir. 2016) (quoting City of Arlington v. FCC, 569 U.S. 290, 296 (2013)). Here, "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." Id. (quoting Nat'l Ass'n of Home Builders, 551 U.S. at 666 (quoting FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132-33 (2000)). If the intent of Congress is clear, that is the end of the matter ...." Id. (quoting Bais Yaakov, 12 F.4th at 86 (quoting Chevron, 467 U.S. at 842)).

"[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. (quoting Bais Yaakov, 12 F.4th at 86 (quoting Chevron, 467 U.S. at 843)). In that event, the court "typically interpret[s] [the ambiguity] as granting the agency leeway to enact rules that are reasonable in light of the text, nature, and purpose of the statute." Id. (quoting Cuozzo Speed

Techs., LLC v. Lee, 579 U.S. 261, 277 (2016)); see Silva v. Garland, 27 F.4th 95, 111-12 (1st

Cir. 2022) (discussing Chevron, 467 U.S. 837 (1984)); see also City of Taunton, 895 F.3d at 126-

27(holding that where "interpreting and implementing [a statute] falls squarely within the

[agency]'s bailiwick…we defer to its reasonable interpretation of that statute." (quotations

omitted)). A reviewing court should "increase [its] level of deference" where the agency is acting

"'within its area of special expertise…as opposed to [making] simple findings of fact[.]'" City of

Taunton, 895 F.3d at 126-127 (quotations omitted).[12]

Plaintiff challenges NMFS's interpretations of six terms of the statute, marked here in

bold:

> (i)      Upon request therefor by citizens of the United States who engage in a
> **specified activity** (other than commercial fishing) within **a specific geographic**
> region, the Secretary shall authorize, for periods of not more than 1 year, subject
> to such conditions as the Secretary may specify, the **incidental**, but not
> intentional, taking by harassment of **small numbers** of marine mammals of a
> species or population stock by such citizens while engaging in that activity within
> that region if the Secretary finds that such harassment during each period
> concerned—
>
> > (I) will have a **negligible impact** on such species or stock, and
> >
> > (II) will not have an unmitigable adverse impact on the availability of such

---

[12] Plaintiff contends that the "Chevron's deference regime is unlawful," Pl. Opp. 14 [Doc. No.
163], but this court has no authority to reject Chevron. Plaintiff also contends that the Vineyard
Wind Project and similar wind energy developments implicate the major-questions doctrine
because they reflect a major shift in environmental policy. Id. at 19 (quoting West Virginia v.
EPA, 142 S. Ct. 2587, 2607-14 (2022)) ("[t]he major-questions doctrine applies if an agency
claims the power to make decisions of 'vast economic and political significance.'"). In response,
NMFS points out that the Second Amended Complaint [Doc. No. 143] does not plead a claim
concerning any such challenge to wind energy development or policy more broadly. Fed. Defs.
Reply 9 [Doc. No. 167]. Melone offers no response in his Surreply [Doc. No. 173]. Where
Plaintiff's claims pertain exclusively to the IHA issued to Vineyard Wind for the specific
purpose of pile-driving in connection with the Vineyard Wind Project and Plaintiff's argument
regarding major-questions doctrine rests on claims not plead in the operative complaint, that
argument is waived.

species or stock for taking for [certain] subsistence uses . . . .

(ii)     The authorization for such activity shall prescribe, where applicable—

(I) permissible methods of taking by harassment pursuant to such activity, and other means of effecting the **least practicable impact** on such species or stock and its habitat, paying particular attention to rookeries, mating grounds, and areas of similar significance, and on the availability of such species or stock for taking for [certain] subsistence uses . . . .

16 U.S.C. § 1371(D)(a)(5) (emphasis added). In addition to these six terms, Plaintiff also objects

to NMFS's reliance on "old data." Pl. Opp. 25-26 [Doc. No. 163].

*1.  Request by Citizens who Engage in a "Specified Activity"*

Plaintiff contends that NMFS impermissibly segmented the "specified activity" engaged

in by Vineyard Wind by excluding other activities contemplated under the Vineyard Wind COP,

and that NMFS thereby "entirely fail[ed] to consider an important aspect of the problem" making

the action arbitrary and capricious. Pl. Opening Mem. 10 [Doc. No. 145]; Pl. Opp. 21 [Doc.

No.163].[13] Plaintiff also contends that NMFS has failed to consider all similar activities in its

definition of "specified activity," emphasizing that the "request[s] by citizens" language in

Section 1371(a)(5)(D)(i) directs NMFS to consider each offshore windfarm project in

conjunction with the other projects in that region. Plaintiff argues that these phrases imply a

collective approach to review, and that the statute's treatment of "commercial fishing" as a single

specified activity further supports this reading. Plaintiff also contends that, as a practical matter,

isolating the projects into individual IHAs permits large numbers of take at the same time (185

takes total based on 13 overlapping IHAs for various windfarm development-related activities)

and defeats the "small numbers" analysis. Pl. Opp. 22 [Doc. No. 163].

---

[13] As part of this and other related arguments, Plaintiff points to an earlier IHA allowing Vineyard Wind to conduct surveys of the area. Pl. Opp. 22-23 [Doc. No. 163].

The legislative history of the amendments to the MMPA reflect that:

> both the specified activity and specified region of referred to in Section 101(a)(5) be narrowly identified so that the anticipated effects will be substantially similar. Thus, for example, it would not be appropriate for the Secretary to specify an activity as broad and diverse as outer continental shelf oil and gas development. Rather, the particular elements of that activity should be separately specified as, for example, seismic exploration or core drilling.

H.R. Rep. No. 97-228 at 19 (Sept. 16, 1981), reprinted in 1981 U.S.C.C.A.N. at 1458, 1469.

Consistent with the language of Section 1371(a)(D)(5) and this House Report, NMFS has defined specified activity as "any activity, other than commercial fishing, that takes place in a specified geographical region and potentially involves the taking of small numbers of marine mammals." 50 C.F.R. § 216.103. The process for obtaining an IHA requires the applicant to submit a written request including "[a] detailed description of the specified activity or class of activities that can be expected to result in incidental taking of marine mammals[.]" 50 C.F.R. § 216.104(a)(1). Once that application was submitted, NMFS is required to consider that specific activity.

Here, Vineyard Wind sought an IHA for its pile-driving activities because it anticipated incidental taking –in the form of harassment– to occur to right whales from that specific activity. Plaintiff has not pointed to any evidence, in the Record or otherwise, to support the contention that the Vineyard Wind IHA impermissibly excludes other Vineyard Wind activities occurring during this same time period that should have been included. To the extent there may be take associated with future aspects of the Project, the IHA at issue here would not apply and Vineyard Wind would need to again seek authorization under the MMPA. Fed. Defs. Opening Mem. 16 [Doc. No. 153]. Moreover, NMFS contends (and Plaintiff has not demonstrated otherwise) that NMFS did consider the impact of other activities and take was not expected in connection with those activities. See id. 16 n.13.

Plaintiff's attempt to read the statutory scheme to require something different is not persuasive. The statutory exclusion from this scheme for "commercial fishing" is not an example of a single "specified activity" but a carve-out for a large category of activities, "commercial fishing operations," that are regulated under an entirely different statutory provision, 16 U.S.C. § 1387, entitled "Taking of marine mammals incidental to commercial fishing operations." Moreover, the legislative history concerning the scope of "specified activity" reflects that Congress intended that "particular elements" of a given activity should be properly identified. Here, Vineyard Wind segmented the activities for which it has sought IHAs– surveying and pile-driving–as suggested in the House Report. Additionally, as discussed infra, Plaintiff has not shown NMFS was obligated to consider other IHAs to a greater degree than it had already in its consideration of the Vineyard Wind IHA, or that it was unreasonable in not doing so.

Accordingly, Plaintiff has not established NMFS's approval of the "specified activity" of pile-driving alone was unreasonable, and thus has not shown that the approval of the Vineyard Wind IHA in reliance on that interpretation, is arbitrary, capricious, or otherwise unlawful.

## 2. Within a "Specific Geographic Region"

Plaintiff challenges the "specific geographic region" designated for the specified activity within the IHA as overly narrow. The Notice of Issuance of IHA describes the Wind Development Area ("WDA") where up to 100 wind turbine generators ("WTGs") and one or more electrical service platforms ("ESPs") will be constructed as "the northeastern portion of the 675 square kilometer Lease Area," located 14 miles from the southeast corner of Martha's Vineyard and a similar distance from Nantucket," as set forth on the figure reprinted below:



**Figure 1. Location of the Vineyard Wind WDA within the northern portion of Lease Area OCS-A 0501**

See Notice of Issuance of IHA, NMFS 3515, at 3516. Plaintiff contends that NMFS's determination of "the specific geographic region" was not based on an analysis of the biogeographic characteristics of the surrounding area, as required by NMFS's own regulations, and therefore was arbitrary and capricious. Plaintiff contends that the narrowest possible reading of the "specified geographic region" should include the entire area south of Martha's Vineyard and that the court should find that NMFS failed to take the requisite "hard look" at defining the region based on its own regulations. Pl. Opening Mem. 11 [Doc. No. 145]; Pl. Opp. 23-25 [Doc. No. 163]. In support of his position, Plaintiff points to extra-record evidence. Pl. Opening Mem.

2-3, 11 [Doc. No. 145] (Melone Decl. Ex. A [Doc. No. 145-2]); Pl. Opp. 23-25 [Doc. No. 163]

(citing Melone Decl. Ex. A [Doc. No. 145-2], Melone Reply Decl. Ex. 1 [Doc. No. 164-1].

NMFS contends that "specific geographic region" is not defined by Congress, and that NMFS's

approach here is consistent with (i) NMFS's past practice and (ii) the legislative history of the

MMPA amendment. Fed. Defs. Opening Mem. 18-19 [Doc. No. 153]. NMFS contends further

that its analysis reflects that the area defined in the IHA is where the pile-driving will occur and

that NMFS reasonably anticipates that the effects to right whales in that area will be substantially

similar due to their proximity to the specified activity. Id. at 18-19. Vineyard Wind adds that the

interpretation is consistent with NMFS's regulatory definition of "specific geographic region"

and that Plaintiff is incorrect that the "hard look" doctrine is applicable here. Vineyard Wind

Opening Mem. 9 n.5 [Doc. No. 157].[14]

      NMFS has defined "specific geographical region" within Section 1371(a)(5)(D)(i) as "an

area within which a specified activity is conducted and that has certain biographical

characteristics." 50 C.F.R. § 216.103. The legislative history of the MMPA amendment directs

that:

> [T]he specified geographic region should not be larger than is necessary to
> accomplish the specified activity, and should be drawn in such a way that the
> effects on marine mammals in the region are substantially the same. Thus, for
> example, it would be inappropriate to identify the entire Pacific Coast of the
> North American continent as a specified geographical region, but it may be
> appropriate to identify particular segments of that coast having similar
> characteristics, both biological and otherwise, as specified geographical
> regions.

---

[14] Vineyard Wind is correct that Plaintiff improperly imports the "hard look" doctrine from
NEPA review into the MMPA without support. See Balt. Gas and Elec. Co. v. Nat. Res. Def.
Council, Inc., 462 U.S. 87, 100-101 (1983) (discussing the "hard look" doctrine as a feature of
NEPA review); see also Dubois v. U.S. Dep't of Agric., 102 F.3d 1273, 1284 (1st Cir. 1996).

H.R. Rep. No. 97-228 at 19 (Sept. 16, 1981), reprinted in 1981 U.S.C.C.A.N. at 1469-1470.

As with his challenge to "specified activity," Plaintiff does not point to any Record evidence or case law that calls into question NMFS's determination as to the "specific geographic region" here as being arbitrary, capricious, or otherwise unlawful. The Record demonstrates that the specific geographic region is consistent with NMFS's regulatory definition, and the fact that both right whales and wind energy projects may also be located in a broader area does not mean that NMFS was unreasonable in approving a more narrowly defined region for the Vineyard Wind IHA.

Even if the court had not rejected Plaintiff's efforts supplement the Record, the extra-record evidence that Plaintiff offers does not support Plaintiff's contention that "specific geographic region" has been defined in a manner inconsistent with NMFS's policy and regulations. Moreover, to the extent a broader area should be considered based on evolving trends concerning right whales, NMFS remains under a continuing obligation to modify, suspend, or revoke the IHA if the requirements for its issuance are no longer satisfied. 16 U.S.C. § 1371(a)(5)(D)(iv). The court cannot make such a determination on NMFS's behalf absent any indication from Plaintiff that NMFS has acted arbitrarily, capriciously, or otherwise unlawfully.

Accordingly, Plaintiff has not established NMFS's approval of the "specific geographic region" is impermissibly narrow, and or that the approval of the Vineyard Wind IHA in reliance on that interpretation is arbitrary, capricious, or otherwise unlawful.

### 3.  "Incidental" Taking

Plaintiff contends that the pile-driving procedures authorized under the IHA, particularly the soft-start procedures, are not incidental taking because they are intentional. Pl. Opening Mem. 14-16 [Doc. No. 145]. Plaintiff points, in particular, to soft-start procedures, whose goal is

to drive right whales out of the area.[15] NMFS and Vineyard Wind both assert that this argument

relies on an incorrect reading of NMFS's regulatory definition of 50 C.F.R. § 216.103 that

assumes any take that is not "accidental" is "intentional," and that Plaintiff's argument misses

the suite of mitigation measures designed to minimize exposure or harm. Fed. Defs. Opening

Mem. 23-28 [Doc. No. 153]; Vineyard Wind Opening Mem. 12 [Doc. No. 157].

   Plaintiff's argument ignores NMFS's regulation, which defines "[i]ncidental harassment,

incidental taking and incidental, but not intentional, taking" to "all mean an accidental taking"

but then continues: "[t]his does not mean that the taking is unexpected, but rather it includes

those takings that are infrequent, unavoidable or accidental." 50 C.F.R. § 216.103.[16] This

definition is consistent with the legislative history of the amendments to the MMPA which direct

that "[t]he words 'not intentional' should not be read to mean that persons who know there is

some possibility of taking marine mammals incidental to commercial fishing operations or other

specified activities are precluded from proceeding under the authority of sections 101(a)(4) or

(5)." H.R. Rep. No. 97-228 at 19, reprinted in 1981 U.S.C.C.A.N. at 1458, 1469.

   Plaintiff relies on Pacific Ranger LLC v. Pritzker, 211 F. Supp. 3d 196 (D.D.C. 2016), for

the proposition that any take that is not "accidental" is "intentional." That reliance is misplaced,

where Pacific Ranger addressed a different provision of the MMPA, namely "[t]aking of marine

---

[15] The court considered and rejected a similar theory in Nantucket Residents Against Turbines et al. v. U.S. BOEM, 1:21-cv-11390-IT, Memorandum & Order [130].

[16] To "take" is "to harass, hunt, capture, collect, or kill, or attempt to harass, hunt, capture, collect, or kill any marine mammal. This includes, without limitation, any of the following: The collection of dead animals, or parts thereof; the restraint or detention of a marine mammal, no matter how temporary; tagging a marine mammal; the negligent or intentional operation of an aircraft or vessel, or the doing of any other negligent or intentional act which results in disturbing or molesting a marine mammal; and feeding or attempting to feed a marine mammal in the wild." 50 C.F.R. § 216.3.

mammals incidental to commercial fishing operations," 16 U.S.C. § 1387, and a different

regulation, 50 C.F.R. § 229.2, which defines an "incidental" action for purposes of commercial

fishing activity more narrowly as "an act, a non-intentional or accidental act that results from,

but is not the purpose of, carrying out an otherwise lawful action." 211 F. Supp. 3d at 203-04.

Moreover, the commercial fishermen in <u>Pacific Ranger</u> "knew that whales were in the area when

they set the purse seine net and did so anyway," 211 F. Supp. at 213, while the Notice of

Issuance of IHA reflects that activities are planned specifically to occur when right whales are

least likely to be in the area and include procedures to halt harassing activities when whales are

detected. Notice of Issuance of IHA, NMFS 3515 at 3542-49 (discussing mitigation measures).

Therefore, take here is expected not only to be "infrequent" but also "accidental" because

procedures are specifically designed to halt pile-driving where whales are known to be in the

area.

Accordingly, Plaintiff's argument that NMFS authorized intentional, not incidental, take

and thus acted arbitrarily, capriciously, or otherwise unlawfully in authorizing the Vineyard

Wind IHA fails.

        *4.   "Small Numbers"*

The Notice of Issuance of the IHA authorized 20 takes of right whales by Level B

harassment. NMFS 3515 at 3551. NMFS calculated this number to be 5.4% of the right whale

population and concluded that this number was a "small number" as required under the MMPA

to authorize incidental taking by harassment. Id. at 3541. NMFS explained that it considers one-

third of a species' population the upper limit of "small numbers." Fed. Defs. Opening Mem. 11-

12 [Doc. No. 153] (discussing 83 Fed. Reg. 63,268, 63,375 (Dec. 7, 2018); 86 Fed. Reg. 5,322,

5,439 (Jan. 19, 2021) ("when the estimated number of individual animals taken…is up to, but not

greater than, one-third of the most appropriate species or stock abundance, NMFS will determine

that the number of marine mammals taken of a species or stock are small."). Plaintiff challenges the one-third policy and its potential application to the Vineyard Wind IHA as (i) inconsistent with the ordinary meaning of "small numbers" and (ii) inconsistent with the obligation that principles of statutory interpretation instruct that the phrase should be interpreted consistently across the MMPA. Plaintiff also objects to NMFS's determination that 5.4% of the right whale population is a "small number" without considering its potential biological removal rate ("PBR"). Pl. Opening Mem. 9-10 [Doc. No. 145].

Congress did not define the term "small numbers." The House Report accompanying the proposed amendments to the MMPA noted that the House Committee "recognize[d] the imprecision of the term 'small numbers'[] but was unable to offer a more precise formulation because the concept is not capable of being expressed in absolute numerical limits." H.R. Rep. No. 97-228 at 19 (Sept. 16, 1981), reprinted in 1981 U.S.C.C.A.N. at 1469. The statutory scheme does dictate, however, that the "small numbers" requirement is distinct from the "negligible impact" requirement, as persuasively explained in Center for Biological Diversity v. Salazar, 695 F.3d 893 (9th Cir. 2012). There, the Ninth Circuit considered the U.S. Fish and Wildlife Service's issuance of taking regulations in connection with oil and gas activities on the coast of Alaska and interpreted "small numbers" under another subsection of Section 1371(a)(5), 16 U.S.C. § 1371(a)(5)(A), which contains language very similar to § 1371(a)(5)(D). The court concluded that "'[t]he plain language [of the statute] indicates that "small numbers" is a separate requirement from "negligible impact." To treat them as identical would appear to render the reference to "small numbers" mere surplusage.'" Salazar, 695 F. 3d at 903 (quoting Nat. Res. Def. Council, Inc. v. Evans, 279 F. Supp. 2d at 1150).

The court held further that Congress had not spoken directly to the question of whether "small numbers" can be analyzed in relative or proportional terms, but that where the requirements for "small numbers" and "negligible impart" are separate, "the agency's interpretation" of the "small numbers" language within the MMPA as a proportional assessment of "the portion of a species or stock subject to incidental take" was entitled to <u>Chevron</u> deference. <u>Id.</u> at 906-908. Moreover, the agency "can analyze 'small numbers' in relation to the size of the larger population, so long as the 'negligible impact' finding remains a distinct separate standard." <u>Id.</u> at 907.

Plaintiff contends that "small numbers" should have its ordinary meaning, <u>Pl. Opening Mem.</u> 9 [Doc. No. 145] ("a number is small if it is 'few in number,' 'little'"…"or 'little or close to zero in an objectively measurable aspect (such as quantity)'"), and that 5.4% is not an objectively small amount, as evidenced by numerous examples, <u>See id.</u> ("If 370,000 (5.4% of) Massachusetts residents lost power after a storm, no reasonable person would say a 'small number' of residents were affected."). But Plaintiff's reliance on dictionary definitions, and his interpretation of what 5.4% amounts to in the context of electricity customers or right whales does not render NMFS's interpretation unreasonable. Plaintiff additionally contends that "small numbers" should be interpreted consistently across the MMPA, but nowhere does Plaintiff point to an inconsistent approach. Finally, Plaintiff asserts that his grievance is with NMFS's policy of setting an upper limit of one-third for the definition of "small numbers" and NMFS "simply looked to see if the 'take' in numerical terms was less than one-third of the estimated remaining population." Pl. Opp. 14-15 [Doc. No. 163]. But the Administrative Record, particularly the Notice of Issuance of the IHA excerpted above, does not indicate that NMFS applied any policy concerning an upper limit on the definition of "small numbers" in connection with issuing the

Vineyard Wind IHA, let alone that NMFS reflexively applied a one-third policy to the potential

take by harassment of right whales.

Additionally, case law does not cut in Plaintiff's favor. Plaintiff cites National Resources

Defense Council, Inc. v. Evans, 279 F.Supp.2d 1129 (N.D. Cal. 2003), for its statement that 12%

take would not be reasonable. Pl. Opening Mem. 9 [Doc. No. 145]. As the Ninth Circuit

observed in Salazar, Evans considered a 1983 regulation which defined "small numbers" in

connection with its evaluation of "negligible impact." See Salazar, 695 F.3d at 902-903. As a

result, the focus of Evans was not on whether 12% of the total population was a reasonable

definition of "small numbers," but rather, whether the agency has properly considered what

constituted "small numbers" separately from its "negligible impact" analysis. Here, NMFS

assessed "small numbers" and "negligible impact" independently. See Notice of Issuance of

IHA, NMFS 3515 at 3549, 3555 (reflecting separate headings and discussions for "Negligible

Impact Analysis and Determination" and "Small Numbers").

Plaintiff's attempt to challenge NMFS "small number" determination based on the PBR

for right whales is similarly unpersuasive. PBR is defined by the MMPA as "the maximum

number of animals, not including natural mortalities, that may be removed from a marine

mammal stock while allowing that stock to reach or maintain its optimum sustainable

population." 16 U.S.C. § 1362(20).[17] Plaintiff argues that the PBR for right whales is only 0.7

which in Plaintiff's view means that no take is permissible. Pl. Opening Mem. 10 [Doc. No.

145], Pl. Opp. 13-21 [Doc. No. 163]. Section 1371(a)(5)(D) does not explicitly contemplate the

---

[17] The PBR level "is the product of the following factors: (A) the minimum population estimate of the stock[;] (B) One-half the maximum theoretically or estimated net productivity rate of the stock at a small population size [; and] (C) A recovery factor between 0.1 and 1.0." Id.

consideration of PBR as part of the IHA review process. See Ga. Aquarium, Inc. v. Pritzker, 135 F. Supp. 3d 1280, 1303-1304 (N.D. Ga. 2015) ("PBR is a formula incorporated into Sections 1386 and 1387 of the MMPA governing domestic stock assessment reports and marine mammal take reduction plans for U.S. fisheries. It is not included or referenced in § 1374 of the MMPA governing permits. Neither the statutory nor regulatory provisions of the MMPA require the Agency to calculate PBR for a given marine mammal stock that is the subject of an import permit."); but see Conserv. Council for Haw. v. Nat'l Marine Fisheries Serv., 97 F. Supp. 3d 1210, 1228 (D. Haw. 2015) (holding that, in connection with its negligible impact analysis under the MMPA, "NMFS cannot reasonably authorize mortalities without any mention of PBR."). But more importantly, PBR is concerned with the "removal" of animals and the IHA at issue does not permit any "removal" or other Level A harassment take of right whales.

Accordingly, Plaintiff has not established NMFS's interpretation of "small numbers," is unreasonable or that the Vineyard Wind IHA, in reliance on that interpretation, is arbitrary, capricious, or otherwise not in accordance with law.

### 5. "Negligible Impact"

Plaintiff contends that NMFS's "negligible impact" determination under Section 1371(D) is "irrational" because it does not consider the "overlapping, additive" impacts of all the current and future activities under the Vineyard Wind COP, and current and future activities of other wind farm developments, on right whales. Pl. Opening Mem. 12-14 [Doc. No. 145]; Pl. Opp. 27-29 [Doc. No. 163]. In support, Plaintiff points to three decisions reflecting that (1) courts recognize the need to consider "real world environmental stressors" in the negligible impact analysis, and (2) that the negligible impact standard cannot be applied in a way that would risk authorizing wiping out an endangered or threatened species. Pl. Opening Mem. 13-14 [Doc. No. 145] (citing Concerned Friends of the Winema v. U.S. Forest Serv., 2016 WL 10637010 (D. Or.

Sept. 12, 2016); U.S. Air Tour Ass'n v. Fed. Aviation Admin., 298 F.3d 997 (D.C. Cir. 2002);

Conserv. Council for Haw., 97 F. Supp. 3d at 1221. NMFS contends that the impacts of ongoing

and past activities were factored into the "negligible impact" analysis as part of the

environmental baseline and that NMFS is not required to consider the impacts of future

activities. Fed. Defs. Opening Mem. 17-18 [Doc. No. 153]; see also Notice of Issuance of IHA,

NMFS 3515 at 3549-51.

The MMPA provides that the Secretary of the Interior may authorize incidental taking by

harassment of marine mammals where the Secretary finds, inter alia, that the harassment "will

have a negligible impact on such species or stock[.]" 16 U.S.C. § 1371(a)(5)(D)(i). NMFS has

defined "negligible impact" as "an impact resulting from the specified activity that cannot be

reasonably expected to, and is not reasonably likely to, adversely affect the species or stock

through effects on annual rates of recruitment or survival." 50 C.F.R. § 216.103; see also Notice

of Issuance of IHA, NMFS 3515 at 3549. The standard is "focused on population-level effects–

i.e. on 'annual rates of recruitment and survival.'" Nat. Res. Def. Council, Inc. v. Pritzker, 828

F.3d 1125, 1134 (9th Cir. 2016) (holding that, in the context of a challenge to rule making

related to the use of naval sonar under 16 U.S.C. § 1371(a)(5)(A)(i), whether NMFS improperly

consolidated its "negligible impact" and "least practicable adverse impact" findings.). A

"negligible impact" finding under the MMPA is arbitrary and capricious "only if the

agency…entirely failed to consider an important aspect of the problem." Ctr. for Bio. Diversity

v. Kempthorne, 588 F.3d 701, 710 (9th Cir. 2009) (upholding the Fish and Wildlife Service's

"negligible impact" determination in connection with on and offshore oil and gas activities that

were likely to harass polar bears, under 16 U.S.C. § 1371(a)(5)(A) and 50 C.F.R.§ 18.27(c)

(which is identical to 50 C.F.R. § 216.103(c)'s definition of "negligible impact" and "small

numbers"), where the Service "made scientific predictions within the scope of its expertise" relating to the impact of climate change on the polar bears). A "negligible impact" finding "requires the analysis of those effects that are 'reasonably expected' and 'reasonably likely' but not those effects that are speculative or uncertain." Id. at 710-11.

Plaintiff's argument that NMFS's negligible impact finding is irrational fails for two reasons. First, Plaintiff has offered no evidence, in the Record or otherwise, that reflects that NMFS failed to consider the impact of other ongoing activities entirely.[18] The Notice of Issuance of the IHA reflects to the contrary, in response to a submitted comment:

> NMFS agrees that consideration of repeated disturbance from the same activity…over time and space should be incorporated into a negligible impact determination and we have done so as [to] the impact of the specified activity [pile-driving] on marine mammals must be considered in accordance with 101(a)(5)(D) of the MMPA. However, neither the MMPA nor NMFS' codified implementing regulations require NMFS to consider impacts from other unrelated activities (such as the construction and operation of additional wind farms) and their impacts on populations. The preamble for NMFS' implementing regulations (54 FR 40338; September 29, 1989) states in response to comments that the impacts from other past and ongoing anthropogenic activities are to be incorporated into the negligible impact analysis via their impacts on the baseline. Consistent with that direction, **NMFS has factored into its negligible impact analysis the impacts of other past and ongoing anthropogenic activities via their impacts on the baseline, e.g., as reflected in the density/ distribution and status of the species, population size and growth rate, and current stressors.** In addition, we consider these factors as relevant contextual elements of the analysis.

Notice of Issuance of IHA, NMFS 3515 at 3526 (emphasis added).

---

[18] Plaintiff points to the 2021 Biological Opinion prepared by NMFS as well as the Hayes Memorandum, Exhibit 1 to Melone Reply Decl. [Doc. No. 164-1], as reflecting that driving right whales out of their "only winter foraging grounds" may result in extinction. Pl. Opp. 27 [Doc. No. 163]. This argument not only relies on extra-record evidence (i.e. the Hayes Memorandum) that the court declines to consider but is also flawed because neither the 2021 BiOp nor the Hayes Memorandum support the idea that pile-driving, which will occur in the spring, summer, and fall when right whales are less prevalent in the area, would adversely affect winter foraging.

Second, Plaintiff is incorrect that the MMPA requires NMFS to consider more than what is reflected in the IHA, and the cases on which Plaintiff relies do not instruct otherwise. As NMFS asserts, both Concerned Friends of the Winema, 2016 WL 10637010, and U.S. Air Tour Association, 298 F.3d 997, are not applicable here. See Fed. Defs. Opening Mem. 22-23 [Doc. No. 153]. In both cases, the courts evaluated whether the agencies had appropriately considered other **ongoing** activities in connection with statutes dissimilar to the MMPA. See Concerned Friends of the Winema, 2016 WL 10637010 at *9 (holding that, under the Forest Service's viability directive, it was obligated to accurately measure current grazing activities, authorized or otherwise); U.S. Air Tour Ass'n, 298 F.3d at 1019 (holding that the agency's determination under the Overflights Act of noise levels at the Grand Canyon was arbitrary and capricious where it failed to consider all types of aircraft flying overhead). Here, Plaintiff does not point to any proposed activities that NMFS has not, but must, consider under the MMPA or NMFS's regulation.

Finally, Plaintiff points to Conservation Council for Hawaii v. National Marine Fisheries Serv., 97 F. Supp. 3d at 1221, for the proposition that an agency cannot apply "negligible impact" in a way that may "authoriz[e] the wiping out of endangered and threatened species." Pl. Opening Mem. 14 [Doc. No. 145]. In that case, however, the agency failed to evaluate the impact of the authorized take on the species and instead evaluated the impact of the anticipated take. Conserv. Council for Haw., 97 F. Supp. at 1221. The court held that agency reasoning that involves a disconnect between the "anticipated" and "authorized" take could allow an agency to authorize wiping out an endangered and threatened species. Id. Plaintiff does not allege that there is a disconnect between the anticipated and requested take figures, nor does he contend that lethal take is authorized.

Accordingly, Plaintiff has not established that NMFS "negligible impact" finding "failed entirely to consider an important aspect of the problem," and thus has not established that NMFS's approval of the Vineyard Wind IHA in reliance on its "negligible impact" finding was arbitrary, capricious, or otherwise unlawful.

### 6.  "Least Practicable Impact"

Plaintiff asserts that (a) vessel speed restrictions and (b) the use of protected species observers do not satisfy NMFS's obligation under Section 1371(a)(5)(D) to prescribe means of "effecting the least practicable impact" on right whales. Pl. Opening Mem. 19-20 [Doc. No. 145]. The court considers the two challenges in turn.

#### a.  Speed Restrictions

Plaintiff relies on recently Proposed NMFS Speed Rules as evidence that NMFS concedes the importance of an across-the-board speed restriction and asserts that, in failing to obligate all Vineyard Wind vessels to travel 10 knots or less, NMFS did not effectuate means of least practicable impact. Pl. Opening Mem. 19-20 [Doc. No. 145]. NMFS contends that the suite of mitigation measures outlined in the IHA and elsewhere in the Administrative Record reflect that NMFS has complied with its obligation under the MMPA to proscribe means of effecting the least practicable impact on right whales.

As discussed supra, the Proposed NMFS Speed Rules are extra-record evidence not before NMFS at the time the IHA was authorized and which the court declines to consider. But even if the Proposed NMFS Speed Rules were part of the Record, several other factors cut against Plaintiff's argument. First, the Proposed NMFS Speed Rules are merely proposed. Second, and more importantly, the Notice of Issuance of IHA reflects that NMFS did consider speed limits, along with a suite of other mitigation measures, in connection with effectuating methods of least practicable impact, and ultimately relied on numerous measures. Notice of

Issuance of IHA, NMFS 3515. Where NMFS has provided numerous protections, including some speed restrictions, and Plaintiff offers no authority or evidence to undermine NMFS's determination that those measures would ensure the action authorized by the IHA would have the "least practicable impact," Plaintiff's argument that NMFS violated the MMPA or otherwise acted arbitrarily, capriciously, or unlawfully in connection with speed restrictions for the Project fails.

b.   Protected Species Observers

Plaintiff also challenges the use of PSOs as not in accordance with NMFS's obligation to effectuate means of "least practicable impact" on right whales under the MMPA. Pl. Opening Mem. 20 [Doc. No. 145]; see also Pl. Statement of Undisputed Facts ¶¶ 50-55 [Doc. No. 145-1]. Plaintiff contends that reliance on PSOs is "flawed," and that PSOs' visibility will often be limited, pointing to his own experiences using binoculars. Pl. Opening Mem. 20 [Doc. No. 145]; see also Melone Decl. ¶ 10 [Doc. No. 145-2].

In response, NMFS contends that NMFS considered comments, specifically from the Plaintiffs in Nantucket Residents Against Turbines et al. v. U.S. BOEM et al., 1:21-cv-11390-IT, who also challenged the use of PSOs, regarding the adequacy of the PSO mitigation measures and that, in the comment process, no additional measures were recommended, nor did any commenters explain why the measures were ineffective. Fed. Defs. Opening Mem. 19, 28 [Doc. No. 153]. As such, NMFS contends that no party or commenter has offered any evidence that NMFS failed to consider with respect to the utility of PSOs. NMFS also reiterates that the PSOs are part of a suite of mitigation measures.

Plaintiff's challenge to the use of PSOs is not persuasive. Plaintiff's contention that the PSOs are flawed as a mitigation measure is supported only by his own experience using

binoculars to view right whales, but Plaintiff's personal experience with binoculars in a recreational setting is insufficient to cast doubt on the reasonableness of this required mitigation measures. More crucially, Plaintiff's argument concerning the use of PSOs disregards that, as stated in the Notice of Issuance of IHA, NMFS is requiring a suite of mitigation measures, of which PSOs are only one aspect. Notice of Issuance of IHA, NMFS 3515 at 3542-47 (detailing the handful of mitigation measures NMFS considered and adopted to effectuate "least practicable impact" on right whales consistent with its obligations under the MMPA). Even if the use of PSOs were flawed, in the absence of an argument that the remaining offered mitigation measures are unreasonable, Melone's challenge does not undermine NMFS's decision to approve the Vineyard Wind IHA. Having failed to point to any case law, Record evidence, or testimony undermining the agency's reliance on PSOs–in conjunction with other measures which Plaintiff does not challenge–Plaintiff's argument that issuance of Vineyard Wind IHA is arbitrary and capricious because of its reliance on PSOs in effecting methods of "least practicable impact" fails.

### 7.   IHA's Reliance on "Old Data"

Plaintiff contends that, in relying on right whale population data from 2019 when issuing the IHA, NMFS acted arbitrarily and capriciously. Plaintiff points to three studies, Quintana-Rizzo (2021), the 2021 Report Card, and O'Brien 2022, reflecting changes in population data and patterns, that Plaintiff argues reflect information NMFS was aware of at the time it issued the IHA but "ignored." Pl. Opp. 25-26 [Doc. No. 163]. In response, NMFS contends first that it relied on the best available data available and, as to the right whale population specifically, it updated right whale population density data at the time of issuance, and second, that Plaintiff points to no superior evidence that NMFS failed to consider at the time of issuance. Fed. Defs.

Opening Mem. 19-20 [Doc. No. 153].[19]

Plaintiff's argument regarding "old data" relies entirely on information that emerged after the IHA was issued. Plaintiff has not, and cannot, demonstrate that NMFS was unreasonable in failing to consider reports and studies that did not exist at the time the IHA. To the extent Plaintiff complains that NMFS also failed to consider current population data at the time of issuance, that argument is contradicted by the Record. As such, Plaintiff's argument that NMFS relied on "old data" and that such reliance was arbitrary and capricious fails.

## VI.    Conclusion

For the foregoing reasons, Plaintiff has not shown that NMFS acted arbitrarily, capriciously, or otherwise unlawfully. Accordingly, NMFS and Vineyard Wind's Motions for Summary Judgment are GRANTED and Plaintiff's Motion for Summary Judgment is DENIED.

IT IS SO ORDERED.

August 4, 2023                                    /s/Indira Talwani
                                                 United States District Judge

---

[19] NMFS notes further that the 2021 Report Card is not peer-reviewed, while the study on which NMFS relied in connection with its review of the Vineyard Wind IHA application is peer-reviewed. Fed. Defs. Reply 14 n.9 [Doc. No. 167]. Again, NMFS's determination as to what factors to consider when determining whether data is best available is entitled to deference.